UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JASON FARINA on behalf of himself and all others similarly situated,<br><br>                Plaintiff,<br><br>   vs.<br><br>METROPOLITAN TRANSPORTATION AUTHORITY, TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, doing business as MTA BRIDGES AND TUNNELS, TRANSWORLD SYSTEMS, INC., and CONDUENT, INC.,<br><br>                Defendants. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**CASE NO.:** |

Plaintiff Jason Farina, on behalf of himself and all others similarly situated, alleges the following based on personal knowledge as to the allegations about himself and, as to all other matters, based on the investigation of Plaintiff's counsel, including their review of EZ Pass and Tolls-By-Mail billing statements, correspondence, news releases and articles, public statements, and public complaints concerning the facts and issues alleged in this Complaint.

## INTRODUCTION

1.    Plaintiff brings this action on behalf of himself and a Class of all similarly situated individuals and entities who have been charged $100 fees as a result of using New York's cashless toll systems (called "EZ Pass" and "Tolls-By-Mail").

2.    In 2017 all MTA bridges and tunnels switched to cashless toll collecting, meaning that tolls are collected from drivers using automated systems. Tollbooths have been dismantled and drivers are no longer able to pay cash at the crossings. Instead, cameras mounted onto new overhead frames collect the tolls either using EZ Pass or Tolls-By-Mail.

3.    However, Defendants - - who operate those systems and collect tolls from drivers - - have used the cashless toll system to line their own pockets at the expense of drivers, primarily by collecting improper fees and penalties in addition to collecting the tolls.  Often the

1

fees and penalties are multiples of the actual toll for the bridge, meaning that many drivers are being repeatedly charged more than $100 to cross a bridge or tunnel.

4.      Compounding the problem, Defendants frequently impose these exorbitant charges without giving prior notice to the drivers and Defendants often wait weeks before notifying the drivers about the charges, which leads to more and more charges.

5.      Defendants also aggressively pursue collection efforts against motorists, threatening them with adverse credit reports, suspension of their driver's license, revocation of their vehicle registration, and seizure of their tax refunds if they do not immediately pay the fees.

6.      Each Defendant has a strong financial incentive to pursue these improper fees and to collect as much as possible from drivers because of secret agreements between the Defendants to split among themselves the amounts they collect. Each Defendant gets a percentage of the money collected from the driver.

7.      Defendants' scheme has resulted in tens of millions of dollars in improper charges on motorists and frequently results in individual drivers being charged hundreds or thousands of dollars in improper fees.

8.      One of those drivers is the Plaintiff in this action, Jason Farina, who from October 2017 through January 2018 has been charged more than $6,000 by Defendants as a result of using his EZ Pass on New York's bridges and tunnels. As alleged below, on numerous occasions, Defendants have charged Plaintiff Farina a $100 fee each time he used a bridge or tunnel that should have cost $8.50, meaning that each time he crossed the bridge Defendants charged him $108.50. As alleged below, Defendants have imposed these fees even before notifying Plaintiff Farina about them or giving him a reasonable chance to avoid the fees.

Despite his repeated efforts to pay the underlying bills, Defendants have continued to pursue Plaintiff Farina for the improper $100 charges, now totaling more than $6,000.

9.      Thousands of motorists have been unfairly and improperly subjected to Defendants' excessive fines and fees.

10.     In addition to imposing excessive and devastating financial penalties, Defendants' aggressive enforcement efforts have resulted in users losing their driver's licenses, having their credit ratings damaged, and being threatened with losing their tax refunds.

11.     On behalf of himself and the members of the Class, Plaintiff seeks injunctive relief, declaratory relief, actual and statutory and punitive damages, and his attorneys' fees and costs.

## JURISDICTION AND VENUE

12.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs.

13.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 due to federal questions raised by the Complaint. Further, this Court has jurisdiction under 15 U.S.C. § 1692k(d) and has jurisdiction over the state law claims by supplemental jurisdiction under 28 U.S.C. § 1367.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction here, regularly conduct business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## PARTIES

### A.    Plaintiff

15.    Plaintiff Jason Farina ("Farina") is a resident of Westchester County, New York. As alleged below, since October 2017 Plaintiff Farina has been charged more than $6,000 in tolls and fines by Defendants for using the cashless tolling systems in New York that are the subject of this action, including EZ Pass and Tolls-By-Mail.

16.    Plaintiff has been damaged by Defendants' conduct as alleged in this Complaint and continues to be damaged by that conduct.

### B.    Defendants

17.    Defendant Metropolitan Transportation Authority ("MTA") is a public benefit corporation responsible for public transportation in New York, serving 12 counties in New York. More than 800,000 vehicles use its seven toll bridges and two tunnels every weekday.

18.    The MTA is the largest public transit authority in the United States.

19.    Defendant MTA has its headquarters at 2 Broadway, New York, New York.

20.    Upon information and belief, at all relevant times, Defendant MTA acted through its officers, directors and employees, including the Triborough Bridge and Tunnel Authority and MTA Bridges and Tunnels, and directed and controlled those entities.

21.    At all relevant times Defendant MTA had effective control over the activities of its officers, directors, employees, and affiliates, including the Triborough Bridge and Tunnel Authority and MTA Bridges and Tunnels. Accordingly, the actions of the MTA's officers, directors, employees and affiliates are imputed to Defendant MTA under the doctrine of *respondeat superior*, and Defendant MTA is liable for these actions.

22.     Defendant Transworld Systems, Inc. ("Transworld") is a corporation organized and existing under the laws of California with its headquarters at 507 Prudential Road, Horsham, Pennsylvania.

23.     At all relevant times Transworld was authorized to do business, and did business, in New York and this District.

24.     At all relevant times Defendant Transworld was engaged in the business of debt collection throughout the United States, including this District.

25.     Defendant MTA used Transworld to collect debts for the MTA and for MTA Bridges and Tunnels from motorists who used EZ Pass or Toll-By-Mail in New York.

26.     Upon information and belief, Defendant Transworld received a percentage of the amounts it recovered from drivers on behalf of the other Defendants.

27.     At all relevant times, Defendant Conduent, Inc. ("Conduent") was a New York corporation with its headquarters at 100 Campus Drive, Florham Park, New Jersey.

28.     Before 2016 Defendant Conduent was a division or affiliate of Xerox Corp. However, since its spinoff from Xerox in 2016, Defendant Conduent is and has been a publicly-traded company that, among other things, provides the billing and money transfers from Defendants' EZ Pass and Tolls-By-Mail program. According to Conduent's annual report for 2016, Conduent "provide[s] revenue-generating transportation services to government clients in over 25 countries. [Its] services include support for electronic toll collection . . . [and it manages] key processes on behalf of [its] clients including fee collecting, compliance and violation management, notifications, statements and reporting."

29.     At all relevant times, Conduent mailed the bills and notices to Plaintiff and Class members for the EZ Pass and Tolls-By-Mail fees.

30.     At all relevant times, Defendant Conduent was authorized to, and did, transact business in New York and in this District.

31.     Conduent also operates tolling programs in other states, including Maryland, Texas, New Jersey, Florida, and California.

32.     Before Defendants began operating the billing and collections program in New York that is at issue in this lawsuit, drivers in many other states experienced some of the same problems that Plaintiff and the Class are experiencing, including erroneous billing practices and the enormous fines, fees and late-charges imposed by Conduent.

33.     Upon information and belief, Defendant Conduent receives a percentage of the amounts it recovers from drivers on behalf of the other Defendants.

34.     In 2015, Defendant Conduent collected more than $3 billion in revenues for the MTA's bridges and tunnels and the Port Authority.

## FACTUAL ALLEGATIONS

### EZ Pass and Tolls-By-Mail Background

35.     Years ago, before a driver would cross a bridge or enter a tunnel in New York, the driver would pay a cash toll to a toll collector at the bridge or tunnel.

36.     Over the past ten years or so, New York has eliminated the staffed collection booths and instead has moved to a cash-less system of collecting tolls using either EZ Pass or billing drivers by mail (referred to in New York as "Tolls-By-Mail").

37.     As a car passes through the cashless toll system, if the car has an EZ Pass tag (a transponder), the system's antenna (the white box) records the information about the car and processes a charge for the toll. The car owner's EZ Pass account is then charged for the toll.

38.     For vehicles that have an EZ Pass, the EZ Pass Account is linked to the customer's bank account or credit card.  When the EZ Pass account balance is low, the consumer's bank account or credit card is automatically charged to "reload" the EZ Pass account.

39.     If a vehicle is not linked to an EZ Pass account, New York recently has instituted a Tolls-By-Mail system which takes a picture as the car and its license plate as the car passes through the cashless toll system on the road, bridge or tunnel. The picture is used to identify the registered owner and then Defendants .... [pick up with "mail a bill..."] mails bill for the toll to the vehicle owner.

40.     The EZ Pass system and the Tolls-By-Mail system were supposed to eliminate long lines at toll booths, reduce pollution from idling vehicles, and allow the MTA to shift personnel from collecting tolls into roles providing heightened security and safety to motorists.

41.     As part of the EZ Pass and Tolls-By-Mail program, Defendants outsource the billing to Defendant Conduent and the collections to Defendant Transworld.

42.     Defendants have turned the EZ Pass and Tolls-By-Mail systems into a profit center that imposes unfair and improper charges on motorists who use New York's bridges and tunnels, often imposing fees and penalties that dwarf the amount of the tolls.

**Defendants Assessed Massive Fees And Penalties On Plaintiff and the Class**

43.     Until October and November 2017, Plaintiff Farina had never had any significant problem with his  EZ Pass tag or account.

44.     However, beginning on November 25, 2017 Plaintiff Farina began to receive notices from Defendants indicating that in October 2017 tolls had not been paid, and assessing charges for those tolls as well as fees of $100 for each unpaid toll.

45.     Defendants repeatedly assessed a $100 fee on Plaintiff Farina, even when the underlying toll charge was relatively small and even when he paid the underlying charge for the toll.

46.     Set forth below is a chart showing the date of each charge by Defendants to Plaintiff Farina as well as the bridge or tunnel used by Plaintiff Farina's vehicle, the applicable toll, the fee or penalty that Defendants imposed on Plaintiff Farina, and the total amount that Defendants sought from him for each toll crossing:

| Date | Facility | Toll | Fee | Amt. Due |
|------|----------|------|-----|----------|
| 12/19/2017 | Bronx Whitestone | $8.50 | $100 | $108.50 |
| 12/19/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 01/07/2018 | Verrazano Bridge | $17.00 | $100 | $117.00 |
| 01/07/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 01/06/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 01/05/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 01/05/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 01/03/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 01/03/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 01/02/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 01/02/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/31/2017 | Bronx Whitestone | $8.50 | $100 | $108.50 |
| 12/31/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/30/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/30/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/29/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/29/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/28/2017 | Bronx Whitestone | $8.50 | $100 | $108.50 |
| 12/28/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/22/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/22/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/20/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/20/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/17/2017 | Henry Hudson Bridge | $8.50 | $100 | $108.50 |
| 12/17/2017 | Henry Hudson Bridge | $8.50 | $100 | $108.50 |

| | | | | |
|---|---|---|---|---|
| 12/16/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/16/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/15/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/15/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/14/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/11/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/10/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/10/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/08/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/08/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/06/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/06/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 11/03/2017 | Bronx Whitestone | $8.50 | $100 | $108.50 |
| 10/29/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/29/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/28/2017 | Bronx Whitestone | $8.50 | $100 | $108.50 |
| 10/28/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/27/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/27/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/25/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/25/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/24/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/22/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/22/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/20/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/20/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/19/2017 | Robert Kennedy Bridge | $8.50 | $100 | $108.50 |
| 10/19/2017 | Robert Kennedy Bridge | $8.50 | $100 | $108.50 |
| 10/18/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/18/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |

47.     In early to mid-December 2017, Plaintiff Farina contacted Defendants' EZ Pass customer service in an effort to understand the multiple charges and fees.

48.     Defendants' representative advised Plaintiff Farina to pay the amount of tolls but to not pay the outstanding fees and to send a supporting letter disputing all of the $100 fees assessed by Defendants to Plaintiff Farina's account.

49.     Plaintiff Farina did that and has not received a response from Defendants or any of their representatives.

50.     As of January 24, 2018, Defendants had not deducted Plaintiff Farina's payment of the tolls from the amount that Defendants claimed he owes.

51.     Plaintiff Farina's EZ Pass account currently shows 61 purported violations with fees of $6,100 associated with his EZ Pass tag.

52.     On January 25, 2018 Plaintiff Farina received a letter from Defendant Transworld requesting payment of $1,302 for 12 of those purported violations.

53.     Once Defendant MTA submitted those charges to Defendant Transworld, Defendant MTA would not accept payment from Plaintiff Farina for the charges and Plaintiff Farina was unable to dispute the charges with Defendant MTA.

54.     Threatened with Transworld's ability to ruin his credit, Plaintiff Farina paid $530 to Transworld in order to resolve Defendants' claim for $1,302 in fees.

55.     On January 25, 2018, after paying the fees to Transworld, Plaintiff Farina again contacted EZ Pass customer service about the outstanding, improper charges and was told to pay the toll charges by check and to write a letter disputing the fees.  Plaintiff had already disputed those charges and sought to pay them by credit card but was told by Defendants that he could only either pay by check or in person.

56.     Plaintiff Farina then went to the EZ pass location in Yonkers, New York to pay all of the outstanding toll charges in person.

57.     On January 28, 2018 Plaintiff Farina received an additional collection notice from Defendant Transworld claiming that he owed $100.  Plaintiff Farina paid $33 of that $100 in order to avoid having his credit report tarnished by the improper claims.

58.     Plaintiff Farina has continued to dispute the charges by contacting  Defendants and their agents but has been unable to resolve the disputed fees.

10

59.     At all relevant times, Defendants would send the notices to Plaintiff Farina more than 30 days after his vehicle incurred the charge for the toll, meaning that he had no notice about the toll charge before Defendants assessed the $100 fee.

**The EZ Pass Contract**

60.     Plaintiff and members of the Class signed up for and held EZ Pass accounts through Defendants and their affiliates.

61.     As to the named Plaintiff, the EZ Pass accounts were opened and the tolls were incurred primarily for personal, family, or household purposes, bringing the Defendants' collection activities within the purview of the FDCPA, 15 U.S.C. § 1692a(5).

62.     At the time of account creation, Plaintiff was presented with Defendants' Terms and Conditions, which contained the following provisions (or provisions that are similar):

    5.  Violations

    a.  If you use the Tag when your Account is in a negative balance, suspended or revoked, or after the Tag has been reported lost or stolen, you may incur administrative fee of up to $50 per occurrence; be charged the full, undiscounted charge; and/or be asked to surrender the Tag to EZ Pass via certified mail or to plaza personnel.

    b.  If you use the Tag in a vehicle other than one of the class for which the Tag is designated, you may incur administrative fees of up to $50 per occurrence; and/or be asked to surrender the Tag to EZ Pass via certified mail or to plaza personnel. Such continued misuse may result in revocation of your Account.

    c.  If you attempt to use the Tag without properly attaching it to your vehicle, you may incur an administrative fee of up to $50 per occurrence.

    d.  Failure to respond to Notices of Violation may result in referral to a collection agency, imposition of additional fees and charges and/or suspension of your vehicle registration . . . .

**Defendants' Equipment Routinely Fails To Read EZ Pass Through No Fault of Users**

63.     The underlying reason for any particular purported toll violation is irrelevant for

11

the purposes of the claims herein.  Regardless of the reason for the violation, Defendants'

enforcement procedures for purported toll violations are contrary to law and violate Defendants'

contract.

64.     In many cases, Defendants' equipment registers a "violation" even where a valid,

fully funded EZ Pass account is in existence.  In other words, Defendants assess fines and

penalties for purported toll violations that were not violations at all simply because their

electronic toll reading equipment (called a "gantry") fails to register a valid EZ Pass.

65.     In addition to faulty gantries, Defendants are aware that EZ Pass readings can fail

for many other reasons—including a tinted windshield, the position of the car in the toll lane, or a

dead EZ Pass battery. Plaintiff and members of the Class do not (and cannot) know when

Defendants' equipment fails to read their EZ Pass.

66.     Despite Defendants' knowledge that EZ Pass gantries may fail to pick up a valid

transponder, Defendants fail to adequately warn consumers of this fact because Defendants reap

significant profits from their equipment "malfunctions."  Moreover, Defendants fail to notify

customers of any purported problems with their accounts until several violations have accrued,

allowing Defendants to increase the fees that they charge to the drivers. Often Defendants wait

more than a month before notifying the driver of the charge. Defendants then illegally seek

additional fines and penalties based on their own delay.

67.     Because equipment that scans EZ Passes does not confirm that an EZ Pass is

registered (like a toll booth would) a user receives no immediate indication that his EZ Pass has

not been read. A user may not find out for months (or even more than a year), when the

Defendants finally send a letter, notice or summons.

**Defendants Assess Excessive Fines When They Register**
**A Real Or Perceived Violation By An EZ Pass User**

68.     If Defendants' EZ Pass scanning equipment does not read an EZ Pass, or if an EZ Pass account is not adequately funded due to an expired or cancelled credit card, Defendants immediately begin to assess fines and penalties.

69.     As alleged above, at all relevant times, Defendants have assessed a fee of $100 per trip (or more) on top of the toll payment.

70.     If a driver somehow "knows" that she has committed an EZ Pass toll violation, she cannot pay the toll voluntarily using Defendants' website because there is a lengthy lag in time between when the toll violation occurs and when Defendants first post information about it on their website.

71.     The "fee" charged by Defendants is not, as required by New York law, reasonably related to the actual cost of collecting the unpaid toll.  Moreover, in the case of multiple violations against the same driver, Defendants charge the $100 fee *per violation*. As a result, an EZ Pass user can end up with hundreds or thousands of dollars in fees in a short time.

72.     According to Defendants, the fees cover the cost associated with locating and contacting the driver.  If this were the case, however, this should be a one-time fee rather than a per violation fee.  In any event, because Defendants locate the driver based on a state records search that takes seconds or minutes, at most, to complete, the fee amount has no relationship to Defendants' actual costs.

73.     Such civil fines and penalties are unconstitutional, unreasonable, unconscionable, and illegal and in no way related or proportional to the toll incurred by using the roadway.

**Defendants Also Assesses Excessive Fines For Tolls-By-Mail**

74.     Defendants send a Tolls-By-Mail Notice to drivers who do not have EZ Pass and to drivers whose EZ Pass does not register.

75.     Like the EZ Pass notices, the Tolls-By-Mail notices assess a $100 fee for each purported violation and often are sent by Defendants weeks or months after the toll violation.  As a result, drivers have no notice about the fee, or the risk of having the fee assessed, and they often incur multiple fees within a very short amount of time.

**Defendants Allow No Reasonable Opportunity To Dispute Or To Cure**

76.     After a purportedly missed toll, Defendants send an invoice via regular mail to the address of the registered owner of the vehicle requesting payment of the toll and the fee.

77.     Defendants make no effort to determine whether the toll violator has a registered EZ Pass account that is available to pay the account holder's tolls. As a result, Defendants charge Class members for unpaid tolls due to the equipment failure that are not the fault of the Class members even if they have EZ Pass accounts from which tolls can be paid.

78.     Defendants also charge Class members with EZ Pass accounts with expired or cancelled credit cards for unpaid tolls, including fees and penalties, without notifying the Class member of the expired or cancelled card.  Further, when a Class member updates his or her account with new credit card information, even if that happens in a matter of days, unpaid tolls are not charged to the account and instead Defendants pursue unconscionable and unconstitutional amounts of fees and expenses from the Class members.

79.     As discussed below, Defendants ignore consumers' attempts to dispute the existence of, or amounts of, purported toll violations and/or the fees and fines associated with them.

**Defendants Regularly Violate The FDCPA**

80.     Defendants regularly demand payment from consumers of unpaid tolls and fees and provide consumers itemizations of amounts that Defendants are attempting to collect.

Defendants did so as to Plaintiff.

81.     Defendants regularly tell consumers in correspondence that "this is an attempt to collect a debt.  Any information obtained will be used for that purpose" and/or that the communication is from a debt collector.

82.     The FDCPA, at 15 U.S.C. § 1692e(11), requires that debt collectors provide these disclosures in all written communications (other than a formal pleading) sent "in connection with the collection of any debt" ("the § 1692e(11) disclosure").

83.     This is a form notice mailed to all consumers, including Plaintiff herein, when Defendants attempt to make the debt validation disclosure for unpaid tolls.

84.     This letter states in relevant part as follows:

> Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume the debt is valid.

85.     This letter does not comply with the FDCPA in several respects.

86.     For example, it fails to include *any* of the required disclosures pursuant to 15 U.S.C. §1692g(4) and (5).

87.     Defendants also falsely represent the character and amount of the debt in violation of 15 U.S.C. § 1692e(2)(A) and they demand payments far in excess of what is allowed by Plaintiff's contract and law in violation of 15 U.S.C. § 1692f(1).

88.     Specifically, Defendants demand payments in the amount of $100.00 for each alleged unpaid toll, which is not allowed by Defendants' contracts.

## CLASS ALLEGATIONS

89.     Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  As detailed further below, this

action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority

requirements of Rule 23.

90. The proposed classes is defined as:

> All users of the MTA's bridges and tunnels in New York
> who either held an EZ Pass at the time of the purported
> violation or received a Tolls-By-Mail notification and who have
> been assessed a fee and/or civil penalties by Defendants, but who
> have not executed a release of Defendants or had a judgment
> entered against them for the fee.

91. Plaintiff reserves the right to modify or amend the definitions of the proposed

Class before the Court determines whether certification is appropriate.

92. Excluded from the Class are Defendants, their parents, subsidiaries, affiliates,

officers and directors, any entity in which Defendants have a controlling interest, all customers

who make a timely election to be excluded, governmental entities, and all judges assigned to hear

any aspect of this litigation, as well as their immediate family members.

93. **Numerosity.** The members of the Class are so numerous that joinder is

impractical. The Class consists of thousands of members, the identity of whom is within the

knowledge of and can be readily ascertained through Defendants' records.

94. **Commonality.** Plaintiff's claims are typical of the claims of the Class that he

seeks to represent in that the representative Plaintiff, like all Class members, were assessed

illegitimate fees and fines by Defendants. The representative Plaintiff, like all Class members,

has been damaged by Defendants' misconduct in that Defendants have assessed unfair and

unconscionable charges against him.  Furthermore, the factual basis of Defendants' misconduct

is common to all Class members and represents a common thread of unfair and unconscionable

conduct resulting in injury to all members of the Class.

16

95.     **Predominance.** There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

96.     Among the questions of law and fact common to the Class are whether:

(i)      Defendants are liable for the claims alleged in this Complaint;

(ii)     Defendants have been unjustly enriched; and

(iii)    Plaintiff is entitled to injunctive relief and damages, including actual statutory, punitive and treble damages.

97.     **Typicality.** Plaintiff's claims are typical of the claims of other members of the Class in that they arise out of the same wrongful policies and practices by Defendants. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other Class members.

98.     **Adequacy.** Plaintiff is committed to vigorously prosecuting this action and has retained competent counsel experienced in prosecuting class actions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

99.     **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendants, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Defendants' misconduct will proceed without remedy.

100.    Even if members of the Class themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized

litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings.

101.    By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. Section 1983**
**Violation of the Eighth Amendment of the United States Constitution**
**and Article I, Section 5 of the New York Constitution**

102.    Plaintiff repeats and realleges each and every allegation contained above as though fully set forth herein.

103.    Defendants are operating under the authority of the government when they collect tolls, fees and civil penalties for themselves.  Defendants keep such monies for their own use.

104.    The enforcement of the civil penalty assessments discussed above constitutes a violation of the United States' Constitution's Eighth Amendment and New York Constitution's (Article One, Section Five) protection against excessive fines.

105.    Plaintiff and members of the Class were assessed enormous fines and penalties that bear no relationship to the harm caused and, as a result, those fines and penalties are unconstitutional.

106.    Defendants impose these penalties in order to maximize their profits.

107.    As a direct result of Defendants' acts and omissions, that were performed under the authority of the State of New York, Plaintiff and members of the Class have suffered damages, and/or are entitled to restitution, in an amount to be proven at trial.

108.   Pursuant to 42 U.S.C. § 1988, Plaintiff further seeks his costs and attorneys' fees incurred as a result of this lawsuit.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. Section 1983
**Violation of Procedural Due Process Under the United States Constitution and Article I, Section 11 of the New York Constitution**

109.   Plaintiff repeats and realleges each and every allegation contained above as though fully set forth herein.

110.   Defendants are operating under the authority of the government when they collect fees and civil penalties for themselves. Defendants keep such monies for their own use.

111.   The scheme described above violates the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution and violates the New York Constitution for the following reasons, among others:

(a)   Defendants impose fees and penalties for multiple violations on class members who do not know and could not reasonably know that they have incurred multiple violations;

(b)   Before notice is given, drivers may have passed through the toll road dozens of times, unknowingly racking up hundreds or thousands of dollars in penalties and fees;

(c)   Defendants do not provide adequate notice of violations before charging fees and penalties for further violations;

(d)   There is no adequate opportunity to be heard on the amount of the civil penalty and fees;

(e)   The penalties and fees are so excessive that class members do not have fair notice that they will be imposed; and

(d)   The penalties and fees bear no reasonable relation to the amount of the toll or the costs to the state or to Defendants of collecting the toll.

112.    The deprivations of the rights of Plaintiff and members of the Class as described above were a proximate result of the policies, procedures, practices, and/or customs maintained by New York and Defendants.

113.    As a direct and legal result of the acts and omissions of Defendants, and each of them, Plaintiff and members of the Class have suffered damages, and/or are entitled to restitution, in an amount to be proven at trial.

114.    Plaintiff and members of the Class seek injunctive relief to stop Defendants' unlawful policies, procedures, practices and/or customs described above.

115.    Pursuant to 42 U.S.C. § 1988, Plaintiff further seeks his costs and attorneys' fees incurred as a result of this lawsuit.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. Section 1983**
**Violation of Substantive Due Process**

121.    Plaintiff repeats and realleges each and every allegation contained above as though fully set forth herein.

122.    Plaintiff and the class members are entitled to, *inter alia*, use toll roads and may be assessed tolls and reasonable administrative fees and civil penalties where appropriate.

123.    New York law specifically governs the fees and penalties Defendants may charge, as well as the time period for bringing suit for such fees and penalties.

124.    The EZ Pass contracts and the Tolls-By-Mail system nowhere authorize Defendants to charge excessive and unreasonable fees and civil penalties.

125.    Defendants charged fees and penalties outside of and contrary to New York law and contrary to Plaintiff's contract.

126.     Defendants sought to collect those fees on Defendants' behalf and on behalf of the state.

127.     Defendants acting under color of state law and with authority delegated by the state have acted unreasonably, arbitrarily and irrationally in seeking to impose fees, penalties and expenses unrelated to Defendants' actual expenses.

128.     Defendants acting under color of state law and with authority delegated by the state have acted unreasonably, arbitrarily and irrationally in seeking to impose excessive fees and penalties on Plaintiff and the Class.

129.     Plaintiff and members of the Class have sustained damages as a result of the Defendants' constitutional violations.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment

130.     Plaintiff repeats and realleges each and every allegation contained above as though fully set forth herein.

131.     In the alternative, Plaintiff, on behalf of himself and the Class, asserts a common law claim for unjust enrichment.

132.     By means of Defendants' wrongful conduct alleged herein, Defendants knowingly assessed fees and charges on Plaintiff and members of the Class that were unfair, unconscionable, and/or oppressive.

133.     Defendants knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class. In so doing, Defendants acted with conscious disregard for the rights of Plaintiff and members of the Class.

134.     As a result of Defendants' wrongful conduct as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

135.     Defendants' unjust enrichment is traceable to, and resulted directly and approximately from, the conduct alleged herein.

136.     It is inequitable for Defendants to be permitted to retain the benefits they received, and are still receiving, without justification, from the imposition of fees and fines on Plaintiff and members of the Class in an unfair, unconscionable, and oppressive manner.

137.     Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

138.     The financial benefits derived by Defendants rightfully belong to Plaintiff and members of the Class.

139.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Class all wrongful or inequitable proceeds received by them.

140.     A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendants traceable to Plaintiff and the members of the Class.

141.     Plaintiff and members of the Class have no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF
### 15 U.S.C. § 1692e(2), 1692f(1), and/or 1692g

142.     Plaintiff repeats and realleges each and every allegation contained above as though fully set forth herein.

143.     As set forth above, Defendants violated the FDCPA by making false and misleading representations, and engaging in unfair and abusive practices in violation of § 1692g.

144.     Each Defendant worked with the other Defendants to notify Plaintiff and the Class of the claimed outstanding debt and to try to collect that debt.

145.     Defendants attempted to collect knowingly excessive and inflated fines and fees in violation of § 1692e(2) and/or 1692f(1).

146.     Upon information and belief, Defendants together had an agreement(s) to share among themselves the funds that they collected from Plaintiff and the Class.

147.     Defendants' violations of the FDCPA entitle Plaintiff and members of the Class to their actual damages (for only the (d) and (f) claims) in an amount to be proved at trial, to statutory damages (for the (g) claim), costs and attorneys' fees, and to any additional relief this Court deems just and proper.

**SIXTH CLAIM FOR RELIEF**
**Violation of the New York Consumer Protection Act,**
**NYGBL §§ 349-350**

148.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further allege as follows.

149.     NY GBL §349 makes unlawful any deceptive acts and practices in connection with the conduct of any business, trade or commerce or in the furnishing of any service in New York.

150.     Defendants' imposition and collection scheme for EZ Pass and Tolls-By-Mail was false, misleading, deceptive, unfair and unlawful.

151.     At all relevant times, Defendants' acts and practices alleged herein were in the conduct of business, trade or commerce or in the furnishing of services in the state.

152.     Defendants' practices injured and impacted Plaintiff, the Class, and the public.

153.   Defendants knew, or should have known, about the improper charges as alleged above, including that drivers in New York were often being charged multiple $100 fees.

154.   Despite this knowledge Defendants continued to impose fines and fees without prior notice and continued to pursue collections of those fines and fees, threatening drivers with collection efforts, threatening to ruin the drivers' credit rating, and threatening to suspend the drivers' driving privileges.

155.   Plaintiff and the Class have been damaged by Defendants' conduct.

156.   Defendants willfully and knowingly violated section 349 of the New York General Business Law. As such, Plaintiff and the Class members are entitled to treble damages.

157.   Plaintiff and the Class seek injunctive relief, damages, statutory damages, and treble damages for each violation of the GBL plus an award of attorneys' fees pursuant to NY GBL §349 (h).

## SEVENTH CLAIM FOR RELIEF
### Tortious Interference with Contract

158.   Plaintiff repeats and realleges each and every allegation contained above as though fully set forth herein.

159.   Plaintiff and Defendants have contracted for toll road use services.

160.   As part of that contract, Plaintiff and the Class members are entitled to, *inter alia*, use toll roads and may be assessed tolls and reasonable administrative fees and civil penalties where appropriate.

161.   At all times, Defendants were aware of the existence of the Terms and Conditions between, on the one hand, Plaintiff and the Class members and, on the other hand, Defendant MTA, because Defendants' business model for operating tolls for bridges and tunnels assumes the existence of EZ Pass users with EZ Pass transponders.

24

162.    Defendants tortiously interfered with this contractual relationship and prevented Plaintiff and the Class members from obtaining the full benefits of this contractual relationship.

163.    The contracts nowhere authorize Defendants to charge excessive and unreasonable administrative fees and civil penalties.

164.    Defendants charged fees and penalties contrary to New York law and contrary to Plaintiff's contracts.

165.    Defendants sought to collect those fees on each other's behalf.

166.    Therefore, Defendants tortiously interfered with the performance of the contracts.

167.    With respect to users, like Plaintiff Farina, who initially opened his EZ Pass account years ago, Defendants additionally tortiously interfered with Plaintiff's EZ Pass Terms and Conditions, which expressly stated, in the "Violations" section that "administrative fees" may be no more than "$50 per occurrence." Instead, Defendants caused the assessment of administrative fees of $100 per violation.

168.    As a direct, proximate, and foreseeable result of Defendants' tortious interference with Plaintiff and the Class members' contracts, Plaintiff and the Class members have been legally injured and sustained damages by not receiving the full benefit of their contractual bargain.

169.    Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the Terms and Conditions.

170.    Plaintiff and members of the Class have sustained damages as a result of Defendants' tortious interference with the Terms and Conditions.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class demand a jury trial on all claims so triable and

judgment as follows:

A.      Declaring Defendants' fee and penalty policies and practices and collection methods to be wrongful, unfair, and unconscionable and enjoining any such future collections;

B.      Awarding restitution of unconstitutional fees and penalties paid to Defendants, and other appropriate declaratory and/or injunctive relief, as a result of the wrongs alleged herein in an amount to be determined at trial;

C.      Awarding disgorgement of the ill-gotten gains derived by Defendants from their misconduct;

D.      Awarding actual damages in an amount according to proof;

E.      Awarding punitive, treble, statutory and exemplary damages;

F.      Awarding pre-judgment interest at the maximum rate permitted by applicable law;

G.      Awarding costs and disbursements incurred by Plaintiff and the Class in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

H.      Awarding such other relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a jury trial on all causes of action so triable.

Dated: February 16, 2018

Respectfully submitted,

SQUITIERI & FEARON, LLP

By: /s/Stephen J. Fearon, Jr.
        Stephen J. Fearon, Jr.
32 East 57th Street -12th Floor
New York, New York 10022
Telephone: (212) 421-6492
Facsimile:  (212) 421-6553
Email: stephen@sfclasslaw.com