UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JASON FARINA, CHARLES GARDNER, DOROTHY TROIANO, DELORIS RITCHIE and MIRIAN ROJAS on behalf of each of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> METROPOLITAN TRANSPORTATION AUTHORITY, TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, NEW YORK STATE THRUWAY AUTHORITY, TRANSWORLD SYSTEMS, INC., ALLIANCEONE RECEIVABLES MANAGEMENT, INC., LINEBARGER GOGGAN BLAIR & SAMPSON, LLP and CONDUENT, INC., <br><br> Defendants. | **CONSOLIDATED COMPLAINT** <br><br><br> **CASE NO.: 18-cv-01433-NRB** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Jason Farina, Charles Gardner, Dorothy Troiano, Deloris Ritchie, and Mirian Rojas, on behalf of themselves and all others similarly situated, allege the following based on personal knowledge as to the allegations about themselves and, as to all other matters, based on the investigation of Plaintiffs' counsel, including their review of EZ Pass and Tolls-By-Mail billing statements, correspondence, news releases and articles, public statements, and public complaints concerning the facts and issues alleged in this Complaint.

## <u>INTRODUCTION</u>

1.      Plaintiffs brings this action on behalf of themselves and a Class of all similarly situated individuals and entities who have been charged fees as a result of using New York's

cashless toll systems (called "EZ Pass" and "Tolls-By-Mail") for bridges, tunnels, and roads operated by the Metropolitan Transportation Authority, the Triborough Bridge and Tunnel Authority (doing business as MTA Bridges and Tunnels) (the Metropolitan Transportation Authority and the Triborough Bridge and Tunnel Authority will be referred to, together, as the "MTA") , the Port Authority of New York and New Jersey (the "Port Authority"), and the New York State Thruway Authority ("NYSTA" or "Thruway Authority").

2.        In 2017 the MTA, Port Authority, and NYSTA switched many of their bridges and tunnels to "cashless toll" collecting, meaning that tolls are collected from drivers using automated systems. Tollbooths have been dismantled and drivers are no longer able to pay cash at many of the crossings. Instead, cameras mounted onto new overhead frames collect the tolls either using EZ Pass or Tolls-By-Mail.

3.        However, Defendants – who operate those systems and collect tolls from drivers – have used the cashless toll system to line their own pockets at the expense of drivers, primarily by collecting improper fees and penalties in addition to collecting the tolls.  Often the fees and penalties are multiples of the actual toll, meaning that many drivers are being repeatedly charged more than $100 to cross a bridge or tunnel.

4.        Compounding the problem, Defendants frequently impose these exorbitant charges without giving prior notice to the drivers and Defendants often wait weeks or months before notifying the drivers about the charges, which leads to more and more charges.

5.        Defendants also aggressively pursue collection efforts against motorists, threatening them with adverse credit reports, revocation of their vehicle registration, and seizure of their tax refunds if they do not immediately pay the fees.

6.      Defendants' scheme has resulted in tens of millions of dollars in improper charges on motorists and frequently results in individual drivers being charged hundreds or thousands of dollars in improper fees.

7.      Plaintiff Jason Farina is one of those drivers. From October 2017 through January 2018 he was charged more than $6,000 by Defendants as a result of using cashless tolls on New York's bridges and tunnels. As alleged below, on numerous occasions, Defendants have charged Plaintiff Farina a $100 fee each time he used a bridge or tunnel that should have cost $8.50, meaning that each time he crossed the bridge Defendants charged him $108.50. As alleged below, Defendants have imposed these fees even before notifying Plaintiff Farina about them or giving him a reasonable chance to avoid the fees.

8.      Similarly, Plaintiff Dorothy Troiano was charged more than $30,000 from May 2017 through February 2018 as a result of using cashless tolling on Defendants' bridges and tunnels. As alleged in detail below, Defendants charged Plaintiff Troiano a $100 fee each time she used a bridge that should have cost $8.50 or $17.00, meaning that each time she crossed the bridge Defendants charged her $108.50 or $117.00. Defendants imposed these fees even before notifying Plaintiff Troiano about them, or about any purported violations, or giving her a reasonable chance to avoid the fees.

9.      Plaintiff Charles Gardner encountered similar problems. Over a short time and only nine tolls, Defendants charged Plaintiff Gardener hundreds of dollars in fees, in addition to the tolls themselves. Despite Gardner having tried to resolve the issues with Defendants and having paid the underlying tolls themselves, Defendant AllianceOne, a collection agency, continues to demand payment of the entire amount – both the tolls and improper fees – assessed against him.

10.     Plaintiff Dolores Ritchie has been charged more than $10,000 in improper fees as a result of Defendants' failures to promptly bill her for Tolls-By-Mail. By the time she received her initial bills – her very first notice of being charged for a toll – Defendants already included $100 fees on top of the tolls. Without proper notice or timely billing, Plaintiff Ritchie has had no reasonable chance to avoid Defendants' excessive fees – despite taking protective measures, such as overpaying on every bill she receives. Yet Plaintiff Ritchie continues to be billed for fees and penalties and Defendants continue to pursue her for the improper charges. She currently has over $1,500 of outstanding bills from NYSTA and MTA Bridges and Tunnels.

11.     Plaintiff Mirian Rojas too was assessed improper fees without notice. Ms. Rojas received letters in the mail in early April 2018 from Defendants indicating that she owed tolls and accompanying fees. She checked her EZ Pass account online to find she owed $650 for ten purported violations occurring in January and February 2018. There were no other tolls or fees assessed against her. Upon checking back several days later, she found that Defendants had now assessed her account for 67 violations. The violations were "new" in the sense that they were just assessed against her. But the dates of the newly assessed violations took place as far back as October 6, 2016. Each newly added toll had a $50 or $100 fee attached to it, totaling over $6,000 in tolls and fees due. Defendants AllianceOne and Transworld have been attempting to collect these improper fees from Plaintiff Rojas.

12.     Thousands of motorists have been similarly unfairly and improperly subjected to Defendants' excessive fines and fees.

13.     In addition to imposing excessive and devastating financial penalties, Defendants' aggressive enforcement efforts have resulted in users having their credit ratings damaged and

being threatened with collections efforts, having their wages garnished, and losing their tax refunds.

14.     On behalf of themselves and the members of the Class, Plaintiffs seeks injunctive relief, declaratory relief, actual and statutory and punitive damages, and their attorneys' fees and costs.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs.

16.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 due to federal questions raised by the Complaint. Further, this Court has jurisdiction under 15 U.S.C. § 1692k(d) and has jurisdiction over the state law claims by supplemental jurisdiction under 28 U.S.C. § 1367.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction here, regularly conduct business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## PARTIES

### A.     Plaintiffs

18.     Plaintiff Jason Farina ("Farina") is a resident of Westchester County, New York. As alleged below, since October 2017 Plaintiff Farina has been charged more than $6,000 in tolls

and fines by Defendants for using the cashless tolling systems in New York that are the subject of this action, including EZ Pass and Tolls-By-Mail.

19.     Plaintiff Charles Gardner ("Gardner") is a citizen of the Commonwealth of Pennsylvania. As alleged below, since August 2017 Plaintiff Gardner has been charged hundreds of dollars in fees by Defendants for using the cashless tolling systems in New York that are the subject of this action, including EZ Pass and Tolls-By-Mail.

20.     Plaintiff Dorothy Troiano ("Troiano") is a resident of Westchester County, New York.  As alleged below, since May 2017 Plaintiff Troiano has been charged more than $30,000 in tolls and fines by Defendants for using Defendants' cashless tolling systems that are the subject of this action.

21.     Plaintiff Deloris Ritchie ("Ritchie") is a citizen of Rockland County, New York. As alleged below, Defendants have charged Plaintiff Ritchie more than $10,000 in fees for using the cashless tolling systems in New York that are the subject of this action.

22.     Plaintiff Mirian Rojas ("Rojas") is a resident of Queens County, New York. As alleged below, Plaintiff Rojas was assessed approximately $6,000 in tolls and fees by Defendants for using the cashless tolling systems in New York that are the subject of this action, including EZ Pass and Tolls-By-Mail.

23.     Plaintiffs have been damaged by Defendants' conduct as alleged in this Complaint and continue to be damaged by that conduct.

**B.     Defendants**

24.     Defendant Metropolitan Transportation Authority ("MTA") is a public benefit corporation responsible for public transportation in New York, serving 12 counties in New York. More than 800,000 vehicles use its seven toll bridges and two tunnels every weekday.

6

25.     The MTA is the largest public transit authority in the United States.

26.     Defendant MTA has its headquarters at 2 Broadway, New York, New York.

27.     Upon information and belief, at all relevant times, Defendant MTA acted through its officers, directors and employees, including Defendant Triborough Bridge and Tunnel Authority.

28.     At all relevant time Defendant MTA had effective control over the activities of its officers, directors, employees, and affiliates, including the Triborough Bridge and Tunnel Authority and MTA Bridges and Tunnels. Accordingly, the actions of the MTA's officers, directors, employees and affiliates are imputed to Defendant MTA under the doctrine of *respondeat superior*, and Defendant MTA is liable for these actions.

29.     Defendant New York State Thruway Authority ("Thruway Authority") is a public-benefit corporation, organized and existing under, and by virtue of, a charter from the State of New York.

30.     The Thruway Authority has its administrative headquarters at 200 Southern Boulevard, Albany, NY 12209.

31.     Upon information and belief, at all relevant times, Defendant Thruway Authority acted through its officers, directors and employees, and directed and controlled those entities and individuals.

32.     At all relevant times Defendant Thruway Authority had effective control over the activities of its officers, directors, employees, and affiliates. Accordingly, the actions of the Thruway Authority's officers, directors, employees and affiliates are imputed to Defendant Thruway Authority under the doctrine of *respondeat superior*, and Defendant Thruway Authority is liable for these actions.

7

33.     Defendant Thruway Authority oversees and manages the Thruway system within New York (known officially as the Governor Thomas E. Dewey Thruway) which comprises more than 560 miles of highway, 496 miles of which are a tollway. The New York Thruway is the fifth busiest toll road in the United States.

34.     Defendant The Port Authority of New York and New Jersey (the "Port Authority") is a bi-state compact between the states of New York and New Jersey.  Its main offices are located at 150 Greenwich Street, New York, New York.

35.     The Port Authority oversees much of the regional transportation infrastructure in New York and New Jersey, including the bridges and tunnels connecting the two states, such as the George Washington Bridge, the Lincoln Tunnel, the Holland Tunnel, the Goethals Bridge, the Bayonne Bridge, and the Outerbridge Crossing.

36.     Defendant Transworld Systems, Inc. ("Transworld") is a corporation organized and existing under the laws of California with its headquarters at 507 Prudential Road, Horsham, Pennsylvania.

37.     At all relevant times Transworld was authorized to do business, and did business, in New York and this District.

38.     At all relevant times Defendant Transworld was engaged in the business of debt collection throughout the United States, including in this District.

39.     Defendant MTA used Transworld to collect debts for the MTA and for MTA Bridges and Tunnels from motorists, including certain Plaintiffs, who used EZ Pass or Toll-By-Mail in New York.

40.     Upon information and belief, Defendant Transworld received a percentage of the amounts it recovered from drivers for cashless toll fees on behalf of the other Defendants.

41.     Defendant AllianceOne Receivables Management, Inc. ("AllianceOne") is a corporation organized and existing under the laws of Minnesota with its headquarters at 1160 Centre Pointe Drive, Suite 202, Mendota Heights, Minnesota 55120.

42.     At all relevant times AllianceOne was authorized to do business and did business in New York and in this District.

43.     At all relevant times Defendant AllianceOne was engaged in the business of debt collection for the Port Authority, including in this District.

44.     Upon information and belief, Defendant AllianceOne received a percentage of the amounts it recovered from motorists who used EZ Pass or Tolls-By-Mail in New York.

45.     Defendant Linebarger Goggan Blair & Sampson, LLP ("Linebarger") is a law firm that primarily engages in debt collection. Linebarger has its principal office at 2700 Via Fortuna Drive, Suite 400, Austin, Texas 78746.

46.     At all relevant times Linebarger did business in New York and in this District.

47.     At all relevant times Linebarger was engaged in the business of debt collection for the NYSTA, including in this District.

48.     Upon information and belief, Defendant Linebarger received a percentage of the amounts it recovered from motorists who used EZ Pass or Tolls-By-Mail in New York.

49.     At all relevant times, Defendant Conduent, Inc. ("Conduent") was a New York corporation with its headquarters at 100 Campus Drive, Florham Park, New Jersey.

50.     Before 2016 Defendant Conduent was a division or affiliate of Xerox Corp. However, since its spinoff from Xerox in 2016, Defendant Conduent is and has been a publicly-traded company that, among other things, provides the billing and money transfers from Defendants' EZ Pass and Tolls-By-Mail program. According to Conduent's annual report for

2016, Conduent "provide[s] revenue-generating transportation services to government clients in over 25 countries. [Its] services include support for electronic toll collection . . . [and it manages] key processes on behalf of [its] clients including fee collecting, compliance and violation management, notifications, statements and reporting."

51.    At all relevant times, Conduent mailed the bills and notices to Plaintiffs and Class members for the EZ Pass and Tolls-By-Mail fees.

52.    At all relevant times, Defendant Conduent was authorized to, and did, transact business in New York and in this District.

53.    Conduent also operates tolling programs in other states, including Maryland, Texas, New Jersey, Florida, and California.

54.    Before Defendants began operating the billing and collections program in New York that is at issue in this lawsuit, drivers in many other states experienced some of the same problems that Plaintiff and the Class are experiencing, including erroneous billing practices and the enormous fines, fees and late-charges imposed by Conduent.

55.    In 2015, Defendant Conduent collected more than $3 billion in revenues for the MTA's bridges and tunnels and the Port Authority.

## FACTUAL ALLEGATIONS

### EZ Pass and Tolls-By-Mail Background

56.    Years ago, before a driver would cross a bridge or enter a tunnel in New York, the driver would pay a cash toll to a toll collector at the bridge or tunnel.

57.    Over the past ten years or so, New York has eliminated the staffed collection booths and instead has moved to a cash-less system of collecting tolls using either EZ Pass or billing drivers by mail (referred to in New York as "Tolls-By-Mail").

58.     As a car passes through the cashless toll system, if the car has an EZ Pass tag (a transponder), the system's antenna (the white box) records the information about the car and processes a charge for the toll. The car owner's EZ Pass account is then charged for the toll.

59.     For vehicles that have an EZ Pass, the EZ Pass Account is linked to the customer's bank account or credit card.  When the EZ Pass account balance is low, the consumer's bank account or credit card is automatically charged to "reload" the EZ Pass account.

60.     If a vehicle is not linked to an EZ Pass account, New York recently has instituted a Tolls-By-Mail system which takes a picture as the car and its license plate as the car passes through the cashless toll system on the road, bridge or tunnel. The picture is used to identify the registered owner and then Defendants mail a bill for the toll to the vehicle owner.

61.     The EZ Pass system and the Tolls-By-Mail system were supposed to eliminate long lines at toll booths, reduce pollution from idling vehicles, and allow the toll operators to shift personnel from collecting tolls into roles providing heightened security and safety to motorists.

62.     As part of the EZ Pass and Tolls-By-Mail program, Defendants outsource the billing to Defendant Conduent and the collections to Defendant Transworld, AllianceOne, and/or Linebarger.

63.     As part of the EZ Pass and Tolls-By-Mail program, the MTA Defendants outsources collections to Defendant Transworld.

64.     As part of the EZ Pass and Tolls-By-Mail program, Defendant Port Authority outsources collections to Defendant AllianceOne.

11

65.     As part of the EZ Pass and Tolls-By-Mail program, Defendant NYSTA outsources collections to Defendant Linebarger.

66.     Defendants have turned the EZ Pass and Tolls-By-Mail systems into a profit center that imposes unfair and improper charges on motorists who use New York's bridges and tunnels, often imposing fees and penalties that dwarf the amount of the tolls.

**Defendants Assessed Massive Fees and Penalties on Plaintiffs and the Class**

A. Plaintiff Farina

67.     Until October and November 2017, Farina had never had any significant problem with his EZ Pass tag or account.

68.     However, beginning on November 25, 2017 Farina began to receive notices from Defendants indicating that in October 2017 tolls had not been paid, and assessing charges for those tolls as well as fees of $100 for each unpaid toll.

69.     Defendants repeatedly assessed a $100 fee on Farina, even when the underlying toll charge was relatively small and even when he paid the underlying charge for the toll.

70.     Set forth below is a chart showing the date of each charge by the MTA and Conduent to Farina as well as the bridge or tunnel used by Farina's vehicle, the applicable toll, the fee or penalty that the MTA and Conduent imposed on Farina, and the total amount that the MTA, Conduent, and Transworld sought from him for each toll crossing:

| Date | Facility | Toll | Fee | Amt. Due |
|------|----------|------|-----|----------|
| 12/19/2017 | Bronx Whitestone | $8.50 | $100 | $108.50 |
| 12/19/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 01/07/2018 | Verrazano Bridge | $17.00 | $100 | $117.00 |
| 01/07/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 01/06/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 01/05/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 01/05/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 01/03/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 01/03/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |

| | | | | |
|---|---|---|---|---|
| 01/02/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 01/02/2018 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/31/2017 | Bronx Whitestone | $8.50 | $100 | $108.50 |
| 12/31/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/30/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/30/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/29/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/29/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/28/2017 | Bronx Whitestone | $8.50 | $100 | $108.50 |
| 12/28/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/22/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/22/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/20/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/20/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/17/2017 | Henry Hudson Bridge | $8.50 | $100 | $108.50 |
| 12/17/2017 | Henry Hudson Bridge | $8.50 | $100 | $108.50 |
| 12/16/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/16/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/15/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/15/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/14/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/11/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/10/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/10/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/08/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/08/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/06/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 12/06/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 11/03/2017 | Bronx Whitestone | $8.50 | $100 | $108.50 |
| 10/29/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/29/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/28/2017 | Bronx Whitestone | $8.50 | $100 | $108.50 |
| 10/28/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/27/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/27/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/25/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/25/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/24/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/22/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/22/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/20/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/20/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/19/2017 | Robert Kennedy Bridge | $8.50 | $100 | $108.50 |
| 10/19/2017 | Robert Kennedy Bridge | $8.50 | $100 | $108.50 |
| 10/18/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |
| 10/18/2017 | Throgs Neck Bridge | $8.50 | $100 | $108.50 |

71.     In early to mid-December 2017, Farina contacted Defendants' EZ Pass customer service in an effort to understand the multiple charges and fees.

72.     Defendants' representative advised Farina to pay the amount of tolls but to not pay the outstanding fees and to send a supporting letter disputing all of the $100 fees assessed by Defendants to Plaintiff Farina's account.

73.     As of January 24, 2018, Defendants had not deducted Farina's payment of the tolls from the amount that Defendants claimed he owes.

74.     Farina's EZ Pass account showed 61 purported violations with fees of $6,100 associated with his EZ Pass tag.

75.     On January 25, 2018 Farina received a letter from Defendant Transworld requesting payment of $1,302 for 12 of those purported violations.

76.     Once Defendant MTA submitted those charges to Defendant Transworld, Defendant MTA would not accept payment from Plaintiff Farina for the charges and Farina was unable to dispute the charges with Defendant MTA.

77.     Threatened with Transworld's ability to ruin his credit, Farina paid $530 to Transworld in order to resolve Defendants' claim for $1,302 in fees.

78.     On January 25, 2018, after paying the fees to Transworld, Farina again contacted EZ Pass customer service about the outstanding, improper charges and was told to pay the toll charges by check and to write a letter disputing the fees.  Farina had already disputed those charges and sought to pay them by credit card but was told by Defendants that he could only either pay by check or in person.

79.     Farina then went to the EZ Pass location in Yonkers, New York to pay all of the outstanding toll charges in person.

80.     On January 28, 2018 Farina received an additional collection notice from Defendant Transworld claiming that he owed $100.  Farina paid $33 of that $100 in order to avoid having his credit report tarnished by the improper claims.

81.     Farina paid the tolls and improper fees under a threat of continued harm to his credit score.

82.     At all relevant times, Defendants the MTA, Conduent, and Transworld would send the notices to Farina more than 30 days after his vehicle incurred the charge for the toll, meaning that he had no notice about the toll charge or any violations before being assessed the $100 fee.

B.     Plaintiff Troiano

83.     Until 2017, Plaintiff Troiano had never had any significant problem with her EZ Pass tag or account.

84.     However, beginning in 2017 Troiano began to receive notices from Defendants the MTA and Port Authority, indicating that tolls had not been paid by her EZ Pass account, and Defendants began assessing charges for those tolls as well as fees of $50 or $100 for each unpaid toll.

85.     Defendants repeatedly assessed exorbitant fees on Troiano, even when the underlying toll charge was relatively small and even when she paid the underlying charge for the toll.

86.     Annexed as Exhibit 1 and incorporated herein by reference is a chart showing the date of each charge by Defendants to Troiano as well as the bridge, tunnel or road used by Troiano's vehicle, the applicable toll, the fee or penalty that Defendants imposed on Troiano, and the total amount that Defendants sought from her for each toll crossing.

87.     In late 2017 and early 2018, Troiano repeatedly contacted Defendants' EZ Pass customer service in an effort to understand the multiple charges and fees by Defendants and was met by demands that Troiano pay the outstanding amounts that Defendants claimed Troiano owed.

88.     On January 10, 2018, Defendant Transworld mailed to Troiano a collection demand listing Defendant "MTA Bridges and Tunnels" as the creditor and claiming that Troiano owed $8,247.00 for "Violations".

89.     Troiano has repeatedly disputed the outstanding, improper charges but Defendants continue to demand payment.

90.     By "Notice of Registration Suspension" dated January 19, 2018, at Defendant's urging and based upon the charges by Defendants that are at issue in this lawsuit, the New York Department of Motor Vehicles notified Plaintiff that her vehicle registration was being suspended effective March 5, 2018 for "failing to pay tolls, fees or other charges" including the charges that are the subject of this Action.

91.     During the last week of January 2018, Defendants' representatives contacted Troiano about $1,215.50 in tolls and "violations" of $11,400.10 and demanded that Troiano pay the tolls ($1,215.50) and ten percent ($1,140.00) of the violations.

92.     On February 7, 2018, Defendants' representatives told Troiano that she needed to pay $2,355.50 towards those tolls and "violation" fees.

93.     Later that day, February 7, 2018, Defendants' representatives told Troiano that the amount had increased, including that the fines had increased to $13,083, and that she would have to pay $2,688 instead of $2,355.50.

94.     On February 8, 2018 Troiano paid to Defendants $2,688.00 towards the tolls and fees.

95.     On February 14, 2018, Troiano received another "violation" notice from the MTA Defendants claiming that Troiano must pay $1,817.50 immediately for tolls and violation fees.

96.     On February 15, 2018 Plaintiff received from AllianceOne an emailed receipt for her payment, three months earlier on November 2, 2017, of $775 towards tolls and fines from Defendants.

97.     Troiano has requested that AllianceOne provide her with information about what tolls and fees the $775 paid but AllianceOne has not provided that information and instead has demanded that Plaintiff pay another $65.90 for an alleged violation that is still open with the Port Authority and AllianceOne.

98.     Troiano only paid the improper fees that she did under a threat of continued harm to her credit score.

99.     At all relevant times, Defendants the MTA, Port Authority, Conduent, AllianceOne, and Transworld would send the notices to Gardner more than 30 days after her vehicle incurred the charge for the toll, meaning that she had no notice about the toll charge before Defendants assessed the $100 fee.

C.     Plaintiff Gardner

100.    At all relevant times, Gardner had an EZ Pass tag and account and used it to drive from his home in Pennsylvania into New York.  Before the summer of 2017, Gardner had no significant problems with his EZ Pass tag or account or with any of the charges he received for using the bridges and tunnels in New York.

101.    However, as New York began to institute its cashless toll system in 2017, Gardner

began to receive notices from Defendants the MTA and Port Authority claiming that he owed

hundreds of dollars for crossing New York's bridges and tunnels.

102.    Since August 2017, Gardner has been billed by Defendants for tolls and fees as

set forth in the following chart:

| DATE | FACILITY | TOLL | FEE | TOTAL |
|------|----------|------|-----|-------|
| 8/6/17 | Queens Midtown Tunnel | $8.50 | $100.00 | $108.50 |
| 10/15/17 | Bayonne Bridge | $15.00 | $50.00 | $65.00 |
| 10/29/17 | Bayonne Bridge | $15.00 | $50.00 | $65.00 |
| 11/3/17 | Verrazano Narrows Bridge | $17.00 | $100.00 | $117.00 |
| 11/5/17 | Bayonne Bridge | $15.00 | $50.00 | $65.00 |
| 11/10/17 | Marine Parkway Bridge | $4.25 | $50.00 | $54.25 |
| 11/10/17 | Marine Parkway Bridge | $4.25 | $50.00 | $54.25 |
| 11/10/17 | Verrazano Narrows Bridge | $17.00 | $100.00 | $117.00 |
| 11/12/17 | Bayonne Bridge | $15.00 | $50.00 | $65.00 |

103.    After receiving a notice from the MTA Defendants in late October 2017 about the

August 6, 2017 charges of $8.50 and $100.00, Gardner paid the $8.50 toll charge, disputed the

$100.00 charge, and told the MTA Defendants that their October 2017 notice was the first notice

he received about the charges.

104.    After receiving a notice from the Port Authority about the $15.00 toll and $50 fee

for crossing the Bayonne Bridge on October 15, 2017; Gardner paid the $15.00 toll by check on

December 19, 2017, which was cashed.  Nevertheless, by letter dated January 17, 2018,

Defendant AllianceOne, on behalf of the Port Authority, notified Gardner that it was pursuing

collection of a "balance due" of $65.00.

105.     On or about November 25, 2017 Gardner paid by check the $15.00 toll assessed by the Port Authority on October 29, 2017 and defendant Port Authority cashed that check.

106.     By check dated December 4, 2017 Gardner paid to the Port Authority the $15.00 toll for crossing the Bayonne Bridge on November 5, 2019, leaving the $50.00 fee unpaid and subject to collection.

107.     By check dated December 19, 2017 Gardner paid to the Port Authority the $15.00 toll for crossing the Bayonne Bridge on November 12, 2017, leaving the $50.00 fee unpaid and subject to collection.

108.     At all relevant times, Defendants the MTA, Port Authority, Conduent, and AllianceOne, would send the notices to Gardner more than 30 days after his vehicle incurred the charge for the toll, meaning that he had no notice about the toll charge before Defendants assessed the $100 fee.

Plaintiff Ritchie

109.     Until November 2017, Plaintiff had never any significant problems with Tolls-By-Mail.

110.     Plaintiff would drive through tolls, as instructed by signs, receive bills in the mail, and pay them.

111.     In November 2017, however, Ritchie's car was impounded and Defendant NYSTA claimed that she owed $12,000 for unpaid tolls and penalties.

112.     Debt collector Linebarger continually sought out Ritchie's payment of these bogus fees and penalties.

113.    In January 2018, NYSTA created a temporary amnesty program in recognition of the profound unfairness to drivers, like Ritchie, shouldering the burden of the shortcomings of NYSTA's own cashless tolling system.

114.    Short-lived as the amnesty program was, Ritchie was nevertheless able to pay $790 to clear her $12,000 debt, which included all tolls, fees, and penalties outstanding in late January 2018. Importantly, NYSTA required her to pay some of the improper fees – despite its tacit recognition that those fees were not properly levied.

115.    The amnesty program lasted only one month and most Class Members were unaware of its existence.

116.    Immediately after the obtaining her one-time amnesty, Ritchie received more invoices with purported violations dating as far back as November 2017, each with a $100 penalty.

117.    NYSTA claims Ritchie currently owes more than $420.00 to NYSTA and the MTA claims that Ritchie owes $108.50 to the MTA. Each of these figures includes improper fees.

118.    Ritchie had not been notified of the tolls before February 2018. Her first notice from Defendants nevertheless included $100 penalties.

119.    Had Defendants properly notified Ritchie of payments due from tolls occurring between November 2017 and the end of the amnesty program in February 2018, those tolls and fees would have been included in the amount she owed when she took advantage of the amnesty program.

120.    The fact that those fees were not cleared by Ritchie's payment in the amnesty program – though they were purportedly incurred more than six months beforehand – shows that

(1) NYSTA had not, as of February 2018, yet assessed those tolls, fees, and penalties against Ritchie; (2) because NYSTA had yet not assessed the tolls against Ritchie, as of February 2018, NYSTA also had not notified Ritchie of the payments due; (3) because NYSTA had not notified Ritchie of the payments due, it was improper to add on $100 penalties for each of the tolls.

121.    Furthermore, after having her car impounded and being encumbered with more than $12,000 in fees, Ritchie began making overpayments on every invoice she received in hopes that it would prevent future penalties. Defendants NYSTA and MTA nevertheless have continued to charge penalties.

122.    Linebarger continues to hound Ritchie for $420 despite the unmistakable illegitimacy of the fees and penalties.

123.    At all relevant times, Defendants NYSTA, the MTA, Conduent, and Linebarger, would send the notices to Ritchie more than 30 days after her vehicle incurred the charge for the toll, meaning that she had no notice about the toll charge before Defendants assessed the $100 fees.

Plaintiff Rojas

124.    Until April 2018, Plaintiff Rojas had never had any significant problem with her EZ Pass tag or account.

125.    However, in early April 2018, Plaintiff Rojas received several letters from the Port Authority of New York and New Jersey indicating that she owed money for tolls and that a notice of enforcement action had been previously sent to her. No such notices had been sent to her though.

126.    Ms. Rojas accessed her EZ Pass account on April 10, 2018 and saw that the MTA and Port Authority had charged her with ten violations. Exhibit 2.

127.    Ms. Rojas accessed her EZ Pass account days later to find that the number of violations the MTA and Port Authority assessed against her had multiplied. They claimed she owed tolls and penalties for 67 discrete occurrences on the road and bridges of Defendants MTA Bridges and Tunnels and the Port Authority of New York and New Jersey. Exhibit 3.

128.    Although Defendants had newly charged Plaintiff Rojas with these violations, these newly assessed violations did not take place after April 10, 2018. Instead Defendants claimed they took place as far back as October 2016 – eighteen months earlier.

129.    Even though Ms. Rojas had only just been given notice of these violations that purportedly occurred months earlier, Defendants nevertheless charged her either $50 or $100 in administrative fees for each occurrence.

130.    In total these Defendants claimed that Ms. Rojas owed more than $6,000.

131.    Transworld and AllianceOne have attempted to collect this money from Plaintiff Rojas, and she has now paid the amount outstanding in tolls ($347) but has not paid the improper fees and penalties.

132.    Plaintiff Rojas has repeatedly disputed the outstanding, improper charges but Defendants continue to demand payment.

133.    AllianceOne told Plaintiff Rojas that she could not dispute her fees and must pay the total amount regardless of whether or not they are rightfully assessed against her.

**The EZ Pass Contract**

134.    Plaintiffs (except Ritchie) and many members of the Class signed up for and held EZ Pass accounts through Defendants and their affiliates.

135.    As to the named Plaintiffs, the EZ Pass accounts were opened and the tolls were incurred primarily for personal, family, or household purposes, bringing the Defendants'

22

collection activities within the purview of the FDCPA, 15 U.S.C. § 1692a(5). The fees arose out of the EZ Pass agreement, and not by operation of New York law.

136.    At the time of account creation, Plaintiffs were presented with Defendants' Terms and Conditions, which contained the following provisions (or provisions that are similar):

5.   Violations

a.  If you use the Tag when your Account is in a negative balance, suspended or revoked, or after the Tag has been reported lost or stolen, you may incur administrative fee of up to $100 per occurrence; be charged the full, undiscounted charge; and/or be asked to surrender the Tag to EZ Pass via certified mail or to plaza personnel.

b.  If you use the Tag in a vehicle other than one of the class for which the Tag is designated, you may incur administrative fees of up to $100 per occurrence and/or be asked to surrender the Tag to EZ Pass via certified mail or to plaza personnel. Such continued misuse may result in revocation of your Account.

c.  Failure to respond to Notices of Violation may result in referral to a collection agency, imposition of additional fees and charges and/or suspension of your vehicle registration . . . .

**Defendants' Equipment Routinely Fails To Read EZ Pass through No Fault of Users**

137.    The underlying reason for any particular purported toll violation is irrelevant for the purposes of the claims herein.  Regardless of the reason for the violation, Defendants' enforcement procedures for purported toll violations are contrary to law and violate Defendants' contract.

138.    In many cases, Defendants' equipment registers a "violation" even where a valid, fully funded EZ Pass account is in existence.  In other words, Defendants assess fines and penalties for purported toll violations that were not violations at all simply because their electronic toll reading equipment (called a "gantry") fails to register a valid EZ Pass.

139.     In addition to faulty gantries, Defendants are aware that EZ Pass readings can fail for many other reasons—including a tinted windshield, the position of the car in the toll lane, or a dead EZ Pass battery. Plaintiffs and members of the Class do not (and cannot) know when Defendants' equipment fails to read their EZ Pass.

140.     Despite Defendants' knowledge that EZ Pass gantries may fail to pick up a valid transponder, Defendants fail to adequately warn consumers of this fact because Defendants reap significant profits from their equipment "malfunctions."

141.     Moreover, Defendants fail to notify customers of any purported problems with their accounts until several violations have accrued, allowing Defendants to increase the fees that they charge to the drivers. Often Defendants wait more than a month before notifying the driver of the charge. Defendants then illegally seek additional fines and penalties based on their own delay.

142.     Because equipment that scans EZ Passes does not confirm that an EZ Pass is registered (like a toll booth would) a user receives no immediate indication that his EZ Pass has not been read. A user may not find out for months (or even more than a year), when the Defendants finally send a letter, notice or summons.

**Defendants Assess Excessive Fines When They Register a Real or Perceived
Violation by an EZ Pass User**

143.     If Defendants' EZ Pass scanning equipment does not read an EZ Pass, or if an EZ Pass Account is not adequately funded due to an expired or cancelled credit card, Defendants immediately begin to assess fines and penalties.

144.     As alleged above, at all relevant times, Defendants have assessed a fee of $50 or $100 per trip on top of the toll payment.

145.    If a driver somehow "knows" that she has committed an EZ Pass toll violation, she cannot pay the toll voluntarily using Defendants' website because there is a lengthy lag in time between when the toll violation occurs and when Defendants first post information about it on their website.

146.    The "fee" charged by Defendants is not, as required by New York law, reasonably related to the actual cost of collecting the unpaid toll.  Moreover, in the case of multiple violations against the same driver, Defendants charge the $50 or $100 fee *per violation*. As a result, an EZ Pass user can end up with hundreds or thousands of dollars in fees in a short time.

147.    According to Defendants, the fees cover the cost associated with locating and contacting the driver.  If this were the case, however, this should be a one-time fee rather than a per violation fee.  In any event, because Defendants locate the driver based on a state records search that takes seconds or minutes, at most, to complete, the fee amount has no relationship to Defendants' actual costs.

148.    Such civil fines and penalties are unconstitutional, unreasonable, unconscionable, and illegal and in no way related or proportional to the toll incurred by using the roadway.

**Defendants Also Assess Excessive Fines for Tolls-By-Mail**

149.    Defendants send a Tolls-By-Mail notice to drivers who do not have EZ Pass and to drivers whose EZ Pass does not register.

150.    Like the EZ Pass notices, the Tolls-By-Mail notices assess a $50 or $100 fee for each purported violation and often are sent by Defendants weeks or months after the toll violation.  As a result, drivers have no notice about the fee, or the risk of having the fee assessed, and they often incur multiple fees within a very short amount of time.

**Defendants Provide No Notice and No Reasonable Opportunity to Dispute**

151.    After a purportedly missed toll, Defendants should send an invoice via regular mail to the address of the registered owner of the vehicle requesting payment of the toll.

152.    Upon information and belief, in Conduent's Tolls-By-Mail and EZ Pass contracts with the MTA, NYSTA, and the Port Authority, Conduent was given strict performance standards for notifying drivers. For instance, in a 2005 contract with Conduent (then called Affiliated Computer Services), which was renewed with Conduent in 2017, the NYSTA required that Conduent mail statements "[w]ithin 7 calendar days of statement cycles," provide notices of speeding violations "within 3 business days of posting date," and process "toll evasion" images "within 3 business days of receipt" and provide notices of "toll evasion" within "3 business days from obtaining demographic information from the DMV or customer database." Exhibit 4.

153.    Conduent frequently, however, sends invoices and notices of alleged violations only months after the fact, in violation of its agreements with the state agencies from which it derives its authority.

154.    Although Conduent's notice procedures fall short of what is required by its own agreements, Conduent nevertheless places the blame on drivers by adding administrative fees for nonpayment in the very first notices drivers receive from Conduent.

155.    Defendants make no effort to determine whether the toll violator has a registered EZ Pass account that is available to pay the account holder's tolls. As a result, Defendants charge Class members for unpaid tolls due to the equipment failure that are not the fault of the Class members even if they have EZ Pass accounts from which tolls can be paid.

156.    Defendants also charge Class members with EZ Pass accounts with expired or cancelled credit cards for unpaid tolls, including fees and penalties, without notifying the Class

member of the expired or cancelled card.  Further, when a Class member updates his or her account with new credit card information, even if that happens in a matter of days, unpaid tolls are not charged to the account and instead Defendants pursue unconscionable and unconstitutional amounts of fees and expenses from the Class members.

157.    Without providing notice until months after the fact, Defendants have devised a system in which drivers will unwittingly continue to rack up violations (and administrative fees).

158.    Defendants have acknowledged the inadequacy of Conduent's notice procedures. For instance, in a January 18, 2018 letter from the Executive Director of NYSTA to the General Manager of Transportation at Conduent, the Executive Director of NYSTA specifically expressed concern over the "lag time from [drivers] travel over the bridge to when they receive a bill."  He specifically requested that Conduent consider "designing an alternative communication option for customers."

159.    Similarly, at a March 19, 2018, monthly meeting of the Triborough Bridge and Tunnel Authority Committee, "Commissioner [Mitchell H.] Pally asked how customers will know whether their E-ZPass has a low balance or insufficient funds since ORT [Open Road Tolling] eliminated gates and driver feedback indicators." No satisfactory response was offered, but rather yet-to-be-implemented plans were discussed.

160.    Another committee member conceded that both EZ Pass and Tolls-by-Mail users "are impacted by lack of driver feedback signage and the elimination of toll gates."

161.    Although Defendants recognize the inadequacies of their notice procedures, they continue to place blame on drivers by charging them excessive fees and penalties and, in the case of malfunction, inadequate funds, or other issues with a driver's EZ Pass, charging fees and

penalties for each toll even though the drivers could not have known of an issue without being notified.

162.    As discussed below, Defendants ignore consumers' attempts to dispute the existence of, or amounts of, purported toll violations and/or the fees and fines associated with them.

### Defendants Regularly Violate The FDCPA

163.    Defendants regularly demand payment from consumers of unpaid tolls and fees and provide consumers itemizations of amounts that Defendants are attempting to collect. Defendants did so as to Plaintiffs.

164.    Defendants regularly tell consumers in correspondence that "this is an attempt to collect a debt.  Any information obtained will be used for that purpose" and/or that the communication is from a debt collector.

165.    Defendants falsely represent the character and amount of the debt in violation of 15 U.S.C. § 1692e(2)(A) and they demand payments far in excess of what is allowed by Plaintiffs' contract and law in violation of 15 U.S.C. § 1692f(1).

166.    Specifically, Defendants demand payments in the amount of $50.00 or $100.00 for each alleged unpaid toll, which is not allowed by Defendants' contracts.

167.    Furthermore, Defendants falsely claim that Plaintiffs do not have the right to dispute some of the fees Defendants seek to collect.

168.    Collections agencies, like Defendants AllianceOne, Transworld, and Linebarger work on a contingency and keep for their own private gain a portion of the improper fees collected.

## CLASS ALLEGATIONS

169.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  As detailed further below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

170.    The proposed class is defined as:

> All users of Defendants' bridges, tunnels, and roads in New York who either held an EZ Pass at the time of the purported violation or received a Tolls-By-Mail notification and who have been assessed a fee and/or civil penalties by Defendants without first receiving a notice demanding payment of just the toll and/or assessed a fee and/or civil penalty when the gantry failed to read an otherwise compliant EZ Pass tag.

171.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

172.    Excluded from the Class are Defendants, their parents, subsidiaries, affiliates, officers and directors, any entity in which Defendants have a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

173.    **Numerosity.** The members of the Class are so numerous that joinder is impractical. The Class consists of thousands of members, the identity of whom is within the knowledge of and can be readily ascertained through Defendants' records.

174.    **Commonality.** Plaintiffs' claims are typical of the claims of the Class in that they, like all Class members, were assessed illegitimate fees and fines by Defendants. The representative Plaintiffs, like all Class members, have been damaged by Defendants' misconduct because Defendants have assessed unfair and unconscionable charges against them.

Furthermore, the factual basis of Defendants' misconduct is common to all Class members and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

175.    **Predominance.** There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

176.    Among the questions of law and fact common to the Class are whether:

(i)    Defendants are liable for the claims alleged in this Complaint;

(ii)    Defendants have been unjustly enriched; and

(iii)    Plaintiffs are entitled to injunctive relief and damages, including actual statutory, punitive and treble damages.

177.    **Typicality.** Plaintiffs' claims are typical of the claims of other members of the Class in that they arise out of the same wrongful policies and practices by Defendants. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class members.

178.    **Adequacy.** Plaintiffs are committed to vigorously prosecuting this action and have retained competent counsel experienced in prosecuting class actions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

179.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendants, no Class member could afford to seek legal redress individually for the

claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Defendants' misconduct will proceed without remedy.

180.    Even if members of the Class themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings.

181.    By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. Section 1983 (Violation of the Eighth Amendment of the United States Constitution) and Violation of Article I, Section 5 of the New York Constitution (Against each defendant)**

182.    Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

183.    Defendants are operating under the authority of the state when they collect tolls, fees and civil penalties for themselves.

184.    Private entity Defendants Conduent, AllianceOne, Transworld, and Linebarger have been delegated the traditional government functions of traffic enforcement and toll collections by the State.

185.    The enforcement of the civil penalty assessments discussed above constitutes a violation of the United States Constitution's Eighth Amendment and New York Constitution's (Article One, Section Five) protection against excessive fines.

31

186.     Plaintiffs and members of the Class were assessed enormous fines, costs, and penalties which are unreasonable and bear a grossly disproportionate relationship to the tolls actually incurred. As a result, those fines, costs, and penalties are unconstitutional.

187.     This is especially so because Plaintiffs and members of the Class did not know they did not pay the tolls or did not receive notice that they did not pay any given toll until weeks or even months later, in many cases only after they had incurred dozens more unpaid tolls.

188.     Defendants impose these penalties in order to maximize their profits.

189.     As a direct result of Defendants' acts and omissions, that were performed under the authority of the State of New York, Plaintiffs and members of the Class have suffered damages, and/or are entitled to restitution, in an amount to be proven at trial.

190.     Pursuant to 42 U.S.C. § 1988, Plaintiffs further seek their costs and attorneys' fees incurred as a result of this lawsuit.

### SECOND CLAIM FOR RELIEF
**42 U.S.C. Section 1983 (Violation of Procedural Due Process Under the United States Constitution) and Violation of Article I, Section 11 of the New York Constitution (Against each defendant)**

191.     Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

192.     Defendants are operating under the authority of the government when they collect fees and civil penalties for themselves.

193.     Private entity Defendants Conduent, AllianceOne, Transworld, and Linebarger have been delegated the traditional government functions of traffic enforcement and toll collections by the State.

194.     The scheme described above violates the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution and violates the New York Constitution for the following reasons, among others:

(a)     Defendants impose fees and penalties for multiple violations on class members who do not know and could not reasonably know that they have incurred multiple violations;

(b)     Defendants do not send invoices regularly and at times provide notice of alleged toll violations only months afterwards;

(c)     Before notice is given, drivers may have passed through the toll road dozens of times, unknowingly racking up hundreds or thousands of dollars in penalties and fees;

(d)     Defendants do not provide adequate notice of violations before charging fees and penalties for further violations;

(e)     When invoices are sent, they do not notify drivers of the amount of fees or the severity of penalties that will be imposed if tolls go unpaid or the date by which payment must be made to avoid those increased fee and penalties;

(d)     There is no adequate opportunity to be heard on the amount of the civil penalty and fees;

(e)     The penalties and fees are so excessive that class members do not have fair notice that they will be imposed; and

(d)     The penalties and fees bear no reasonable relation to the amount of the toll or the costs to the state or to Defendants of collecting the toll.

195.     Defendants have the email addresses and/or phone numbers of all EZ Pass users and could have immediately notified Plaintiffs and Class Members of any problems with the

processing of their toll payment. Instead, Defendants do not notify Plaintiffs or Class Members until months later, after they have racked up several such instances of inadvertent non-payment.

196.    The deprivations of the rights of Plaintiffs and members of the Class as described above were a proximate result of the policies, procedures, practices, and/or customs maintained by New York and Defendants.

197.    As a direct and legal result of the acts and omissions of Defendants, and each of them, Plaintiffs and members of the Class have suffered damages, and/or are entitled to restitution, in an amount to be proven at trial.

198.    Plaintiffs and members of the Class seek injunctive relief to stop Defendants' unlawful policies, procedures, practices and/or customs described above.

199.    Pursuant to 42 U.S.C. § 1988, Plaintiffs further seek costs and attorneys' fees incurred as a result of this lawsuit.

**THIRD CLAIM FOR RELIEF**
**15 U.S.C. §§ 1692e(2), 1692f(1), and/or 1692g**
**Violations of the Fair Debt Collection Practices Act**
**(Against each defendant)**

200.    Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

201.    As set forth above, Defendants violated the FDCPA by making false and misleading representations, and engaging in unfair and abusive practices in violation of § 1692g.

202.    Each Defendant worked with the other Defendants to notify Plaintiffs and the Class of the claimed outstanding debt and to try to collect that debt.

203.    Defendants attempted to collect knowingly excessive and inflated fines and fees in violation of § 1692e(2) and/or 1692f(1).

204.    Defendant AllianceOne has told Plaintiffs and other Class members that they could not dispute the inflated and excessive fees. AllianceOne has also failed to provide to Plaintiffs requested information regarding purported debts.

205.    Upon information and belief, Defendants AllianceOne, Transworld, and Linebarger work on a contingency and keep for their own private gain a portion of the improper fees collected.

206.    Defendants' violations of the FDCPA entitle Plaintiffs and members of the Class to their actual damages (for only the (d) and (f) claims) in an amount to be proved at trial, to statutory damages (for the (g) claim), costs and attorneys' fees, and to any additional relief this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
### Violation of the New York Consumer Protection Act,
### NYGBL §§ 349-350
### (Against each defendant)

207.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein and further allege as follows.

208.    NY GBL §349 makes unlawful any deceptive acts and practices in connection with the conduct of any business, trade or commerce or in the furnishing of any service in New York.

209.    Defendants' cashless tolling and billing practices have a broad impact on consumers at large. Defendants' conduct is therefore consumer-oriented.

210.    Defendants' imposition and collection scheme for EZ Pass and Tolls-By-Mail was false, misleading, deceptive, unfair and unlawful.

211.    At all relevant times, Defendants' acts and practices alleged herein were in the conduct of business, trade or commerce or in the furnishing of services in the state.

212.    Defendants' practices injured and impacted Plaintiffs, the Class, and the public.

213.    Defendants knew, or should have known, about the improper and inflated charges as alleged above, including that drivers in New York were often being charged multiple $100 fees.

214.    Defendants misrepresented the amount Plaintiffs owed by adding false "fees" that were only the result of Defendants' own conduct in both assessing violations where there were none and by sending notices and invoices so late that Defendants added fees and penalties.

215.    Defendants falsely blamed Plaintiffs for the $100 fees, claiming that they were due to insufficient account balances, late payments, failure to register an EZ Pass tag, or any number of other reasons. In reality, these fees that so rapidly accumulate result from Defendants' failure to properly notify drivers.

216.    Despite this knowing that their own systems were at fault, Defendants continued to impose fines and fees without prior notice and continued to pursue collections of those fines and fees, threatening drivers with collection efforts, threatening to ruin the drivers' credit rating, and threatening to suspend the drivers' driving privileges.

217.    Plaintiffs and the Class have been damaged by Defendants' conduct.

218.    Defendants willfully and knowingly violated section 349 of the New York General Business Law. As such, Plaintiffs and the Class members are entitled to treble damages.

219.    Plaintiffs and the Class seek injunctive relief, damages, statutory damages, and treble damages for each violation of the GBL plus an award of attorneys' fees pursuant to NY GBL §349 (h).

## FIFTH CLAIM FOR RELIEF
### Breach of Contract
**(Against the MTA, the Triborough Bridge and Tunnel Authority, the New York State Thruway Authority, and the Port Authority of New York and New Jersey)**

220.    Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

A.  Breach of EZ Pass Contract

221.    Plaintiffs had a contract for the use of the EZ Pass electronic toll collection system with Defendants the MTA, the Triborough Bridge and Tunnel Authority, the New York State Thruway Authority, and the Port Authority of New York and New Jersey.

222.    The contract states that the Plaintiffs' EZ Pass accounts will be "assigned to one of the above mentioned agencies, and your Agreement is with that particular agency."

223.    Plaintiffs do not have access to information regarding which agency their particular EZ Pass accounts were assigned. Regardless of which agency each Plaintiff was assigned, they were treated similarly because all the agencies delegated the operation of EZ Pass to Conduent.

224.    Plaintiffs agreed, in that contract, to be assessed tolls and reasonable administrative fees where appropriate.

225.    Specifically, Plaintiffs agreed to pay fees where a toll violation has actually occurred because their "Account in in a negative balance, suspended or revoked as a result of E-Z Pass violations or any other reason, or after the Tag has been reported lost or stolen." Contract at ¶ 5(a). Plaintiffs also agreed to pay administrative fees if they "use the Tag in a vehicle other than one of the class for which the Tag is designated." *Id.* at ¶ 5(b).

226.    The contract does not allow Defendants to charge Plaintiffs with administrative fees of $100 for using a properly installed transponder connected to a funded EZ Pass account which is simply not read.

227.    By assessing administrative fees where no violation has occurred, Defendants the MTA, the Triborough Bridge and Tunnel Authority, the New York State Thruway Authority, and the Port Authority of New York and New Jersey have breached their contracts with Plaintiffs.

228.    Defendants have also breached the contract by adding fees and penalties for late payments for tolls which Defendants had not previously invoiced Plaintiffs.

229.    Defendants the MTA, the Triborough Bridge and Tunnel Authority, the New York State Thruway Authority, and the Port Authority of New York and New Jersey have breached their contracts with Plaintiffs have also breach the implied covenant of good faith and fair dealing.

230.    By failing to notify Plaintiffs and members of the Class of their purported violations until months after the fact, Defendants sought to prevent Plaintiffs from performing their part of the contract – timely paying or disputing tolls and/or fees – in order to charge unnecessary fees that Plaintiffs could have avoided had they been notified earlier that they have been assessed a violation. This constitutes a breach of the implied covenant of good faith and fair dealing.

231.    Furthermore, where a contract contemplates the exercise of discretion, the implied covenant of good faith and fair dealing includes a promise not to act arbitrarily or irrationally in exercising that discretion.

232.    Plaintiffs granted Defendant-counterparties to their contracts the right to "receive updated information about [their] credit card, including new account numbers and expiration

38

dates, from the financial institution issuing the card"; the right to "receive updated banking information including routing numbers, account numbers, and account type, from [their] financial institution"; and the right to "receive updated information about their address[es] from the United States Postal Service."

233.   Despite Plaintiffs having granted Defendants this authority so that Defendants would receive timely payments from Plaintiffs, Defendants declined to exercise this discretion in bad faith to profit from exorbitant "administrative fees." By failing to seek updated information and instead charging Plaintiffs and the Class $100 in administrative fees per use of the EZ Pass, Defendants breached the implied covenant of good faith and fair dealing.

B.   Breach of Tolls-By-Mail Contract

234.   Upon information and belief, there is no written contract for use of Tolls-By-Mail.

235.   Instead, Defendants the MTA, the Triborough Bridge and Tunnel Authority, the New York State Thruway Authority, and the Port Authority of New York and New Jersey offer use of their roads, tunnels, and bridges to those willing to pay tolls.

236.   When drivers approach a cashless toll, they are notified that they will be billed by mail for the toll in a given amount. These signs relaying that there is a toll, the amount of the toll, and that bills would be mailed the constitute offer and the terms of the offer.

237.   Driving through the toll constitutes acceptance of that offer through performance.

238.   Defendants have failed to timely send out bills and have included administrative fees for purported nonpayment of tolls. However, because Plaintiffs were informed they would be billed by mail for a toll, and the first notice Defendants sent was (sometimes several months later) a bill for the toll and fees and penalties for nonpayment, Defendants breached their end of the bargain – billing Plaintiffs for tolls, by mail. The bills did not reflect the cost of a mutually

assented toll but unilaterally imposed unavoidable fees and penalties that are the fault of Defendants' billing practices. As such, Defendants have breached the contract accepted by Plaintiffs for Tolls-By-Mail.

239.    By failing to timely bill Plaintiffs and members of the Class by mail and adding on administrative fees for nonpayment of tolls, Defendants are preventing Plaintiffs from performing their part of the contract – paying the tolls on time. Defendants have therefore also breached the implied covenant of good faith and fair dealing.

### SIXTH CLAIM FOR RELIEF
#### Tortious Interference with Contract
#### (Against Conduent Inc., AllianceOne, Transworld, and Linebarger)

240.    Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

241.    Plaintiffs and Defendants the MTA, the Triborough Bridge and Tunnel Authority, the New York State Thruway Authority, and the Port Authority of New York and New Jersey have contracted for toll road use services under both the EZ Pass program and the Tolls-By-Mail program.

242.    As part of that contract, Plaintiffs and the Class members are entitled to, *inter alia*, use toll roads and may be assessed tolls and reasonable administrative fees and civil penalties where appropriate.

243.    Defendants Conduent Inc., AllianceOne, Transworld, and Linebarger were not parties to Plaintiffs' EZ Pass contracts or their Tolls-By-Mail contracts.

244.    At all times, Defendants Conduent Inc., AllianceOne, Transworld, and Linebarger were aware of the existence of the Terms and Conditions between Plaintiffs and the Class members and, on the other hand, Defendants the MTA, the Triborough Bridge and Tunnel

Authority, the New York State Thruway Authority, and the Port Authority of New York and New Jersey.

245.    Conduent was delegated the responsibility to carry out the terms of customers' contracts, including customer service, billing, and running the cashless tolling operations and systems themselves for both EZ Pass and Tolls-By-Mail. By failing to timely notify Plaintiffs and the Class of purported violations in order to cause additional fees and penalties and by assessing fees where no violation has occurred, Conduent has caused the MTA, the Triborough Bridge and Tunnel Authority, the New York State Thruway Authority, and the Port Authority of New York and New Jersey to breach their obligations to Plaintiffs and Class members.

246.    The collection Defendants – AllianceOne, Transworld, and Linebarger – assisted Conduent in causing breaches to the EZ Pass and Tolls-By-Mail contracts. AllianceOne, Transworld, and Linebarger acted as agents of Conduent and worked together with Conduent to overcharge drivers in New York.

247.    Defendants tortiously interfered with this contractual relationship and prevented Plaintiffs and the Class members from obtaining the full benefits of this contractual relationship because Conduent, AllianceOne, Transworld, and Linebarger continually imposed fees and penalties on drivers that had properly installed transponder connected to funded E–Z Pass accounts which were not read by the toll operator. Defendant Conduent further caused a breach of contract by failing to notify drivers of purported violations until months after the fact.

248.    The contracts nowhere authorize Defendants to charge excessive and unreasonable administrative fees and civil penalties.

249.    Defendants charged fees and penalties contrary to New York law and contrary to Plaintiffs' contracts.

250.   Defendants sought to collect those fees on each other's behalf.

251.   Therefore, Defendants tortiously interfered with the performance of the contracts.

252.   As a direct, proximate, and foreseeable result of Defendants' tortious interference with Plaintiffs and the Class members' contracts, Plaintiffs and the Class members have been legally injured and sustained damages by not receiving the full benefit of their contractual bargain.

253.   Plaintiffs and members of the Class have performed all, or substantially all, of the obligations imposed on them under the Terms and Conditions.

254.   Plaintiffs and members of the Class have sustained damages as a result of Defendants' tortious interference with the Terms and Conditions.

**SEVENTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against all defendants)**

255.   Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

256.   In the alternative, Plaintiffs, on behalf of themselves and the Class, asserts a common law claim for unjust enrichment.

257.   By means of Defendants' wrongful conduct alleged herein, Defendants knowingly assessed fees and charges on Plaintiffs and members of the Class that were unfair, unconscionable, and/or oppressive.

258.   Plaintiffs have paid at least some of the wrongfully assessed fees.

259.   Defendants knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Class. In so doing, Defendants acted with conscious disregard for the rights of Plaintiffs and members of the Class.

260.    As a result of Defendants' wrongful conduct as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

261.    Defendants' unjust enrichment is traceable to, and resulted directly and approximately from, the conduct alleged herein.

262.    It is inequitable for Defendants to be permitted to retain the benefits they received, and are still receiving, without justification, from the imposition of fees and fines on Plaintiffs and members of the Class in an unfair, unconscionable, and oppressive manner.

263.    Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

264.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and members of the Class.

265.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the Class all wrongful or inequitable proceeds received by them.

266.    A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendants traceable to Plaintiffs and the members of the Class.

267.    Plaintiffs and members of the Class have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class demand a jury trial on all claims so triable and judgment as follows:

A.    Declaring Defendants' fee and penalty policies and practices and collection methods to be wrongful, unfair, and unconscionable and enjoining any such future collections;

B.       Awarding restitution of unconstitutional fees and penalties paid to Defendants,

and other appropriate declaratory and/or injunctive relief, as a result of the wrongs alleged herein

in an amount to be determined at trial;

C.       Awarding disgorgement of the ill-gotten gains derived by Defendants from their

misconduct;

D.       Awarding actual damages in an amount according to proof;

E.       Awarding punitive, treble, statutory and exemplary damages;

F.       Awarding pre-judgment interest at the maximum rate permitted by applicable law;

G.       Awarding costs and disbursements incurred by Plaintiffs and the Class in

connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

H.       Awarding such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all causes of action so triable.

Dated: April 30, 2018

Respectfully submitted,

SQUITIERI & FEARON, LLP

By: /s/Stephen J. Fearon, Jr.
        Stephen J. Fearon, Jr.

Stephen J. Fearon, Jr.
Raymond N. Barto
32 East 57th Street -12th Floor
New York, New York 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: stephen@sfclasslaw.com
          raymond@sfclasslaw.com

Joseph Santoli
LAW OFFICE OF JOSEPH SANTOLI
340 Devon Court
Ridgewood, New Jersey 07450

Telephone:  (201) 926-9200
Facsimile:   (201) 444-0981
Email: josephsantoli@aol.com

Counsel for Plaintiffs and the Class