UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
JASON FARINA, CHARLES GARDNER,
DOROTHY TROIANO, DELORIS RITCHIE and
MIRIAN ROJAS, on behalf of themselves and all
others similarly situated,

      Plaintiffs,         18-cv-1433 (PKC)

    -against-            OPINION
                   AND ORDER

METROPOLITAN TRANSPORTATION
AUTHORITY, TRIBOROUGH BRIDGE AND
TUNNEL AUTHORITY, THE PORT
AUTHORITY OF NEW YORK AND NEW
JERSEY, NEW YORK STATE THRUWAY
AUTHORITY and CONDUENT STATE AND
LOCAL SOLUTIONS, INC.,

      Defendants.
----------------------------------------------------------x

CASTEL, U.S.D.J.

    E-Z Pass technology was first introduced late last century and met with initial

public skepticism. With the passage of time, it has been embraced as a convenience that

eliminates a driver's search for loose change and reduces traffic backups at toll-collection

points.[1] The State of New York is one of 17 states where E-Z Pass is available. Since 2017,

New York's toll collection has moved toward "cashless tolling," in which a car's passage

through a toll point is recorded through the E-Z Pass transponder or a license-plate reader.

---

[1] The undersigned discloses that in the pre-E-Z Pass era, in or about 1971-72, he and others were hired by one of
New York's toll-collecting agencies to distribute fliers at bridge crossings encouraging drivers to have exact change
("Exact tolls makes 'em roll. Exact change moves the lanes."). After a day and a half, the ill-conceived flier-
distribution program was abruptly discontinued after a chorus of outcries from drivers whose daily commutes were
worsened by slowdowns caused by the flier distribution.

Those not registered with an E-Z Pass account are billed by mail. Neither E-Z Pass nor the transition to cashless tolls has been problem-free.

Plaintiffs are five drivers who allege that they were wrongfully sent notices to pay fines for failing to comply with aspects of the cashless tolling process. Four of the five plaintiffs received fine notices for failing to comply with some aspect of the automated E-Z Pass system, and a fifth plaintiff received fine notices for failing to pay toll bills sent to her as part of the state's "Tolls-By-Mail" program, an adjunct of the cashless tolling program. Plaintiffs allege that defendants did not give them notice of their violations until long after they occurred, during which time they accumulated fines that totaled from several hundred to tens of thousands of dollars.

Several plaintiffs have successfully challenged the fines that were initially demanded and do not allege that they paid anything more than the tolls. With noted exceptions, plaintiffs who may have paid some amount in fines fail to distinguish in the Complaint between the amount paid in tolls and the amount paid in fines.

Plaintiffs bring a variety of state and federal claims on behalf of themselves and a putative class. They allege that defendants have violated the Eighth Amendment's prohibition against excessive fines, and, separately, failed to give them fair notice in violation of the procedural due process guaranteed by the Fourteenth Amendment. Plaintiffs also bring state law claims for breach of contract, tortious interference with contract, and unjust enrichment, and assert that defendants violated sections 349 and 350 of the New York General Business Law. Plaintiffs seek money damages, disgorgement, restitution, injunctive relief and punitive damages.

Defendants Triborough Bridge and Tunnel Authority ("TBTA"), the Port Authority of New York and New Jersey ("Port Authority") and the New York State Thruway

Authority (the "Thruway Authority") are public entities that administer aspects of New York's toll systems. Defendant Conduent State and Local Solutions, Inc. ("Conduent") is a private company that contracted to administer aspects of the cashless-tolling process.

The TBTA, Port Authority and Thruway Authority assert that plaintiffs do not have Article III standing, and move to dismiss the Complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), Fed. R. Civ. P. All defendants move to dismiss the Complaint for failure to state a claim. Rule 12(b)(6), Fed. R. Civ. P.

For the reasons that will be explained, the Rule 12(b)(1) motions will be denied in their entirety. The Rule 12(b)(6) motions will be granted, except as to the excessive fine and unjust enrichment claims of Dorothy Troiano against the TBTA.

BACKGROUND.

A. Overview of the Cashless Tolling System.

In 2017, the TBTA, Port Authority and Thruway Authority "switched many of their bridges and tunnels to 'cashless toll' collecting, meaning that tolls are collected from drivers using automated systems." (Compl't ¶ 2.) Tollbooths were dismantled and drivers could no longer pay in cash at many crossings. (Compl't ¶ 2.) Instead, tolls were collected through "E-Z Pass" and "Tolls-By-Mail" systems. (Compl't ¶¶ 2, 57.) Among other claimed benefits, cashless tolling alleviates congestion at crossings and permits the agencies to shift responsibilities from toll collection to security and safety. (Compl't ¶ 61.)

Drivers participating in the E-Z Pass system affix a tag to their vehicle, and maintain an E-Z Pass account linked to their bank account or credit card. (Compl't ¶¶ 58-59.) When the vehicle passes through a tolling location, an E-Z Pass transponder on or in the car communicates with an antenna, and the E-Z Pass account is charged for the toll. (Compl't ¶ 58.)

When an account's balance becomes low, the driver's bank or credit card is automatically charged to "reload" the account. (Compl't ¶ 59.)

As part of the cashless-tolling system, New York maintains a "Tolls-By-Mail" system for drivers who are not enrolled in E-Z Pass. (Compl't ¶ 60.) The vehicle and its license plate are photographed when a driver passes through a tolling point on a bridge, road or tunnel. (Compl't ¶ 60.) A license-plate reader is used to identify the vehicle's registered owner, and a bill for the toll is then mailed to its owner. (Compl't ¶ 60.)

Defendants are responsible for different bridges, tunnels and roadways in the State of New York. The TBTA is controlled by the Metropolitan Transportation Authority ("MTA"), and oversees seven toll bridges and two tunnels around New York City. (Compl't ¶¶ 24-28.) The Thruway Authority manages the Governor Thomas E. Dewey Thruway in New York, which includes 496 miles of toll roads. (Compl't ¶¶ 29-33.) The Port Authority oversees the bridge and tunnel crossings between New York and New Jersey, including the Lincoln and Holland tunnels and the George Washington Bridge. (Compl't ¶¶ 34-35.)

These public authorities outsourced billing and collection duties to various private companies, including Conduent, which allegedly manages billing for the cashless tolling system, and sent bills and notices to drivers who incur fines. (Compl't ¶¶ 49-55.)[2]

B. Fines Administered for Violations of Cashless-Tolling Procedures.

The Complaint and the parties' memoranda variously refer to charges (other than actual tolls) as "penalties," "fees" and "fines." There appears to be no meaningful distinction

---

[2] The Complaint names Conduent, Inc. as a defendant in this case. The parties have stipulated that Conduent State & Local Solutions, Inc. is to be substituted as a defendant, with all allegations in the Complaint amended accordingly. That stipulation has been entered as an Order. (Docket # 84.)

between the terms. For consistency, the Court refers to them as "fines," except where quoting from a submission.

Defendants impose fines upon vehicle owners who fail to comply with aspects of the cashless tolling system. The TBTA and the Thruway Authority have adopted regulations that govern imposition of such fines.

The Thruway Authority provides for a "toll violation fee . . . in the amount of $100.00" for the "evasion, nonpayment, payment in other than lawful currency, payment of less than the full amount required or other failure to comply with the published toll rates or tolls for any reason along the Thruway System for any cashless tolling facility . . . ." 21 N.Y.C.R.R. § 101.3(a)(1)(i)(*a*).

The regulations of the TBTA set a "toll violation fee" in the amount of $50 or $100, depending on the crossing. 21 N.Y.C.R.R. § 1021.3(b). For instance, the failure to properly pay the toll at the Henry Hudson Bridge will result in a $50 fine, whereas a fine of $100 is assessed for failure to pay the toll at the Queens Midtown Tunnel. Id. The fine is charged to "[t]he owner of any vehicle which violates toll collection regulations by crossing a bridge or tunnel without paying the crossing charge prescribed by the Authority . . . ." Id. The fine "shall be in addition to the applicable crossing charge and any fines and penalties otherwise prescribed by law or by agreement." Id. The TBTA's regulations also establish a procedure for disputing a fine, which includes the vehicle owner's filing of an initial complaint, a decision by the TBTA's "Authorized Agent" and an administrative appeal to the TBTA. Id. § 1021.3(d)-(f).

The parties have not pointed to any regulation by the Port Authority that governs the administration of fines or establishes a process to dispute them. However, New York and New Jersey both have statutes that permit the Port Authority to charge tolls for the construction

and maintenance of tunnels and bridges.  N.Y. Unconsolidated L. § 6501; N.J. Stat. Ann. § 32:1-118.  Plaintiffs do not assert that the Port Authority lacks authorization to set fines for violating cashless-tolling procedures.

For plaintiffs who participated in the E-Z Pass program, an agreement included certain terms and conditions that governed its use (the "Agreement").  (Compl't ¶¶ 134, 136; Fausti Dec. Ex. A.)  Under the heading "Violations," the Agreement provides that if a user's account "is in a negative balance, suspended or revoked as a result of *E-ZPass* speed violations or any other reason, or after the Tag has been reported lost or stolen, you may: incur administrative fees of up to $100 per occurrence . . . ."  (Agrm't ¶ 5.a.)  It also provided for a $100 fine if the E-Z Pass tag is affixed to a vehicle "other than one of the class for which the Tag is designated . . . ."  (Id. ¶ 5.b.)

According to the Complaint, where an E-Z Pass account is underfunded, or scanning equipment malfunctions and incorrectly flags a vehicle for non-payment, defendants immediately assess fines.  (Compl't ¶ 143.)  The fines are in an amount of $50 or $100, and are assessed in addition to the underlying toll.  (Compl't ¶ 144.)

The Complaint alleges that "[i]n many cases" defendants' equipment inaccurately registers a violation when a valid, funded E-Z Pass account is in use.  (Compl't ¶ 138.)  Electronic toll-reading equipment, which is known as a "gantry," sometimes fails to recognize a valid pass.  (Compl't ¶ 138.)  E-Z Pass readings may fail for other reasons, including windshield tinting, a car's position in the toll lane, or a dead E-Z Pass battery.  (Compl't ¶ 139.)  Plaintiffs allege that defendants do not adequately warn drivers of E-Z Pass malfunctions because the errors allowed defendants to "reap significant benefits."  (Compl't ¶ 140.)  They allege that by

waiting a month or more to alert owners of a violation of E-Z Pass policy, defendants allowed fines to recur. (Compl't ¶ 141.)

Although the Complaint describes these possible equipment malfunctions, it does not allege that any plaintiff was wrongfully charged a fine based on such a malfunction.

### C. Defendants' Alleged Delay in Notifying Plaintiffs that They Had Violated Tolling Policies.

The Complaint alleges that defendants do not provide timely notice of tolling violations, and that plaintiffs received notice only weeks or months after an alleged violation. (Compl't ¶ 4.) During that time, plaintiffs allege that they unknowingly continued to violate cashless tolling policies and accrue additional fines.

As described in the Complaint, the delay in alerting plaintiffs of their violations had a different consequence depending on whether the driver used E-Z Pass or was billed through the Tolls-By-Mail program. In all instances, plaintiffs assert, any delay in notice allowed defendants to use cashless tolling as "a profit center that imposes unfair and improper charges" by "imposing fees and penalties that dwarf the amount of the tolls." (Compl't ¶ 66.)

The Complaint alleges that E-Z Pass customers who did not receive timely notice of an initial violation were unaware that their continued travel through toll crossings would incur similar fines for similar violations. For example, the Complaint lists numerous tolling violations asserted against plaintiff Jason Farina, with the first violation occurring at the Throgs Neck Bridge on October 18, 2017. (Compl't ¶ 70.) For each violation, Farina was charged a $100 fine, in addition to $8.50 owed for the underlying toll. (Compl't ¶ 70.) The notices of violation sent to Farina by the TBTA stated, "Our records indicate that the vehicle bearing E-ZPass Tag number listed below crossed [a TBTA] Facility without payment of the Toll(s)." (Bressler Dec.

Ex. 1.)  A form notice included the heading, "WHY DID I RECEIVE A VIOLATION?" with the following answer:

> You received this violation because an invalid E-ZPass Tag was used in a vehicle registered to you.  The account associated with the E-ZPass Tag had a negative balance, or the Tag was speed suspended, revoked, reported lost or stolen, or the Tag was an Unregistered on-the-go Tag.

(Bressler Dec. Ex. 1.)

Farina alleges that he first received notice on November 25, 2017 of unpaid tolls from the prior October.  (Compl't ¶ 68.)  However, according to the Complaint, because Farina was not aware that his E-Z Pass tag was invalid, he continued to use facilities charging a toll, during which time he accumulated additional violations and fines.  (Compl't ¶¶ 82, 157.)  As described in the Complaint, from October 18, 2017 through January 7, 2018, Farina's E-Z Pass account accrued 61 violations with fees of $6,100.  (Compl't ¶ 74.)  Plaintiffs state that although the purported purpose of the fines is to cover the costs of locating and contacting drivers, that explanation is inconsistent with the size of the fines and the relative ease of obtaining a vehicle owner's information.  (Compl't ¶ 147.)

For the Tolls-by-Mail program, fines were demanded when a vehicle owner did not make a timely payment after being sent a bill.  Plaintiff Deloris Ritchie states that she received tolling bills through the mail and paid them as instructed without difficulty, until November 2017, when her car was impounded and the Thruway Authority notified her that she owed $12,000 for unpaid tolls and fines.  (Compl't ¶¶ 109-11.)  Tolls-By-Mail fines are assessed when the recipient does not make a timely payment on the underlying toll, and Ritchie asserts that because she was not timely notified of the payments due, it was improper to add $100 fines to each of her tolls.  (Compl't ¶ 120.)  She alleges that in no instance did the Thruway Authority

or the TBTA send notice until more than 30 days after her vehicle incurred a tolling charge; in other words, she had no notice of the toll before the assessment of a $100 fine. (Compl't ¶ 123.)

The Complaint alleges that, pursuant to Conduent's contracts with the defendant agencies, Conduent is required to mail a notice of violation within certain fixed deadlines. (Compl't ¶ 152.) However, plaintiffs allege that Conduent sends invoices and notice months after the fact, often resulting in additional fines for nonpayment. (Compl't ¶¶ 153-54.) The Complaint quotes statements by officials that refer to issues like "lag time" in vehicle owners' receiving bills and "lack of driver feedback signage and the elimination of toll gates." (Compl't ¶¶ 158-60.)

Each plaintiff's allegations vary significantly based on when the notice of a fine was received in relation to the toll crossing, whether he or she successfully challenged a fine, whether he or she participated in an amnesty program, and how much he or she has actually paid in fines. The claims of each plaintiff will be analyzed separately.

D. <u>Procedural History.</u>

The Consolidated Complaint (the "Complaint") that is the subject of this motion was filed on April 30, 2018. (Docket # 44.) On August 30, 2018, plaintiffs filed a notice of voluntary dismissal against Transworld Systems, Inc., AllianceOne Receivables Management, Inc. and Linebarger Goggan Blair & Sampson, LLP, and dismissed their claim for unjust enrichment as to Conduent only. (Docket # 82.) The Complaint also brought a claim under the Fair Debt Collection Practices Act, which the plaintiffs voluntarily dismissed. (<u>Id.</u>)

The Complaint separately named the MTA as a defendant. (Docket # 44.) The MTA and the TBTA jointly filed a motion to dismiss the Complaint. (Docket # 97.) In a footnote to their opposition memo, plaintiffs voluntarily dismissed all claims against the MTA.

(Opp. Mem. at 10 n.2.)  Because certain of the Complaint's allegations have referred to the TBTA and the MTA as the "MTA" collectively, the Court construes those allegations as being asserted against the TBTA.

DEFENDANTS' RULE 12(b)(1) MOTIONS ARE DENIED.

      A.  <u>The Requirements of Article III Standing.</u>

The Thruway Authority, Port Authority and TBTA urge that this action should be dismissed pursuant to Rule 12(b)(1), Fed. R. Civ. P., for lack of subject matter jurisdiction.  They urge that plaintiffs cannot demonstrate an injury in fact and therefore do not have Article III standing.  The Court concludes that plaintiffs have pointed to identifiable injuries that are sufficient to demonstrate Article III standing.

Rule 12(b)(1) permits a defendant to move to dismiss an action for lack of subject matter jurisdiction.  A Rule 12(b)(1) motion may be either fact-based or facial.  <u>Carter v. HealthPort Techs., LLC</u>, 822 F.3d 47, 56 (2d Cir. 2016).  When the motion is directed to the face of the complaint, the Court must accept all uncontroverted allegations as true and draw every reasonable inference in favor of the plaintiff.  <u>Tandon v. Captain's Cove Marina of Bridgeport, Inc.</u>, 752 F.3d 239, 243 (2d Cir. 2014).  However, "'[w]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.'"  <u>Id.</u> (quoting <u>APWU v. Potter</u>, 343 F.3d 619, 627 (2d Cir. 2003)).  The party asserting subject matter jurisdiction must prove its existence by a preponderance of the evidence.  <u>Id.</u>

A district court must dismiss a complaint for lack of subject matter jurisdiction where a plaintiff does not have constitutional standing.  <u>Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.A.R.L.</u>, 790 F.3d 411, 416-17 (2d Cir. 2015).  To demonstrate Article III

standing, plaintiffs must "clearly" allege that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." <u>Spokeo, Inc. v. Robins</u>, 136 S. Ct. 1540, 1547 (2016).

Identifying an injury in fact is "a low threshold." <u>John v. Whole Foods Mkt. Grp., Inc.</u>, 858 F.3d 732, 736 (2d Cir. 2017) (Article III standing demonstrated where the plaintiff "adequately and plausibly allege[d] that Whole Foods overcharged him at least once for pre-packaged cheese and cupcakes."). "Even a small financial loss is an injury for purposes of Article III standing." <u>Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.</u>, 710 F.3d 71, 85 (2d Cir. 2013) ("incurring the expense of buying [triclosan-free] soap would itself constitute an injury in fact.").

B. <u>Plaintiffs Have Alleged Injuries Sufficient to Demonstrate Standing.</u>

The Complaint's allegations are often imprecise as to the payments that any particular plaintiff made on the fines demanded of them. While this lack of clarity makes certain plaintiffs' claims implausible, the allegations are sufficient to satisfy the "low threshold" of Article III standing. <u>John</u>, 858 F.3d at 736. They include injuries such as the payments of fines and tolls, the impoundment of a car and the threat of further enforcement.

Plaintiff Farina alleges that he made payments of $530 and $33 on tolls and fines that were initially demanded in the amount of $6,100. (Compl't ¶¶ 70-80.) Plaintiff Troiano alleges that she paid $775 and $2,688 toward tolls and fines after initially being demanded to pay fines totaling more than $30,000. (Compl't ¶¶ 83-99 & Ex. 1.) The allegations that Farina and Troiano paid fines that they claim were wrongfully imposed is sufficient to confer Article III standing. <u>See, e.g., John</u>, 858 F.3d at 736; <u>Leder v. Am. Traffic Solutions, Inc.</u>, 81 F. Supp. 3d

211, 221 (E.D.N.Y. 2015) (payment of $65 fine for not stopping at a red light demonstrated Article III standing to bring action disputing the fine).

Plaintiffs Gardner and Rojas do not allege that they have paid the fines demanded from them. However, Gardner alleges that, as of the filing of the Complaint, a non-party acting on behalf of the Port Authority "was pursuing collection of a 'balance due' of $65.00," and that additional fines were "unpaid and subject to collection." (Compl't ¶¶ 104-07.) Rojas alleges that the TBTA and Port Authority have asserted that she owes tolls and penalties for 67 tolling violations, totaling more than $6,000. (Compl't ¶¶ 127, 130.) She alleges that she has paid all outstanding tolls "but has not paid the improper fees and penalties," which remain subject to dispute. (Compl't ¶¶ 131-32.)

When a plaintiff is subject to or threatened with government action that he or she asserts is unconstitutional, courts "'do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat.'" Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158-59 (2014) (quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-29 (2007)). "[A] credible threat of enforcement" can be enough to demonstrate standing. Id. at 159. The Notices of Violation sent to Gardner and Rojas are headed, in all-capital letters, "NOTICE OF VIOLATION ENFORCEMENT ACTION," and state, in bolded text, that failure to respond may result in referral to a collection agency, additional fees and suspension of vehicle registration. (Bressler Dec. Ex. 8, 14.) Although Gardner and Rojas do not allege that they have paid the fines demanded of them, the threat of enforcement is sufficient to satisfy the "low threshold" of Article III standing.

Delores Ritchie is the only plaintiff to assert claims against the Thruway Authority. The Thruway Authority has submitted a declaration from Eric Christensen, a deputy

director of operations.  (Docket # 95.)  Christensen states that, based on Thruway Authority records, Ritchie incurred more than 200 toll violations and has "paid just $85 in fees" while the Thruway Authority has dismissed or waived $11,200 in fines.  (Christensen Dec. ¶ 18.) Christensen states that Ritchie's unpaid balance of $420 is based on four unpaid tolls of $5 each and four fines of $100 each.  (Id. ¶ 19.)  Christensen states that, despite the Complaint's assertion that Ritchie did not receive notice of November violations until the following February, the Thruway Authority's records demonstrate that bills were sent in December and January, the non-payment of which led to the fees assessed against her.  (Id. ¶¶ 20-22.)

As noted, when jurisdictional facts are placed in dispute, courts look to evidence outside the pleadings.  Tandon, 752 F.3d at 243.  Reviewing the evidence offered by Christensen on behalf of the Thruway Authority, Ritchie has still met the "low threshold" of demonstrating injury in fact.  John, 858 F.3d at 736.  Her injuries include the $85 in fines or "fees" that she paid to the Thruway Authority and the alleged impoundment of her vehicle.  (Christensen Dec. ¶ 18; Compl't ¶ 111.)  The Thruway Authority urges that Ritchie caused her own injury by not making timely payments, but that argument goes to the ultimate merits of her claims, not standing.  At this stage, the Thruway Authority does not point to evidence that Ritchie's "'injury is so completely due to [her] own fault as to break the causal chain.'"  Nat. Res. Def. Council, 710 F.3d at 85 (quoting St. Pierre v. Dyer, 208 F.3d 394, 403 (2d Cir. 2000)).

The Thruway Authority's motion to dismiss Ritchie's claims against it pursuant to Rule 12(b)(1) is denied.

C.  The Remaining Rule 12(b)(1) Motions Are Denied.

The TBTA urges that no plaintiff who claims to be an E-Z Pass user has Article III standing because none alleges that he or she maintained properly funded E-Z Pass accounts.

However, plaintiffs' claims include challenges to the adequacy of notice, their opportunity to contest the fines and the size of the fines. The status of the E-Z Pass account, and whether plaintiffs' actions ultimately warranted the imposition of fines, does not go toward the issue of injury in fact.

The TBTA also points to portions of its records indicating that Troiano and Rojas were billed using Tolls-by-Mail, and urges that the Complaint inaccurately alleges that they were billed through E-Z Pass. (Bressler Dec. ¶¶ 8, 20 & Ex. 5, 14.) But this factual challenge toward how certain plaintiffs were billed does not go toward the question of whether Troiano and Rojas were injured by the administration of fines as a result of the cashless tolling program.

The Port Authority's motion urges that plaintiffs do not have Article III standing because the Complaint alleges "nothing more than an assortment of public grievances related to toll collection generally and E-ZPass specifically." (P.A. Mem. 11.) However, the Complaint identifies by date and location numerous specific instances where plaintiffs claim they were wrongfully fined and alleges demands for payment. Those allegations are more than a generalized "public grievance" and are sufficient to allege injury in fact.

Defendants' motions to dismiss for lack of Article III standing will be denied.

DEFENDANTS' RULE 12(b)(6) MOTIONS ARE GRANTED IN PART AND DENIED IN PART.

I.  Rule 12(b)(6) Standard.

Rule 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In assessing the sufficiency of a pleading, a court must disregard legal conclusions, which are not entitled to the presumption of truth. Id. Instead, the Court must examine the well-pleaded factual

allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679. "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

Plaintiffs' claims and defendants' motions turn in part on documents that are attached to the Complaint and incorporated by reference, including the Agreement entered by E-Z Pass users, notices of violation sent by the defendants, and records of plaintiffs' tolls and fines. A complaint is "'deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint.'" Cohen v. Rosicki, Rosicki & Assocs., P.C., 897 F.3d 75, 80 (2d Cir. 2018) (quoting L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011)). The Court may therefore consider such documents, including those submitted by defendants, as part of a Rule 12(b)(6) motion without converting the motion into one for summary judgment. Holowecki v. Fed. Exp. Corp., 440 F.3d 558, 566 (2d Cir. 2006).

However, affidavits or exhibits that go beyond the Complaint may not be considered on a Rule 12(b)(6) motion. Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc., 697 F.3d 59, 64 n.4 (2d Cir. 2012). In connection with their motions, defendants have submitted certain documents and raised arguments that fall outside the Complaint's allegations. This includes assertions that plaintiffs received actual notice of their violations at dates earlier than alleged in the Complaint. To the extent that defendants' submissions rely on documents that raise factual challenges to the allegations of the Complaint, such arguments are not properly considered on a Rule 12(b)(6) motion.

II.     The Complaint Plausibly Alleges that Plaintiff Troiano Paid an Excessive Fine to the
        TBTA, but the Excessive Fines Claim Is Dismissed as to the Other Plaintiffs.

        A.  The Eighth Amendment's Prohibition of Excessive Fines.

        Count One alleges that defendants violated the Eighth Amendment's prohibition

against excessive fines.  It alleges that the Port Authority, the TBTA and the Thruway Authority

functioned as state actors when collecting fees and penalties, and that Conduent was delegated a

traditional government function when it administered the bills for cashless tolling.  (Compl't ¶¶

183-84.)

        The Eighth Amendment states, "Excessive bail shall not be required, nor

excessive fines imposed, nor cruel and unusual punishments inflicted."  The prohibition against

excessive fines "'limits the government's power to extract payments, whether in cash or in kind,

as punishment for some offense.'"  von Hofe v. United States, 492 F.3d 175, 178 (2d Cir. 2007)

(quoting Austin v. United States, 509 U.S. 602, 609-10 (1993)).  "The form of the fine is

irrelevant and may be a payment in kind, i.e., a forfeiture, or a payment in cash."  Id. at 182.  The

Eighth Amendment's limitation s apply to both criminal and civil proceedings, so long as the

fines "can be characterized as punitive . . . ."  United States v. Sabhnani, 599 F.3d 215, 263 n. 19

(2d Cir. 2010).  While this motion was sub judice, the Supreme Court held that the Fourteenth

Amendment incorporates the Eighth Amendment's prohibition against excessive fines and that it

therefore applies to the states.  Timbs v. Indiana, 139 S. Ct. 682, 689 (2019).

        As will be discussed, the Second Circuit has adopted a two-step inquiry to decide

"whether a financial penalty is excessive under the Eighth Amendment."  United States v.

Viloski, 814 F.3d 104, 108 (2d Cir. 2016) (citing United States v. Bajakajian, 524 U.S. 321

(1998)).  First, a court must consider whether the payment or forfeiture at issue constitutes a

"fine," meaning that it is punitive in nature and not "purely 'remedial.'"  Id. at 109.  Second, a

court weighs four factors to determine whether the fine is "grossly disproportional" to the underlying offense.  Id. at 110.  Ultimately, whether a fine is excessive "involves solely a proportionality determination."  Id. at 111.

      B.  The Excessive Fines Claims of Farina, Troiano and Ritchie Are Ripe for Adjudication, but the Claims of Gardner and Rojas Are Not.

      Defendants urge that plaintiffs' excessive fines claims should be dismissed in their entirety because they are not yet ripe.  They argue that the Complaint does not "allege that a judgment for an administrative fee was ever imposed" or identify any formal, legal action to collect on the fines.  (Conduent Mem. at 9.)

      Because the Complaint and documents integral to the Complaint allege that plaintiffs Farina, Troiano and Ritchie have actually paid fines demanded by one or more defendant, their excessive fines claim is ripe for adjudication.  However, Gardner and Rojas do not allege that they have made any payment of fines, and the Complaint's allegations demonstrate that defendants' initial demands for fines may significantly exceed the amounts ultimately paid by a vehicle owner.  Accordingly, the excessive fines claims of Gardner and Rojas are not ripe for adjudication at this time.

      "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 807-08 (2003) (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 148-149 (1967)).  Ripeness is based on both "Article III limitations on judicial power" and prudential reasons for declining to exercise jurisdiction."  Id. (quotation marks omitted).

"A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Texas v. United States, 523 U.S. 296, 300 (1998) (quoting Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 580-581 (1985)). In weighing whether a claim is ripe, courts should "'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" Id. (quoting Abbott Labs., 387 U.S. at 148-149).

"[C]hallenges under the Excessive Fines Clause are . . . generally not ripe until the actual, or impending, imposition of the challenged fine." Cheffer v. Reno, 55 F.3d 1517, 1523 (11th Cir. 1995). In Cheffer, plaintiffs urged that a recently-enacted statute directed toward access to abortion clinics contained civil and criminal penalties prohibited by the excessive fines clause. Id. at 1523-24. The Eleventh Circuit concluded, sua sponte, that the excessive fines claim was not ripe because plaintiffs had not been arrested or convicted under the statute. Id. at 1524. The statute left courts "broad discretion to determine . . . the amount of fines or civil penalties to be assessed in each case." Id. Without allegations of a particular violation and fine, the court concluded that it "cannot decide whether a specific fine will be excessive . . . ." Id.; see also Infinity Outdoor, Inc. v. City of New York, 165 F. Supp. 2d 403, 431 (E.D.N.Y. 2001) (granting summary judgment to defendants on plaintiffs' excessive fines claim where "no fine has been imposed, and no enforcement proceedings have been commenced against plaintiff.") (Gershon, J.); United States v. Blackman, 746 F.3d 137, 144 (4th Cir. 2014) ("Where no final forfeiture order or judgment has been entered, ruling on [an excessive-fines challenge] would be premature.").

In this case, based on the pleadings and documents that are integral to the pleadings, plaintiffs Farina, Troiano and Ritchie have all purportedly paid some portion of the

fines demanded of them. Farina has alleged the payment of fines and tolls in amounts of $530 and $33, and Troiano has alleged the payment of fines and tolls in the amounts of $775 and $2,688. (Compl't ¶¶ 70-80, 83-99.) Ritchie alleges that the Thruway Authority impounded her vehicle as a result of tolling violations, and the Thruway Authority has asserted that Ritchie has paid $85 in fines. (Christensen Dec. ¶ 18; Compl't ¶ 111.) Because Farina, Troiano and Ritchie have paid fines for the claimed violations of the cashless tolling system, their claims are ripe for adjudication.

Gardner and Rojas, however, do not allege that they made any payment on the fines. Gardner alleges that the Port Authority and the TBTA have demanded payment on three $100 fines and six $50 fines. (Compl't ¶ 102.) He alleges that he has paid some underlying tolls associated with the fines, but asserts that he has not paid any amount owed toward the fines. (Compl't ¶¶ 103-07.) Rojas alleges that the Port Authority and the TBTA have demanded more than $6,000 in fines. (Compl't ¶ 130.) She alleges that she has paid $347 toward defendants' tolls "but has not paid the improper fees and penalties." (Compl't ¶ 131.)

The claims of Gardner and Rojas are somewhat different from those of the plaintiffs in Cheffer and Infinity Outdoor, where plaintiffs challenged fines that had been set by statute, but no action had been taken to enforce the statutes against them. Here, the Complaint alleges that the Port Authority and TBTA sent Gardner and Rojas notices of violation and demanded payment of the fines, and the defendants have submitted copies of the notices of violation sent to Gardner and Rojas. (Bressler Dec. Exs. 8, 14.) Their claim is not purely hypothetical, and, as discussed, such demands are sufficient to demonstrate Article III standing.

But the Complaint does not allege that any fines actually have been paid by Gardner or Rojas, and alleges that they are both in the process of disputing their fines. The

Complaint also describes successful efforts by other plaintiffs to dispute the fines initially demanded of them: Farina's fines and tolls were reduced from $6,100 to payments of $530 and $33, and after initial demands of approximately $30,000, Troiano paid $2,688 and $775 to resolve all outstanding fees and tolls. In the case of Ritchie, the Thruway Authority implemented an "amnesty period" in which all outstanding fines were dismissed or waived. Ritchie's payment of fines purportedly totaled $85.

The Complaint's factual allegations therefore do not demonstrate that the fines initially demanded by defendants reflect the amounts ultimately paid by plaintiffs. The unambiguous demands for payment make the claims of Gardner and Rojas less contingent and hypothetical than those of the plaintiffs in Cheffer and Infinity Outdoor, but they ultimately suffer from the same obstacle to justiciability: given the wide variations between the initial demands and the eventual payments, the Complaint's allegations provide no support for the proposition that Gardner and Rojas have paid a fine that could plausibly be considered excessive under the Eighth Amendment.

In weighing whether a claim is ripe for adjudication, courts must consider the hardship placed on the parties by withholding consideration, in addition to the issue's fitness for judicial determination. Texas v. United States, 523 U.S. at 300. While the plaintiffs have an interest challenging a civil administrative fine alleged to violate the Eighth Amendment, neither the Complaint nor their memorandum identifies a particular hardship that Gardner or Rojas might suffer that weighs in favor of justiciability at this time.

Accordingly, the Court concludes that the excessive fines claims of Farina, Troiano and Ritchie are ripe for adjudication, but the claims of Gardner and Rojas are not.

C. Defendants Have Not Identified Procedural or Prudential Barriers to Adjudicating the Excessive Fines Claim.

Defendants separately urge that plaintiffs' excessive fines claims be dismissed based on various procedural and prudential bars to adjudication. Each of the grounds raised by the defendants is without merits.

1. Administrative Exhaustion.

Defendants urge that the excessive fines claim should be dismissed because plaintiffs did not first exhaust administrative remedies available through Article 78 of the New York Civil Practice Law and Rules. But the Supreme Court has "stated categorically that exhaustion is not a prerequisite to an action under § 1983 . . . ." Patsy v. Bd. of Regents, 457 U.S. 496, 500-01 (1982); see also Felder v. Casey, 487 U.S. 131, 146-50 (1988) (striking down a notice provision that imposed a state-law exhaustion requirement for section 1983 claims and discussing reasons why exhaustion is not required). The Second Circuit has described Patsy as making a "categorical statement that exhaustion is not required" and establishing "the expansive view of the federal courts in protecting constitutional rights allow[ing] plaintiffs to seek relief under § 1983 without first resorting to state administrative procedures." Doe v. Pfrommer, 148 F.3d 73, 78 (2d Cir. 1998). Exhaustion of a constitutional claim is required "only where Congress has carved out a specific exception to the general rule . . . ." Id.

Defendants have pointed to no such exception for this case, and their procedural exhaustion argument is without merit.

2. The Voluntary Payment Doctrine.

Defendants next urge that any plaintiff who has paid a portion of the fines demanded of him or her is barred from seeking relief under the "voluntary payment doctrine." "'That common-law doctrine bars recovery of payments voluntarily made with full knowledge of

the facts, and in the absence of fraud or mistake of material fact or law.'" Spiro v. Healthport Techs., LLC, 73 F. Supp. 3d 259, 276 (S.D.N.Y. 2014) (quoting Dillon v. U-A Columbia Cablevision of Westchester, Inc., 100 N.Y.2d 525, 526 (2003)).  But this is a doctrine of New York common law, see, e.g., U.S. ex rel. Feldman v. City of New York, 808 F. Supp. 2d 641, 657 (S.D.N.Y. 2011), as well as an affirmative defense, the application of which "may be inappropriate at the motion to dismiss stage."  Wurtz v. Rawlings Co., LLC, 2014 WL 4961422, at *6 (E.D.N.Y. Oct. 3, 2014); see also Spagnola v. Chubb Corp., 574 F.3d 64, 73 (2d Cir. 2009) (at the motion to dismiss stage, "it is too early in this case" to adjudicate the affirmative defense of the voluntary payment doctrine).

Defendants have not pointed to any authority applying the voluntary payment doctrine to a claim under section 1983 or any other federal law.  Even assuming that it is applicable to a section 1983 excessive fines claim, plaintiffs are "not required to preemptively plead facts refuting the voluntary payment doctrine."  Spagnola, 574 F.3d at 73.  The voluntary payment doctrine therefore does not bar plaintiffs' Eighth Amendment claim.

### 3. The Filed-Rate Doctrine.

Defendants also urge that the filed-rate doctrine bars plaintiffs' claims under the excessive fines clause.  "The filed rate doctrine bars suits against regulated utilities grounded on the allegation that the rates charged by the utility are unreasonable.  Simply stated, the doctrine holds that any 'filed rate'—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers."  Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 18 (2d Cir. 1994).  The doctrine recognizes that legislatures organize agencies for the purpose of setting uniform rates, and that courts are not institutionally suited for rate-setting exercises.  Id. at 19.

The filed-rate doctrine applies to claims that challenge the rates and tariffs set in regulated industries, where a private actor's deviation from the regulated price could result in price discrimination between customers and the imposition of unreasonable charges.  See, e.g., AT&T Co. v. Cent. Office Tel., Inc., 524 U.S. 214, 222 (1998) (discussing history of the filed rate doctrine as applied to the Interstate Commerce Act and Federal Communications Act); Simon v. KeySpan Corp., 694 F.3d 196, 204-07 (2d Cir. 2012) (noting that "the filed rate doctrine has 'been extended across the spectrum of regulated utilities'" and concluding that it bars claims directed to rates "set by a regulatory auction scheme.") (quoting Ark. La. Gas Co. v. Hall, 453 U.S. 571, 577 (1981)).

Defendants have not explained how civil penalties for tolling infractions fall within the category of "rates" covered by the doctrine.  For instance, the AT&T case involved FCC-mandated rates, terms and condition for the sale of bulk long-distance phone services, and observed that the filed-rate doctrine prevented common carriers from intentionally "misquoting" rates to engage in price discrimination between similarly situated customers.  524 U.S. at 216-17, 222-23.  Moreover, the filed-rate doctrine is an affirmative defense that may not be appropriately applied at the pleading stage.  See, e.g., E. & J. Gallo Winery v. EnCana Corp., 503 F.3d 1027, 1039 n.11 (9th Cir. 2007).

The Court concludes that the filed-rate doctrine does not bar plaintiffs' excessive fines claim.

D.  Troiano Has Plausibly Alleged that She Paid Excessive Fines to the TBTA, but the Claims of Farina and Ritchie Are Dismissed.

1.  The Complaint Plausibly Alleges that the Fines Are Punitive in Nature.

As noted, the Second Circuit uses a two-step inquiry to decide "whether a financial penalty is excessive under the Eighth Amendment."  Viloski, 814 F.3d at 108.  "At the

first stage, [courts] determine whether the Excessive Fines Clause applies at all." Id. at 109. This factor looks to whether the fine "may be characterized, at least in part, as 'punitive,'" meaning that one of the goals is "to punish" the individual. Id. If the fine is "remedial," and intended only to compensate the government for lost revenue, it "fall[s] outside the scope of the Excessive Fines Clause." Id.

The Complaint plausibly alleges that the fines imposed for violating the cashless-tolling process are punitive in nature, and thus within the scope of the excessive fines clause. Civil fines that seek to deter rule-breaking or enforce compliance are punitive in character. For example, a "Drivers' Responsibility Fee" that imposed a mandatory $45 payment on traffic citations that received a final disposition other than "not guilty" was plausibly alleged to be punitive. Dubin v. Cnty. of Nassau, 277 F. Supp. 3d 366, 400-02 (E.D.N.Y. 2017) (Bianco, J.); see also Prince v. City of New York, 108 A.D.3d 114, 119 (1st Dep't 2013) ($2,000 administrative fee for unlawfully taking recyclable material was adequately alleged to be punitive in nature because the fine was intended as a deterrent).

Here, defendants urge, among other things, that the purpose of the fine is "to secure compliance with toll obligations." (Conduent Mem. at 10.) This reflects a purpose that is deterrent in part, and therefore punitive, as opposed to furthering the sole goal of compensating for lost revenue. See, e.g., Austin v. United States, 509 U.S. 602, 610 (1993) ("a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.") (quotation marks omitted); Viloski, 814 F.3d at 109 (distinguishing "punitive" fines from "purely 'remedial' forfeitures . . . .").

Moreover, at the motion to dismiss stage, a court accepts all non-conclusory factual allegations as true. Iqbal, 556 U.S. at 679. The Complaint alleges that defendants administer "fees and penalties" that "are multiples of the actual toll," and that the fees far exceed the costs of locating and contacting the driver to collect an unpaid toll. (Compl't ¶¶ 3, 146-47.) These are non-conclusory factual allegations that, if accepted as true, would support a deterrent or retributive purpose, as opposed to an exclusively remedial one. See Dubin, 277 F. Supp. 3d at 403 (accepting as true plaintiff's factual allegations that mandatory fee was not solely remedial).

Plaintiffs have plausibly alleged that the disputed fees were at least partly punitive in nature and therefore subject to scrutiny under the excessive fines clause.

2.  The Claims of the Individual Plaintiffs.

If a plaintiff can demonstrate that a fine is punitive, the court next considers whether the fine is unconstitutionally excessive. Viloski, 814 F.3d at 110-13. In the Second Circuit, that analysis is guided by four non-exhaustive factors set forth in the Supreme Court's Bajakajian decision, which look to "(1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct." Id. at 110. In certain cases, whether the fine or penalty deprives a person of his or her livelihood is also a relevant consideration, id. at 111, but no party has urged that this factor is applicable here.

The excessiveness analysis "'involves solely a proportionality determination.'" Id. at 111 (quoting Bajakajian, 524 U.S. at 333-34). A penalty "is unconstitutionally excessive 'if it is grossly disproportional to the gravity of a defendant's offense.'" Id. (quoting Bajakajian, 524 U.S. at 334).

a. <u>Jason Farina.</u>

Farina alleges that he received notices of violation only from defendant TBTA, which initially demanded payment of 61 fines, each in the amount of $100, for the alleged non-payment of tolls at the Throgs Neck, Robert Kennedy, Bronx Whitestone and Verrazzano Bridges, for aggregate total fines of $6,100.  (Compl't ¶¶ 67-70, 74.)  The underlying toll at the Verrazzano Bridge was $17, and the toll at all other bridges was $8.50.  (Compl't ¶ 70.)

After Farina learned of the fines, he spoke to a representative of E-Z Pass customer service, who advised him to pay the underlying tolls but not the outstanding fines, and to send a supporting letter disputing the fines charged to his account.  (Compl't ¶¶ 71-72.)  Farina attempted to pay the underlying tolls by credit card, but was unable to do so successfully because payment could only be made by check or in person.  (Compl't ¶¶ 72-73, 78.)

The Complaint alleges that on January 25, 2018, Farina received a letter on behalf of the TBTA from non-party Transworld, "requesting payment of $1,302 for 12 of those purported violations."  (Compl't ¶ 75.)  The sum of $1,302 would be consistent with an outstanding toll of $8.50 and a $100 fine for each of twelve violations.  The Complaint asserts that after Transworld sought payment, the TBTA itself would no longer accept payment from Farina, and he was unable to dispute the charges with the TBTA.  (Compl't ¶ 76.)  "Threatened with Transworld's ability to ruin his credit, Farina paid $530 to Transworld in order to resolve Defendants' claim for $1,302 in fees."  (Compl't ¶ 77.)  Farina separately visited an E-Z Pass location in Yonkers "to pay all of the outstanding toll charges in person."  (Compl't ¶ 79.)

Subsequently, on January 28, 2018, Farina received an additional notice from Transworld, asserting that he owed $100.  (Compl't ¶ 80.)  Farina alleges that he paid $33 to

resolve the demand.  (Compl't ¶ 80.)  The Complaint contains no additional facts concerning the $33 payment or the $100 demand.

The Complaint does not identify the portion of the $563 paid by Farina that is attributable to fines rather than tolls.  The Court could construct a variety of scenarios based on the number of Farina's crossings, a matter peculiarly within his knowledge and ability to ascertain.  For example, Farina notes that he received 61 violations, which may or may not correspond to the number of toll crossings;[3] one of several possibilities is that he owed the TBTA for 60 tolls at $8.50 per toll and one toll in the amount of $17, a total of $527.50 in tolls.

Because the Complaint fails to set forth the amount of fines paid by Farina, it fails to plausibly allege a violation of the excessive fines clause.  The allegation that Farina was initially was billed "more than $6,000" in fines (Compl't ¶¶ 7, 18, 74) does not reflect the amounts he paid to resolve the matter.  With no allegation as to the amount of fines actually paid by Farina, it is not possible to undertake the four-factor analysis of whether his fines were "grossly disproportional" to the underlying offense and therefore a plausible violation of the Eighth Amendment.  Viloski, 814 F.3d at 111.

Farina's excessive fines claim will be dismissed.

b.  Deloris Ritchie.

Ritchie's claim is directed to fines administered by the Thruway Authority for her purported failure to make timely payments in the Tolls-By-Mail program.  (Compl't ¶ 10.)  As described in the Complaint, the Thruway Authority informed Ritchie in November 2017 that she owed approximately $12,000 for unpaid tolls and fines.  (Compl't ¶ 111.)  However, in January 2018, the Thruway Authority enacted a temporary amnesty program, during which she was "able

---

[3] By the Court's count, paragraph 70 of the Complaint identifies 55 toll crossings and fines that are challenged by Farina.

to pay $790 to clear her $12,000 debt . . . ."  (Compl't ¶ 114.)  The Complaint alleges that the payment included "some of the improper fees," but does not allege the amount of fines that Ritchie claims to have actually paid.  (Compl't ¶ 114.)

Shortly after the amnesty program concluded, Ritchie received additional notices of violation.  The Complaint alleges that if Ritchie had received timely notice of the fines, she would have resolved them during the amnesty period.  (Compl't ¶ 119.)  At the time the Complaint was filed, the Thruway Authority claimed that she owed more than $420, and the TBTA claimed that she owed $108.50.  (Compl't ¶ 117.)

Like Farina, Ritchie does not identify what, if any fines she actually paid, and in what amount.  The Complaint alleges only that she paid "some of the improper fees . . . ." (Compl't ¶ 114.)  For the reasons explained as to Farina, the failure to identify the fines actually paid are fatal to Ritchie's claim because they foreclose an analysis of the four-factor Bajakajian test.

Separately, the Complaint alleges that Ritchie's car was impounded in November 2017.  (Compl't ¶¶ 111, 121.)  The Complaint is curiously silent as to the reason (or stated reason) for the impoundment or where or by whom it was impounded.  It merely alleges that the car was impounded by an unidentified person or entity, and at the time of impoundment the TBTA claimed she owed $12,000 in tolls and fees.  (Compl't ¶ 111 ("In November 2017, however, Ritchie's car was impounded and [the Thruway Authority] claimed that she owed $12,000 for unpaid tolls and penalties.").)  Even assuming that the impoundment was by the Thruway Authority and the reason was the $12,000 in purported debt, the Complaint does not reveal the number of toll crossings Ritchie made or the portion of the $12,000 that represented the fines rather than tolls.  With no allegations that describe the circumstances of the

impoundment or explain how it amounted to a violation of the excessive fines clause, the Complaint does not plausibly allege a claim for relief.

c. Dorothy Troiano.

Troiano alleges that the TBTA charged her "more than $30,000" in tolls and fines. (Compl't ¶ 20.) Exhibit 1 to the Complaint is a five-page chart that purports to list each toll and fine asserted against Troiano. It reflects demands to pay fines totaling $27,300 and payments of $1,305 to resolve the fines.

According to the Complaint, on January 10, 2018, non-party Transworld mailed Troiano a collection demand on behalf of the TBTA, claiming that she owed $8,247 for "Violations." (Compl't ¶ 88.) In a notice dated January 19, 2018, the Department of Motor Vehicles stated that Troiano's vehicle registration would be suspended effective March 5, 2018. (Compl't ¶ 90.)

In the last week of January 2018, "Defendants' representatives" contacted Troiano, stating that she owed $1,215.50 in tolls and $11,400.10 for violations. (Compl't ¶ 91.) They demanded full payment of the tolls and a payment of ten percent of the "violations," an amount of $1,140. (Compl't ¶ 91.)

On February 7, 2018, "Defendants' representatives" told Troiano that she now owed a total amount of $13,083, including fines and tolls, and that she would now have to pay a total amount of $2,688. (Compl't ¶ 93.) On February 8, 2018, she "paid to Defendants $2,688.00 towards the tolls and fees." (Compl't ¶ 94.)

On February 14, 2018, Troiano received an additional notice from the TBTA demanding payment of $1,817.50 in tolls and fees. (Compl't ¶ 95.)

According to the Complaint, on February 15, 2018, Troiano received an e-mail from non-party AllianceOne with a receipt for a $775 payment that she had made on November 2, 2017 that went "towards tolls and fines from Defendants." (Compl't ¶ 96.) The Complaint does not otherwise describe the details of the November 2 payment. (Compl't ¶ 96.) The Complaint states that Troiano has asked AllianceOne for information about what tolls and fines were covered by the $775 payment, but that AllianceOne has refused to give that information and instead demanded a payment of $65.90 for an open violation with the Port Authority. (Compl't ¶ 97.)

Exhibit 1 to the Complaint provides more clarity as to Troiano's payments. It lists 17 columns of information, including the date and time of each disputed toll crossing, "Agency ID," whether the payment demanded of Troiano was for a fee or a toll, and headings of "Amount Due" and "Amount Paid." (Compl't Ex. 1.) Under the heading "Detail Status," every toll and fine is denoted as "PAIDFULL." (Id.)

Exhibit 1 reflects that Troiano paid thirteen fines of $100 each to the TBTA for crossings of the Verrazzano Narrows Bridge that occurred in September, October and November of 2017. (Id.) It also lists a payment of $5 against a $100 fine incurred as the result of an August 22, 2017 crossing at the same bridge. (Id.) A summary line in the chart indicates that Troiano was cited for 298 unpaid tolls and 298 associated fines. (Id.) Based on the Court's review, it appears that Troiano's payment of fines was limited to fourteen incidents and total payments of $1,305. (Id.)

In the case of Troiano, the facts included at Exhibit 1 plausibly allege that she paid fines in an amount "grossly disproportional" to the underlying offense, and thus she has stated a claim of a violation of the excessive fines clause. Viloski, 814 F.3d at 111.

First, the amount of the fine must be considered in light of "the essence of the crime of the defendant and its relation to other criminal activity . . . ." Id. at 110. As alleged in the Complaint, the "essence of the crime" was Troiano's unwitting use of an inadequately funded or non-functioning E-Z Pass account during fourteen crossings of the Verrazzano Bridge. There is no indication that Troiano's fines were paid to address any civil or criminal violations beyond a purportedly underfunded E-Z Pass account, or that Troiano's conduct threatened public safety. Because Troiano's fines were allegedly incurred without the knowledge that she was in violation of the TBTA's cashless-tolling rules, this factor weighs in favor of her assertion that the fines are disproportionate to the offense. See, e.g., Bajakajian, 524 U.S. at 337-38 (forfeiture of $357,144 based on failure to report lawfully-held currency was an "excessive fine" when the currency had no relation to other criminal conduct).

Second, Troiano is within the class of people that the fines are meant to regulate. She is a vehicle owner who used the TBTA's infrastructure for which a toll is due. Hence, this is not an instance in which a person was fined pursuant to a statute or regulation intended to affect a different category of activity or person. Bajakajian, 524 U.S. at 338. This factor weighs against an allegation of disproportionality.

Third, $100 is the maximum fine that could have been imposed for Troiano's violations. A regulation of the TBTA establishes a $100 fine for vehicle owners who "violate[] toll collection regulations" at the Verrazzano Narrows Bridge. 21 N.Y.C.R.R. § 1021.3(b). As set forth in Exhibit 1, Troiano paid thirteen fines of $100 each and one fine of $5. That Troiano paid the maximum possible fine in thirteen instances weighs in favor of a plausible allegation that the fines were disproportionate to the offense.

Fourth, on the nature of the harm involved, defendants urge that the $100 fine advances the value of deterrence against toll evasion, given that tolls are necessary to maintain transportation infrastructure. In <u>Bajakajian</u>, the court concluded that the failure to declare currency caused "minimal" harm that "affected only one party, the Government, and in a relatively minor way." 524 U.S. at 339. At the same time, courts "should grant substantial deference" to the legislature, and "any judicial determination regarding the gravity of a particular . . . offense will be inherently imprecise." <u>Id.</u> at 336. The Complaint alleges that the fines are excessive because they bear no connection to the actual cost of collecting unpaid tolls and are assessed multiple times against the same vehicle owner. (Compl't ¶¶ 146-48.) There is no assertion that the fines were intended to protect a public-safety concern, or, for instance, as a safeguard against fraudulent activity.

There is no requirement that a vehicle be enrolled in the E-Z Pass program. Those who travel through a cashless toll without E-Z Pass enrollment simply receive a notice to pay by mail. At the motion to dismiss stage, the TBTA has not had a full opportunity to detail the nature and magnitude of the harm caused by an E-Z Pass enrollee who has failed to replenish her account or update her credit card. Promoting deterrence, minimizing administrative expenses and obtaining reimbursement from those who increase expenses are, in the abstract, worthy goals. But at the pleading stage and without the benefit of discovery, the Court is unable to conclude as a matter of law that fines of $1,305 are not grossly disproportional to the underlying offense.[4]

---

[4] The Court notes that many of the Second Circuit decisions applying the excessive fines clause arise in the sentencing phase of criminal proceedings and not in section 1983 civil actions. In the sentencing context, a court is not limited to the version of events described in a pleading, and has more flexibility to weigh both the government's proffered rationale for the penalty and the facts giving rise to the fine.

Troiano plausibly has alleged that the fines she paid to the TBTA violated the Eighth Amendment's protections against excessive fines, and defendants' motion to dismiss her claim will be denied.

III. No Plaintiff Plausibly Alleges the Infringement of the Right to Due Process.

    A. Plaintiffs' Due Process Claim Is Directed Solely to the Receipt of Fair Notice.

Plaintiffs bring a claim under section 1983 alleging that each defendant violated the procedural due process guaranteed by the Fifth and Fourteenth Amendments. (Compl't ¶¶ 191-99.) The Complaint alleges that defendants demanded fines from the plaintiffs without providing them with timely notice of their tolling violations, and continued to charge fines without providing fair notice or an opportunity to object. (Compl't ¶ 194.) Plaintiffs seek damages and injunctive relief. (Compl't ¶¶ 197-98.)

The Complaint specifically challenges "[t]he scheme" devised by defendants and alleges that plaintiffs were deprived due process as "a proximate result of the policies, procedures, practices and/or customs" of the defendants. (Compl't ¶¶ 194, 196.) According to the Complaint, defendants have e-mail addresses and phone numbers for all E-Z Pass users, and "could have immediately notified" plaintiffs "of any problems with the processing of their toll payment." (Compl't ¶ 195.)

Additionally, in opposition to the defendants' motion to dismiss, plaintiffs clarify that they "do not challenge the procedures relating to the opportunity to be heard." (Opp. Mem. at 40.) The due process claim is thus somewhat narrow in focus: it asserts that as a matter of official policy, defendants fail to provide fair notice of the tolling violations, which caused plaintiffs to accumulate additional fines while they unwittingly continued to violate E-Z Pass and cashless-tolling policies. (Compl't ¶ 194.) Specifically, the Complaint seems to allege that due

process required defendants to "immediately" notify plaintiffs' through their e-mail addresses or phone numbers, as opposed to "months" of delay attendant to mailed notice. (Compl't ¶ 195.)

For the reasons that will be explained, the Court concludes that no plaintiff has plausibly alleged that any defendant deprived them of fair notice. The defendants' motion to dismiss the plaintiffs' due process claims will be granted.

B. <u>The Role of Fair Notice in Securing Due Process.</u>

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." Due process "imposes constraints on governmental proceedings which result in decisions that deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." <u>Mathews v. Eldridge</u>, 424 U.S. 319, 332 (1976). "The two threshold questions in any § 1983 claim for denial of procedural due process are whether the plaintiff possessed a liberty or property interest protected by the United States Constitution or federal statutes and, if so, what process was due before the plaintiff could be deprived of that interest." <u>Green v. Bauvi</u>, 46 F.3d 189, 194 (2d Cir. 1995). "Generally, due process requires that a state afford persons 'some kind of hearing' prior to depriving them of a liberty or property interest." <u>DiBlasio v. Novello</u>, 344 F.3d 292, 302 (2d Cir. 2003) (quoting <u>Hodel v. Va. Surface Mining & Reclamation Ass'n</u>, 452 U.S. 264, 299 (1981)).

Because "[t]he fundamental requisite of due process of law is the opportunity to be heard," a party must receive "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." <u>In re Medaglia</u>, 52 F.3d 451, 455 (2d Cir. 1995) (quotation marks omitted); <u>see also</u> <u>Jones v. Flowers</u>, 547 U.S. 220, 226 (2006) ("[D]ue process requires the government to provide 'notice reasonably calculated, under all the

circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'") (quoting <u>Mullane v. Centr. Hanover Bank & Trust co.</u>, 339 U.S. 306, 314 (1950)).

   "'The due process right to fair notice is a . . . general rule of law that demands a substantial element of judgment and [that] can hardly be implemented mechanically.'" <u>Oneida Indian Nation of New York v. Madison Cnty.</u>, 665 F.3d 408, 434-35 (2d Cir. 2011) (quoting <u>Ortiz v. N.Y. State Parole in Bronx, NY</u>, 586 F.3d 149, 157 (2d Cir. 2009)). A successful challenge to the adequacy of notice generally involves "a notice that failed to reach its intended recipient." <u>Oneida Indian Nation</u>, 665 F.3d at 432. Due process does not "impose a rigid requirement as to the precise timing with which notice must be given." <u>Id.</u> at 434. Rather, constitutionally adequate notice should "apprise [a plaintiff] of its right of redemption and to enable it to take appropriate steps to protect its property interests" prior to deprivation. <u>Id.</u> at 435; <u>see also</u> <u>id.</u> at 428 (notice "'must afford a reasonable time for those interested to make their appearance.'") (quoting <u>Mullane</u>, 339 U.S. at 314).

   C.  <u>The Process Adopted by Defendants for Challenging Fines.</u>

   Even though the plaintiffs do not challenge the procedures related to their opportunity to be heard, the requirement of fair notice seeks to ensure awareness of the pendency of an action and an opportunity to object. <u>Jones</u>, 547 U.S. at 226. Thus, some background on the dispute processes implemented by defendants is helpful to understand why their related notice practices do not violated accepted notions of due process.

   1.  <u>The TBTA.</u>

   The TBTA has adopted regulations that establish an administrative process for vehicle owners who wish to dispute a fine demanded from them. 21 N.Y.C.R.R. § 1021.3. First,

if a vehicle has crossed a bridge or tunnel without paying a toll "at the place and time and in the manner established for the collection of such crossing charge," a Notice of Violation is sent to the vehicle's owner by the "Authorized Agent" of the TBTA.  Id. §§ 1021.3(a), (c).  The vehicle's owner may then dispute the violation and the fine by submitting a "Declaration of Dispute."  Id. § 1021.3(d).  The regulations provide that "such toll violation and associated toll violation fee shall be dismissed" if the individual provides a certification that he or she did not own the vehicle; that the toll was paid through an E-Z Pass account or in cash; that the vehicle was not present during the time of the violation; or "for other good cause shown."  Id.

The vehicle owner's "Declaration of Dispute" is reviewed by the TBTA's "Authorized Agent."  Id.  The "Authorized Agent" sends a written determination in response.  Id. § 1021.3(f).  The owner may then request further review by the TBTA.  Id. § 1021.3(f)(1).  The TBTA's determination on review "shall be final and binding on the owner unless overturned by a Court of competent jurisdiction of the State of New York, County of New York, under Article 78 of the New York Civil Practice Law and Rules or a United States Court located in New York City, under the procedures and laws applicable in that court."  Id. § 1021.3(f)(3).

The notices of violation sent to plaintiffs on behalf of the TBTA included forms and instructions for disputing the fines.  (Bressler Dec. Exs. 1, 5, 8, 12, 14.)  The forms offered standardized topics of dispute such as "Surrendered Plate" and "Sold Vehicle," along with an option designated "Other," with the instruction to "[p]rovide and/or attach any additional information and/or documents in support of your dispute as necessary."  (Id.)  The form advised in part, "You may dispute the violation(s) for the reasons shown below. . . . Your dispute will be reviewed and you will be notified of the resolution."  (Id.)

2.  The Port Authority.

Unlike the TBTA, the Port Authority does not appear to have adopted regulations that set forth the options available to a vehicle owner to dispute a fine.  However, the notices accompanying the fines advised plaintiffs that they may dispute the fines, and attached forms for a "Customer Certification / Declaration of Dispute" that are nearly identical to those used by the TBTA.  (Faust Dec. Exs. B-D.)

The notice of violation sent by the Port Authority attaches a page-long "Declaration of Dispute" that states, "You may appeal the violations for the following reasons," and includes six grounds for dispute, as well as the option of "Other," which has the instruction, "Provide and/or attach any additional information and/or documents in support of your appeal as necessary." (Fausti Dec. Exs. B-D.)  The form lists a web address where E-Z Pass holders may "resolve this violation online . . . ." (Id.)  It states, "Your dispute will be reviewed and you will be notified of the resolution." (Id.)

3.  The Thruway Authority.

The Thruway Authority maintains a website with the heading "Violation Enforcement." (Christensen Dec. Ex. 4.)  It states in part that notices of violation "generally take about 4-6 weeks to receive." (Id.)  It also states, "If you feel you have received a notice of violation notice [sic] in error, you may contact the Violations Processing Unit . . . ." (Id.)  Under the heading "Collection Agencies," the site states that if a notice of violation is not paid within 30 days of the issue date, it will be referred to a collection agency.  (Id.)  It states, "To dispute a debt, motorists should contact the collection agency directly using the number referenced in the notice." (Id.)

The Notices of Violation that the Thruway Authority sent to Ritchie included some information about her ability to dispute the fine. (See, e.g., Christensen Dec. Ex. 6 at 082.) A form at the bottom of the notice's second page is divided into two headings, one labeled, "To Pay this Toll Bill" and the second labeled, "To Dispute this Toll Bill." (Id.) Under the "Dispute" heading, the text states, "Check one of the boxes and sign the statement below, attach the required documentation and return this portion of the Toll Bill in the envelop provided." (Id.) It includes four boxes that may be checked, one of which is labeled, "D4 – Other – attach additional information." (Id.)

    4.   The Procedures Described in the E-Z Pass Agreement.

A would-be E-Z Pass user must open an account and agree to the terms and conditions of usage (the "Agreement"). The Agreement includes the procedures for "every question or dispute arising from" the Agreement, "including, without limitation, the imposition of tolls, fees or other charges incurred, applied or stated for the use or misuse of your Tag or Account." (Agrm't ¶ 6.) The Agreement requires a dispute to be submitted in writing to E-Z Pass's customer-service center within 180 days of receiving notice of a toll, fee or other charge. (Id.) The Agreement also provides that claims against the Port Authority, Thruway Authority and TBTA are governed by specific statutes or terms:

> The resolution of claims against [the Port Authority], [Thruway Authority] and TBTA arising from, under, in connection with or in any way related to this agreement, including, without limitation, the imposition of tolls, fees, or other charges incurred, applied or stated for the use or misuse of your Tag or Account, are governed as follows:
>
> - [Port Authority] – the provisions of New York State Unconsolidated Laws, Sections 7101 through 7136 of New York State Unconsolidated Laws, Sections 7101 through 7136 or New Jersey Statutes Annotated, Sections 32:1-157 through 32:1-176.

- [Thruway Authority] – the provisions of Section 361-b of the New York State Public Authorities Law.
- TBTA – no action shall lie or be maintained unless such action shall be commenced within one year of *E-ZPass'* determination regarding your dispute submitted pursuant to this Agreement.

(Id.)  The statutes cited in relation to the Port Authority include provisions that generally govern actions against it, including the waiver of immunity, venue provisions and requirements to submit a notice of claim.  The provision governing the Thruway Authority provides that tort and contract claims against it shall be brought in the New York Court of Claims.  N.Y. Pub. Auth. L. § 361-b.

D.  Plaintiffs Have Plausibly Alleged a Protectible Property Interest in the Payment of Fines.

Conduent urges that the due process claim should be dismissed because plaintiffs have not identified a protectible property interest.  The threshold question for any due process claim is whether the plaintiff has identified a protectible liberty or property interest that is to be afforded due process protections.  Green, 46 F.3d at 194.

For the purposes of this motion, the Court concludes that plaintiffs have plausibly alleged a protectable interest in the fines demanded by defendants.  See, e.g., Rackley v. City of New York, 186 F. Supp. 2d 466, 480-81 (S.D.N.Y. 2002) (assuming that parking fines and vehicle seizures deprived plaintiff of a property interest and required due process safeguards) (Sprizzo, J.); Contractors Against Unfair Taxation Instituted on New Yorkers v. City of New York, 1994 WL 455553, at *4 (S.D.N.Y. Aug. 19, 1994) ("Plaintiffs plainly have a property interest in the money allegedly exacted from defendants for payment of fines for traffic violations, as well as in the vehicles that were allegedly seized by defendants.") (Wood, J.).

E.  The Plaintiffs Have Not Plausibly Alleged Constitutionally Deficient Notice.

1.  Jason Farina.

The Complaint alleges that Farina first received notice from the TBTA on November 25, 2017 for toll violations that occurred in October 2017.  (Compl't ¶ 68.)  The first toll violation listed in the Complaint is dated October 18, 2017.  (Compl't ¶ 70.)  Thus, according to the Complaint, a window of approximately five weeks passed between Farina's first toll violation and his receipt of notice.[5]

The TBTA's notices to Farina are headed "NOTICE OF VIOLATION ENFORCEMENT ACTION."  (Bressler Dec. Ex. 1.)  As previously discussed, the notices stated that Farina's E-Z Pass tag had crossed a toll facility without payment.  (Id.)  They included forms and instructions for disputing any underlying fine.  (Id.)  The forms included the standardized topics of dispute previously described.  (Id.)  They advised in part, "You may dispute the violation(s) for the reasons shown below.  . . .  Your dispute will be reviewed and you will be notified of the resolution."  (Id.)

The Complaint alleges that in early- to mid-December 2017, Farina contacted E-Z Pass customer service to inquire about the fines, and was advised to pay the tolls billed to him but not the outstanding fines.  (Compl't ¶¶ 71-72.)  He was further told to "send a supporting letter disputing all of the $100 fees assessed by Defendants to Plaintiff Farina's account."  (Compl't ¶ 72.)

The TBTA has submitted a letter in which Farina disputes his fines.  The letter is incorporated by reference in paragraph 72 of the Complaint, and is therefore properly considered

---

[5] The TBTA has submitted copies of notices of violation addressed to Farina that are dated as early as October 30, 2017.  (Bressler Dec. Ex. 1.)  For the purposes of this Rule 12(b)(6) motion, the Court accepts as true Farina's allegations concerning the timing of notice.

on a motion to dismiss.  In that letter of January 25, 2018, Farina stated that when he learned that he had received fines for not paying tolls through his E-Z Pass account, he spoke to an E-Z Pass customer-service representative.  (Bressler Dec. Ex. 3.)  The representative explained that the credit card associated with Farina's account had been blocking charges as a precaution against potentially fraudulent activity on the card.  (Id.)  The representative advised Farina to pay all tolls, but not to pay any fines, and to separately "send a supporting letter as to what had transpired."  (Id.)  Farina's letter requested removal of all violations associated with his account. (Id.)

Based on the Complaint's allegations, Farina's dispute of the fines was substantially successful.  The Complaint alleges that Farina's total payment of all fines and tolls was reduced from an initial demand of $6,100 to a demand for $1,302, which was ultimately resolved with a payment of $530.  (Compl't ¶ 74-77.)  Farina made a separate payment of $33 to non-party Transworld after receiving a notice stating that "he owed $100."  (Compl't ¶ 80.)  The Complaint does not allege what portion of his payments of $530 and $33 went toward tolls and what portion went toward fines.

Construing the allegations in the light most favorable to Farina, he has not alleged that the notices mailed by the TBTA failed to satisfy due process.  The notices identified the date, time and location of the claimed tolling infractions, the amount of the unpaid tolls, and the amount of the associated fines.  (Bressler Dec. Ex. 1.)  They advised Farina of his right to dispute the fines and included forms for doing so.  (Id.)  According to the Complaint, Farina successfully disputed the fines.  The TBTA reduced its initial, total payment demands of $6,100 to $530, a figure that very nearly equals the amount of his tolls alone, with no fines included.

Based on the allegations of the Complaint and the documents incorporated by reference, Farina has failed to plausibly identify a constitutional defect in the notice sent by the TBTA. Due process required notice that was reasonably calculated, under all the circumstances, to apprise him of the fines and afford him an opportunity to object. See Jones, 547 U.S. at 226. He has not identified a deficiency in the notice or an impairment to his right to be heard.

To the extent that the due process claim is premised on the gap in time between a violation and the receipt of notice, Farina alleges that about five weeks elapsed before being informed of his first tolling infraction. (Compl't ¶¶ 68, 70.) Farina has not plausibly explained why a five-week time gap was unreasonable. Due process does not "impose a rigid requirement as to the precise timing with which notice must be given," and must "enable [the plaintiff] to take appropriate steps to protect [his] property interests . . . ." Oneida Indian Nation, 665 F.3d at 434, 435.

Further, to the extent that Farina, and all plaintiffs, seem to allege that due process requires the defendants to "immediately" notify them of "any problems with the processing of their toll payment" through e-mail and telephone notice (Compl't ¶ 195), such notice is not required by due process. See, e.g., Weigner v. City of New York, 852 F.2d 646, 650 (2d Cir. 1988) (due process did not require notice by certified mail with return receipt, because "in deciding what the Constitution requires, we are not free to select forms of notice simply because they are advantageous."). Mail-based notice that is reasonably calculated to reach its intended recipient has repeatedly been held sufficient to safeguard due process. See Jones, 547 U.S. at 226; Weigner, 852 F.2d at 650 ("In the context of a wide variety of proceedings that threaten to deprive individuals of their property interests, the Supreme Court has consistently held that mailed notice satisfies the requirements of due process.").

Plaintiffs rely heavily on <u>Brown v. Transurban USA Inc.</u>, 144 F. Supp. 3d 809, 839-40 (E.D. Va. 2015), which concluded that plaintiffs had plausibly alleged deficient notice where they did not receive "immediate notification" of a toll violation.  But the procedures for notice, the opportunity to be heard and the nature of the fines were far different in that case.  In the case of one plaintiff, she first learned that four tolling violations had been outstanding for fourteen months based on an oral conversation with a defendant's employee.  <u>Id.</u>  Nine months after closing her E-Z Pass account, that same plaintiff received a summons to appear in a state civil court proceeding demanding payment of $9,440.90 for ten tolls that initially totaled $20.  <u>Id.</u> at 822.  Plaintiffs apparently had no opportunity to contest the fines prior to the commencement of formal legal proceedings against them.  <u>Id.</u> at 820-24.  <u>Brown</u>'s references to the need for "immediate notification" of a tolling violation does not render the notice provided to the plaintiffs in this case constitutionally deficient.  Farina's claim asserting the denial of due process will be dismissed.

2.  <u>Dorothy Troiano.</u>

Troiano alleges that prior to 2017, she "never" had a "significant problem" with her E-Z Pass account, but that beginning in 2017, she began to receive notices from the TBTA and the Port Authority informing her of unpaid tolls and fines.  (Compl't ¶¶ 83-84.)  Troiano alleges that "[a]t all relevant times," the defendants sent her notice "more than 30 days" after the underlying infraction.[6]  (Compl't ¶ 99.)

Troiano alleges that she paid tolls through E-Z Pass, while the defendants have asserted that she was sent notice of tolls and fines owed as part of the Tolls-By-Mail program.

---

[6] Troiano's allegation concerning the timing of notice refers to the notice received by plaintiff Gardner.  (Compl't ¶ 99.)  However, this allegation is included under a heading that refers to Troiano and is included with allegations specific to her.  The Court therefore construes the allegation to apply to Troiano and not Gardner.

The TBTA has submitted the billing notices that it sent to Troiano identifying tolls and fines owed pursuant to Tolls-By-Mail, not E-Z Pass. (Bressler Dec. Ex. 5.) However, for the purposes of this Rule 12(b)(6) motion, the Court accepts as true Troiano's factual assertion that she was enrolled in E-Z Pass.

Troiano alleges that she "has repeatedly disputed the outstanding, improper charges" demanded by defendants and "repeatedly contacted" E-Z Pass customer service. (Compl't ¶¶ 87, 89) As discussed, Troiano's payments were then substantially reduced: after initial demands of more than $30,000 in fines and tolls, Troiano paid $2,688 and $775 to resolve all outstanding charges. (Compl't ¶¶ 87, 89, 94-96 & Ex. 1.) As discussed, Exhibit 1 to the Complaint reflects that Troiano's payments included $1,305 in fines.

For the reasons largely explained as to Farina, Troiano has not plausibly alleged that the notice sent to her fell short of due process requirements. Her only allegation concerning the deficient timing of notice is the assertion that she received notice "more than 30 days" after each claimed tolling infraction. (Compl't ¶ 99.) But this does not plausibly allege notice that was so delayed that she was unable to dispute the fines prior to payment. Indeed, she successfully disputed a significant portion of the fines initially demanded of her. While Troiano ultimately paid $1,305 in fines, and alleges that the fines she paid were excessive and otherwise inequitable, she has not identified a constitutional defect in the process afforded to her, including the timing and form of notice. Troiano's claim asserting the denial of due process will be dismissed.

### 3.   Charles Gardner.

Gardner alleges that he paid tolls using an E-Z Pass account. (Compl't ¶ 100.) He alleges that "in late October 2017," he received notice from the TBTA of an unpaid toll of

$8.50 and a related $100 fine based on an August 6, 2017 crossing of the Queens Midtown Tunnel. (Compl't ¶¶ 102-03.) Gardner alleges that "[a]fter receiving notice," he disputed the $100 fine and told the TBTA that he had not received prior notice of the amounts owed. (Compl't ¶ 103.)

In all, Gardner alleges that he was fined for nine tolling violations, eight of which took place in October and November 2017. (Compl't ¶ 102.) The timing of his receipt of notice is not explicitly alleged, but some appear to have been received fewer than 30 days after the violation. He alleges that on November 25, 2017, he paid a toll assessed on October 29, 2017, and that on December 4, 2017, he paid a toll assessed on November 5, 2017. (Compl't ¶¶ 105-06.) Those payments would have been made 27 and 29 days after the toll crossings, meaning that Gardner must have received notice on or before that date. Nevertheless, the Complaint alleges that defendants sent Gardner notice "more than 30 days after" his toll crossings. (Compl't ¶ 108.) Gardner alleges that he paid toll crossings demanded of him but does not allege that he has paid any fine. (Compl't ¶¶ 103-07.)

For the reasons largely explained, Gardner has not identified a defect in the notices he received from the TBTA or the Port Authority. The TBTA's notices contained the same types of details and explanations concerning the recipient's ability to dispute fines as previously described in relation to Farina. Gardner has not identified a pre-deprivation deficiency in the notices of violation or an impairment to his ability to dispute the fines. He also has not identified any obstacle to his ability to dispute the fines based on the timing of the notice that he received. Gardner's claim asserting the denial of due process will be dismissed.

4.  <u>Deloris Ritchie.</u>

As has been discussed, Ritchie is the only plaintiff who brings a claim against the Thruway Authority, and the only plaintiff who asserts that she was fined for a violation of the Tolls-By-Mail program.

Ritchie alleges that she "had never any significant problems" with using Tolls-By-Mail until November 2017, when her car was impounded and the Thruway Authority claimed that she owed $12,000 in tolls and fines. (Compl't ¶¶ 109, 111.) The reason for the impoundment is not alleged, nor does the Complaint allege that the Thruway Authority was, itself, responsible for the impoundment.

In January 2018, the Thruway Authority implemented its amnesty program, at which point Ritchie resolved all outstanding tolls and fines with a payment of $790. (Compl't ¶ 114.) However, in February 2018, after the amnesty program concluded, Ritchie "received more invoices" for violations going back to November 2017. (Compl't ¶¶ 116.) As of the filing of the Complaint, the Thruway Authority claimed that she owed $420 in tolls and fines, and the TBTA claimed that she owed $108.50. (Compl't ¶ 117.) Ritchie appears to assert that if she had received earlier notice of the fines and tolls, she would have resolved them as part of the January 2018 amnesty program. (Compl't ¶ 120.)

The Complaint includes no allegations concerning any notice that Ritchie received prior to the November 2017 impoundment of her car, and does not expressly allege that the Thruway Authority was the entity responsible for the impoundment. (Compl't ¶ 111 ("In November 2017, however, Ritchie's car was impounded and [the Thruway Authority] claimed that she owed $12,000 for unpaid tolls and penalties.").) With no supporting factual allegations concerning Ritchie's notice or lack thereof prior to the impoundment, she fails to allege a

deprivation of due process related to the impoundment and the demands of $12,000 in tolls and fees. Those outstanding tolls and fees were resolved by Ritchie's payment during the amnesty program.

As to the notice that she received in or around February 2018, Ritchie does not identify any deprivation of due process that arose based on its timing or contents. Instead, she appears to assert that if she had received notice at an earlier date, she may have been able to resolve outstanding fees and tolls as part of the Thruway Authority's amnesty program that January. (Compl't ¶ 119 ("Had Defendants properly notified Ritchie of payments due . . . those tolls and fees would have been included in the amount she owed when she took advantage of the amnesty program.").) But Ritchie does not explain how this deprived her of a constitutionally protectible interest. She does not identify a protectible property right to participate in an agency's temporary amnesty program. She also does not explain why such tolls and fines would have necessarily been eligible for relief as part of the amnesty program.

Ritchie's allegations do not allege a deprivation of the notice guaranteed by the Fourteenth Amendment's due process protections. They do not identify an obstacle to Ritchie's right to be heard in response to the fines or assert that the notices did not adequately inform her of the fines. As of the time that the Complaint was filed, it appears that Ritchie had not paid the post-amnesty fines demanded of her. (Compl't ¶ 122.) Ritchie's claim asserting the denial of due process will be dismissed.

5.  Mirian Rojas.

Rojas alleges that in "early April 2018," she received "several letters" from the Port Authority stating that she owed money for fines and tolls, and learned that a notice of enforcement action had been previously sent to her. (Compl't ¶ 125.) Rojas states that she

"accessed" her E-Z Pass account on April 10, 2018, and saw that the TBTA and the Port Authority had charged her with ten total violations.[7] (Compl't ¶ 126.) Upon reviewing her account "days later," a total of 67 penalties were listed by the TBTA and the Port Authority. (Compl't ¶ 127.) One violation was listed as having taken place in October 2016. (Compl't ¶ 128.) In total, the TBTA sought "more than $6,000" in tolls and fines. (Compl't ¶ 130.)

Exhibit 2 to the Complaint is the print-out from a website dated April 10, 2018, and purports to reflect ten of Rojas's tolls and fines.[8] It lists tolls and fines dated from January 17, 2018 through March 19, 2018. (Compl't Ex. 2.) Under the heading "Description," all tolls and fines are listed as "OPEN." (Id.) Each unpaid toll is listed as $15 and each unpaid fine is $50. (Id.) It is unclear from the exhibit whether the fines and tolls were claimed by the TBTA or the Port Authority.

Exhibit 3 to the Complaint is an undated print-out of a website that purports to reflect 67 incidents in which Rojas was recorded as owing tolls and fines. The incidents date from October 6, 2016 through February 3, 2018. (Compl't Ex. 3.) The February 3 entry is denoted "DISPPOST" but all other fines and tolls are listed as "OPEN." (Id.) Numerous fines are listed from July and August 2017, approximately nine months before Rojas claims that she first received notice of the outstanding violations.

Rojas asserts that she has resolved all outstanding tolls with a payment of $347 but has made no payment toward the fines. (Compl't ¶ 131.) Although alleging that she has "repeatedly disputed" the fines, Rojas also states that non-party AllianceOne told her that "she

---

[7] As with Troiano, the TBTA has submitted billing notices reflecting that Rojas was billed using the Tolls-By-Mail program and not through an E-Z Pass account. (Bressler Dec. Ex. 14.) However, the Complaint makes the express allegation that Rojas was enrolled in E-Z Pass, and the Court assumes the truth of that allegation.
[8] Rojas's name does not appear on the print-out, and the payor on the E-Z Pass account is identified as "frank K cerquin." (Compl't Ex 2.) The Court accepts as true that the exhibit reflects tolls and fines demanded from Rojas.

could not dispute her fees and must pay the total amount regardless of whether or not they are rightfully assessed against her." (Compl't ¶¶ 132-33.) AllianceOne was allegedly retained to perform debt collection services on behalf of the Port Authority. (Compl't ¶ 43.)

Rojas's due process claim differs somewhat from those of the other plaintiffs. She alleges that she first received notice of outstanding tolls and fines in April 2018, eighteen months after the violation of October 2016, a significantly longer period between violation and notice than other plaintiffs have alleged. By her own account, she acknowledges that she has not disputed $347 in unpaid tolls, yet the Complaint does not plausibly allege how she could have reasonably believed that her repeated passage through toll crossings over an extended period of time, eighteen months, resulted in no toll charges to her whatsoever.

Rojas's failure to plausibly allege how the delay amounted to a violation of her due process rights is fatal to her claim. The purpose of the notice requirement is "to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Jones, 547 U.S. at 220. Constitutionally adequate notice should enable a plaintiff "to take appropriate steps to protect [her] property interests" prior to deprivation. Oneida Indian Nation, 665 F.3d at 435. Rojas has not alleged that the delayed notice prevented her from raising objections to the fines or impaired her ability to take appropriate steps to protect her property interests. The Complaint asserts that she has "repeatedly disputed" the fines and that, as of the filing of the Complaint, the fines remain unpaid. She has not alleged that either the Port Authority or TBTA has declined to consider her challenge to the fines as too remote in time. No identifiable prejudice has been alleged. While Rojas may believe that the fines are unjust and unwarranted, she has not identified a defect in constitutional process. Oneida Indian Nation, 665 F.3d at 431-32, 434-35.

The Complaint does not plausibly allege that the timing of notice has left Rojas unable to "take appropriate steps" to protect her property interests.  Id.  Rojas's claim asserting the denial of due process is dismissed.

IV.     All State Law Claims Against the Port Authority Are Voluntarily Dismissed.

In response to the Port Authority's motion, plaintiffs have voluntarily dismissed all state law claims against the Port Authority.  (Opp. Mem. at 15 n. 5 ("Plaintiffs voluntarily dismiss their state law claims against the Port Authority . . . .").)

All state law claims against the Port Authority will therefore be dismissed.

V.      Plaintiffs' Claims under the New York State Constitution Are Dismissed.

The Complaint asserts, pursuant to 42 U.S.C. § 1983, that the defendants imposed excessive fines and violated due process safeguards in violation of the New York State Constitution.  But section 1983 is not a vehicle for asserting a violation of a state constitution.  See, e.g., Pollnow v. Glennon, 757 F.2d 496, 501 (2d Cir. 1985) (a "violation of state law is not cognizable under § 1983.").

Moreover, the New York constitution provides for a private right of action only where remedies are otherwise unavailable under common law or section 1983.  Allen v. Antal, 665 Fed. App'x 9, 13 (2d Cir. 2016) (summary order); Brown v. State, 89 N.Y.2d 172, 192 (1996) (state constitution provides only a "narrow remedy" where "the greatest danger of official misconduct exists.").  Neither the Complaint nor plaintiffs' motion papers suggest any reason why the disposition of an excessive fines or due process claim would be decided differently under the New York Constitution than under the U.S. Constitution.  See, e.g., Algarin v. New York City Dep't of Correction, 460 F. Supp. 2d 469, 478 (S.D.N.Y. 2006) ("The New York State

Constitution's guarantee of due process is virtually coextensive with that of the U.S. Constitution.") (Rakoff, J.) (citing <u>Cent. Sav. Bank v. City of New York</u>, 280 N.Y. 9, 10 (1939)).

Plaintiffs' claim for relief under the New York Constitution will be dismissed.

VI.   <u>Plaintiffs' Claim under the New York General Business Law Is Dismissed.</u>

Count Four of the Complaint alleges that defendants violated sections 349 and 350 of the New York General Business Law. (Compl't ¶¶ 207-19.) The Complaint alleges that defendants' cashless tolling system and their related billing practices are "consumer oriented" because they "have a broad impact on consumers at large." (Compl't ¶ 209.) It alleges that defendants knew or should have known that they were imposing "improper and inflated charges" and that the fines were a result of defendants' own conduct in delaying notice of the violations. (Compl't ¶¶ 213-15.)

"General Business Law § 349 declares deceptive acts and practices unlawful and section 350 declares false advertising unlawful." <u>Denenberg v. Rosen</u>, 71 A.D.3d 187, 194 (1st Dep't 2010). "The elements of a cause of action under these statutes are that: (1) the challenged transaction was 'consumer-oriented'; (2) defendant engaged in deceptive or materially misleading acts or practices; and (3) plaintiff was injured by reason of defendant's deceptive or misleading conduct. Thus, a plaintiff claiming the benefit of these statutes must allege conduct that is consumer oriented." <u>Id.</u> (internal citation omitted). "Whether a representation or an omission, the deceptive practice must be likely to mislead a reasonable consumer acting reasonably under the circumstances." <u>Stutman v. Chem. Bank</u>, 95 N.Y.2d 24, 29 (2000) (quotation marks omitted).

"[S]ection 349 is directed at wrongs against the consuming public," and seeks to promote "an honest market place where trust prevails between buyer and seller." <u>Oswego</u>

Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 24-25 (1995) (quotation marks omitted). "[A]s a threshold matter, plaintiffs claiming the benefit of section 349 . . . must charge conduct of the defendant that is consumer-oriented." Id. at 25. "In New York law, the term 'consumer' is consistently associated with an individual or natural person who purchases goods, services or property primarily for 'personal, family or household purposes.'" Cruz v. NYNEX Info. Res., 263 A.D.2d 285, 289 (1st Dep't 2000); accord Genesco Entm't, a Div. of Lymutt Indus., Inc. v. Koch, 593 F. Supp. 743, 751 (S.D.N.Y. 1984) ("The typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising.") (Weinfeld, J.).

In Kinkopf v. Triborough Bridge & Tunnel Authority, 792 N.Y.S.2d 291, 291-92 (N.Y. App. Term 2004), a plaintiff brought a claim in state civil court under GBL 349, asserting that the TBTA had wrongfully overcharged his E-Z Pass account. The trial court concluded that entering to the agreement governing E-Z Pass use amounted to a consumer transaction, and that the TBTA had violated the General Business Law. Id. The Appellate Term reversed, concluding that the legislature created the TBTA to carry out essential government functions, which included the collection of tolls. Id. at 292. Because "the tolls are in essence a use tax, the collection of same is not a consumer oriented transaction and therefore not subject to [GBL 349]." Id. (citing New York City Tunnel Auth. v. Consol. Edison Co. of N.Y., 295 N.Y. 467, 476 (1946)); see also Singh v. NYCTL 2009-A Trust, 2016 WL 3962009, at *12 (S.D.N.Y. July 20, 2016) (dismissing GBL 349 claim because "the collection of mandatory water, sewer and tax charges likewise is not a consumer oriented transaction . . . .") (Sweet, J.) (citing Kinkopf); Estler v. Dunkin' Brands, Inc., 2016 WL 5720814, at *3 (S.D.N.Y. Oct. 3, 2016) (dismissing GBL 349

claim where plaintiffs alleged that sales tax was improperly charged, because the "[c]ollection of a sales tax constitutes 'merely a ministerial act,' and thus is not consumer-oriented.") (Schofield, J.) (citing <u>Kinkopf</u>).

Plaintiffs have not plausibly alleged that the collection of fines for tolling violations is a consumer-oriented transaction subject to the protections of the General Business Law. They have not directed the Court to authority that has applied the statute to a comparable penalty imposed by a public authority. By contrast, <u>Kinkopf</u> and related authorities have concluded that the collection of tolls and taxes are not consumer-oriented activities, and therefore do not give rise to a cause of action under the General Business Law. As a federal court sitting in diversity, the Court declines to extend the GBL to plaintiffs' claims. <u>See</u>, <u>e.g.</u>, <u>Michalski v. Home Depot, Inc.</u>, 225 F.3d 113, 116 (2d Cir. 2000) ("The holding of 'an intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'") (quoting <u>West v. AT&T</u>, 311 U.S. 223, 237 (1940)).

Plaintiffs' claim asserting a violation of sections 349 and 350 of the New York General Business Law will be dismissed.

VII.   <u>Plaintiffs' Breach of Contract Claim Is Dismissed.</u>

Count Five asserts a breach of contract claim against the Thruway Authority and the TBTA. (Compl't ¶¶ 220-39.) It alleges the existence of an express contract for E-Z Pass users and an implied-in-fact contract for drivers who used the Tolls-By-Mail system.

Plaintiffs Farina, Gardner, Troiano and Rojas all allege that they used E-Z Pass and received notices of violation from the TBTA. Ritchie alleges that she paid under the Tolls-

By-Mail system and received notices of violation from the Thruway Authority. The Court separately considers the allegations against the TBTA and the Thruway Authority.

      1.  The Motion to Dismiss the Breach of Contract Claim Against the TBTA Is <u>Granted.</u>

As discussed, when plaintiffs enrolled in the E-Z Pass system, they did so pursuant to an express agreement. Farina, Gardner, Rojas and Troiano allege that the TBTA breached the Agreement by wrongfully demanding the payment of fines in a manner inconsistent with the Agreement.

The elements of a breach of contract claim "include the existence of a contract, the plaintiffs performance thereunder, the defendant's breach thereof, and resulting damages." <u>Harris v. Seward Park Hous. Corp.</u>, 79 A.D.3d 425, 426 (1st Dep't 2010). "To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." <u>Kolchins v. Evolution Markets, Inc.</u>, 128 A.D.3d 47, 59 (1st Dep't 2015).

The Agreement contained a provision wherein plaintiffs agreed to pay fines when a toll violation occurred because an account was "in a negative balance," suspended for "any" reason, or when plaintiffs used a tag that had been reported lost or stolen. (Compl't ¶ 225.) E-Z Pass users also agreed to pay fines if a tag was used in a vehicle other than the class for which it was designated. (Compl't ¶ 225.) The Agreement provided that fines could be "up to $100 per occurrence . . . ." (Agrm't ¶ 5(a).) It also stated: "Failure to respond to Notices of Violation may result in referral to a collection agency, imposition of additional fees and charges and/or suspension of your vehicle registration by the New York State Department of Motor Vehicles under 15 NYCRR 127.14." (Agrm't ¶ 5(c).)

The Complaint alleges that the TBTA breached the Agreement because the Agreement does not provide for fines when E-Z Pass technology fails to read a properly affixed E-Z Pass tag. (Compl't ¶¶ 226-27.) However, while the Complaint describes possible technological errors that could lead to a driver being erroneously fined (e.g., Compl't ¶¶ 137-42), no plaintiff alleges that he or she was actually fined as a result of such an error. The Court accepts as true plaintiffs' factual allegations of technical failures in the E-Z Pass system, but with no allegation that any plaintiff was, in fact, fined as a result of such an error, the Complaint does not plausibly allege a breach.

The Complaint separately alleges that the TBTA "breached the contract by adding fees and penalties for late payments for tolls which Defendants had not previously invoiced Plaintiffs." (Compl't ¶ 228.) Paragraph 5(c) of the Agreement states in part: "Failure to respond to Notices of Violation may result in . . . imposition of additional fees and charges . . . ."

But again, the Complaint does not allege that any of the four plaintiffs who used E-Z Pass actually was charged – let alone paid – "additional fees and charges" based on a failure to timely respond to notices of violation. The Complaint identifies fines that were assessed contemporaneous to the use of a tolled facility. (Compl't ¶¶ 70 (Farina), 102 (Gardner), Ex. 1 (Troiano), Ex. 2 (Rojas).) Farina specifically alleges fines arising from "purported violations . . . associated with his E-Z Pass tag," (Compl't ¶ 74) not based on a "[f]ailure to respond" to notices of violation. (Agrm't ¶ 5.c.) No other plaintiff who used E-Z Pass asserts that a fine was demanded or paid based on a failure to respond; the only identified fines arose from a violation of policy at the point of tolling. The allegations concerning defendants' delay in sending notice asserted that plaintiffs continued to rack up fines while they unknowingly violated E-Z Pass

policy every time they used tolled infrastructure, not that they were assessed or paid additional fines pursuant to paragraph 5(c) of the Agreement.

The Complaint asserts that the TBTA breached the implied covenant of good faith and fair dealing by not sending timely breach notices and by failing to directly contact plaintiffs' financial institutions to receive updated banking and credit card information. (Compl't ¶¶ 230-33.) "Every contract contains an implied covenant of good faith and fair dealing. This covenant is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." P.T. & L. Contracting Corp. v. Trataros Const., Inc., 29 A.D.3d 763, 764 (1st Dep't 2006). As to the mailing of timely breach notices, the Agreement expressly requires vehicle owners to "maintain a sufficient balance in your pre-payment Account" and states that an E-Z Pass tag may not be used "unless a sufficient balance is maintained." (Agrm't ¶ 2.f.) It provides for "administrative fees of up to $100 per occurrence" if an account is in negative balance. (Id. ¶ 5.a.) There is no requirement as to the timing of violation notices, and plaintiffs have not plausibly alleged that the timing of their receipt of notice has deprived them of the Agreement's benefits. As to the assertion that the TBTA should have contacted plaintiffs' financial institutions, the Agreement provides that E-Z Pass "may receive updated information" from customers' bank or credit card companies. (Agrm't § 3.i-j.) But this provision does not imply an obligation on the part of any defendant to seek out that information.

The breach of contract claim will therefore be dismissed as to the TBTA.

2. The Complaint Does Not Plausibly Allege the Existence of an Implied Contract between Ritchie and the Thruway Authority.

Ritchie is the only plaintiff who alleges that she received demands for the payment of fines pursuant to the Tolls-By-Mail program. Those fines were demanded as a result

of tolls owed to the Thruway Authority.  The Complaint alleges that Ritchie participated in the

Tolls-By-Mail program pursuant to an implied-in-fact contract, and that the Thruway Authority

breached the implied-in-fact contract by not sending timely mailings as to the underlying tolls

and later demanding fines for failing to pay those tolls.

"A contract implied in fact may result as an inference from the facts and

circumstances of the case, although not formally stated in words, and is derived from the

'presumed' intention of the parties as indicated by their conduct.  It is just as binding as an

express contract arising from declared intention, since in the law there is no distinction between

agreements made by words and those made by conduct."  Jemzura v. Jemzura, 36 N.Y.2d 496,

503-04 (1975) (internal citation omitted).  "An implied-in-fact contract would arise from a

mutual agreement and an 'intent to promise, when the agreement and promise have simply not

been expressed in words.'  This type of contract still requires such elements as consideration,

mutual assent, legal capacity and legal subject matter."  Maas v. Cornell Univ., 94 N.Y.2d 87,

93-94 (1999) (quoting 1 Williston, Contracts § 1:5, at 20 (4th ed. 1990)).

The Complaint asserts that drivers enter into an implied-in-fact contract when

they cross a tolling point.  (Compl't ¶¶ 234-39.)  According to the Complaint, when drivers

approach a cashless-toll crossing, signs notify them that they will be billed by mail for the toll in

a specified amount.  (Compl't ¶ 236.)  The Complaint alleges that driving through the toll

constitutes an acceptance of this offer.  (Compl't ¶ 237.)

The Complaint alleges that the "defendants" breached the implied-in-fact contract

by failing to timely send bills for the Tolls-By-Mail program.  (Compl't ¶ 238.)  As a result,

"Plaintiffs" first received notice of the toll at the time they received a notice asserting fines owed

for non-payment.  (Compl't ¶ 238.)  The Complaint states: "The bills did not reflect the cost of a

mutually assented toll but unilaterally imposed unavoidable fees and penalties that are the fault of Defendants' billing practices."  (Compl't ¶ 238.)

New York courts have been reluctant to conclude that the mere payment for use of transit infrastructure gives rise to an implied contract or a quasi-contractual relationship.  In Leeds v. Metropolitan Transportation Authority, 460 N.Y.S.2d 219, 219 (1st Dep't 1983), the plaintiff alleged that the MTA breached a contract with him by providing "late . . . unsanitary, unsafe, and overcrowded" service in exchange for his token purchases.  The First Department described the subway fare as an "admission tax" and not contractual consideration.  Id. at 219-20.  "[A]bsent a special relationship or unless an individual, private obligation is shown to exist, those services are not owed to any specific individual and individual relief may therefore not be granted."  Id. at 220.  Leeds also noted that "countenancing a massive return of fares" through breach of contract claims over service conditions threatened to usurp the MTA's prerogatives. Id. at 330-31.

In D'Angelo v. Triborough Bridge and Tunnel Authority, 106 A.D.2d 128 (1st Dep't 1985), the plaintiff brought an estoppel claim urging that the TBTA had a duty to accept pre-paid $.75 tickets as full payment for a bridge crossing, even after the TBTA raised its toll to $1.  The trial court concluded that the complaint had alleged an actionable claim, reasoning that "an estoppel should be applied here upon a detriment/benefit analysis based upon the premise that since plaintiff purchased his book of tickets in advance, he exchanged the present use of his money for a promise of future service and for the convenience of using tickets rather than cash each time he obtained service, while the TBTA gained the benefit of present value and use of the money transferred."  Id. at 130.  The First Department reversed, concluding that plaintiff's purchase of the ticket booklet did not give him a general "right of passage" or access to facilities

where tolls exceeded $.75.  Id. at 131.  The First Department observed that estoppel did not apply to the state when it was acting in a governmental capacity; that the ticket did not contain language supporting the plaintiff's claim; and that the plaintiff could not reasonably assume that the ticket could validly cover a toll exceeding $.75.  Id. at 131.[9]

In this case, the Complaint fails to plausibly allege the existence of an implied-in fact-contract arising out of Ritchie's use of a governmental authority's administration of toll roads.  The Complaint alleges only that certain signs advised drivers that they would be mailed bills for tolls incurred when they used Thruway Authority infrastructure.  But the tolls, as well as the fines for their non-payment or evasion, are set forth by Thruway Authority regulation.  21 N.Y.C.R.R. §§ 101.2, 101.3(a).  Unlike drivers who enrolled in E-Z Pass, paid mandatory deposits, affixed identifying tags to their vehicles, and agreed to terms and conditions set forth by the Agreement, no obligation or consideration on the part of Ritchie has been identified beyond the payment of tolls and fines already required by law.  See Leeds, 460 N.Y.S.2d at 220 (a paying subway passenger does not enter into a contract with the MTA "absent a special relationship" or "an individual, private obligation . . . .").

Moreover, the Complaint includes no allegations specific to the existence of any implied-in-fact contract between Ritchie and the Thruway Authority.  It makes only general allegations concerning "Plaintiffs" and "Defendants," despite the fact that all other plaintiffs have asserted that they paid tolls through the E-Z Pass program.  Broad generalities concerning

---

[9] In some instances, courts have assumed without deciding that a plaintiff could assert a breach of contract claim based on certain purchase terms, but relied on contents of tariff schedules to dismiss the claim.  See, e.g., Stathakos v. MTA, 109 A.D.3d 979, 980 (2d Dep't 2013) (assuming that the purchase of monthly train tickets created a contractual obligation but concluding that tariff schedules precluded refunds for service delays); Levine v. LIRR Co., 38 A.D.2d 936, 937-38 (2d Dep't 1972) (discussing public authority's obligations set forth by its tariff schedule); Den Hollander v. MTA, 20 N.Y.S.3d 292 (N.Y. Sup. Ct. N.Y. Cnty. 2015) (assuming the existence of an implied contract, the MTA satisfied all obligations described in its tariff schedule).  Ritchie has not pointed to any particular language or understanding that plausibly implies the existence of a contract here.

- 59 -

all "Plaintiffs" and "Defendants" fail to allege the existence of an implied-in-fact contract between Ritchie and the Thruway Authority.

The Thruway Authority's motion to dismiss Ritchie's breach of contract claim will be granted.

VIII.    The Claim against Conduent for Tortious Interference with Contract Is
         <u>Dismissed.</u>

Count Six of the Complaint alleges that Conduent tortuously interfered with plaintiffs' E-Z Pass and Tolls-By-Mail contracts.  It alleges that Conduent prevented plaintiffs "from obtaining the full benefits" of their contractual relationships with the TBTA and the Thruway Authority.  (Compl't ¶ 247.)  Specifically, it alleges that Conduent imposed fines on drivers based on equipment malfunctions and separately caused a breach by failing to notify drivers of penalty fines months after they were incurred.  (Compl't ¶ 247.)

To state a claim for tortious interference with contract, a plaintiff must plausibly allege the existence of a valid contract, the defendant's knowledge of that contract, the defendant's "intentional procurement" of the breach "without justification," actual breach, and resulting damages.  <u>Oddo Asset Mgmt. v. Barclays Bank PLC</u>, 19 N.Y.3d 584, 594 (2012).

For the reasons just discussed, the tortious interference claim is dismissed.  The Complaint has failed to plausibly allege the breach of any provision of the Agreement governing plaintiffs' use of E-Z Pass.  Moreover, the Complaint has failed to allege the existence of an implied-in-fact agreement between Ritchie and the Thruway Authority.

Plaintiffs' tortuous interference claim against Conduent is therefore dismissed.

IX.     Plaintiffs' Unjust Enrichment Claim Is Dismissed as to All Plaintiffs but
        Troiano.

Count Seven of the Complaint asserts a claim of unjust enrichment against the

TBTA and the Thruway Authority.[10]  (Compl't ¶¶ 255-67.)  Plaintiffs allege that all defendants

assessed fines that they knew to be "unfair, unconscionable and/or oppressive."  (Compl't ¶ 257.)

The Complaint alleges that plaintiffs paid "at least some" of the fines, and that defendants

wrongfully retained the fines.  (Compl't ¶¶ 258-59.)  According to the Complaint, it would be

inequitable to permit defendants to retain the benefits of fines paid by plaintiffs, which were

allegedly imposed without justification.  (Compl't ¶¶ 261-64.)  It asserts that the fines should be

placed into a constructive trust.  (Compl't ¶ 266.)

        "The essential inquiry in any action for unjust enrichment or restitution is

whether it is against equity and good conscience to permit the defendant to retain what is sought

to be recovered."  Paramount Film Distrib. Corp. v. State of N.Y., 30 N.Y.2d 415, 421 (1972).

"Generally, courts will look to see if a benefit has been conferred on the defendant under mistake

of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change

of position by the defendant, and whether the defendant's conduct was tortious or fraudulent."

Id.

        As to the Thruway Authority, the Complaint does not identify any fines actually

paid by Ritchie, or any other plaintiff, for a violation of cashless-tolling rules.  The unjust

enrichment claim is therefore dismissed as to the Thruway Authority.

        As to the TBTA, as discussed, the Complaint asserts that defendants Gardner and

Rojas have not paid the fines demanded of them.  They therefore have not plausibly alleged that

the TBTA was unjustly enriched at their expense.  It is also unclear the amount of fines, if any,

---

[10] As noted, plaintiffs have voluntarily dismissed their unjust enrichment claim against Conduent.  (Docket # 82.)

that Farina paid to the TBTA.  Because Farina has not alleged the amount of fines that he paid to

the TBTA, he has not alleged that the TBTA was unjustly enriched at his expense.

        Troiano, however, has alleged that she paid $1,305 in fines to the TBTA.  Under

New York law, if a tax or a fee is deemed to be invalid, the payor may be entitled to the return of

the payment, provided that the payment was involuntary and made under duress, or,

alternatively, that the payor protested the payment.  Paramount, 30 N.Y.2d at 419-20; Video Aid

Corp. v. Town of Wallkill, 85 N.Y.2d 663, 666 (1995) ("The settled law is that the payment of a

tax or fee cannot be recovered subsequent to the invalidation of the taxing statute or rule, unless

the taxpayer can demonstrate that the payment was involuntary."); Five Boro Elec. Contractors

Ass'n, Inc. v. City of N.Y., 12 N.Y.2d 146 (1962).  The New York Court of Appeals has

explained:

> Payment under express protest is an indication that a tax is not paid
> voluntarily.  Where protest has been interposed, the municipality is
> notified that it may be obliged to refund the taxes and must be
> prepared to meet that contingency.  Otherwise, moneys remitted as
> taxes or fees are applied to authorized public expenditures, and
> financial provision is not made for refunds.  In situations where
> payment of the tax or fee is made under actual duress or coercion,
> which is present when payment is necessary to avoid threatened
> interference with present liberty of person or immediate possession
> of property, the failure to formally protest will be excused.

Video Aid Corp., 85 N.Y.2d at 667 (internal citations omitted).  A plaintiff may recover under a

theory of unjust enrichment where the plaintiff paid a tax or fee that is not properly retained by a

public entity.  See, e.g., Matteawan On Main, Inc. v. City of Beacon, 109 A.D.3d 590, 591 (2d

Dep't 2013); see also Bias Limud Torah Inc. v. Cnty. of Sullivan, 290 A.D.2d 856, 857-58 (3d

Dep't 2002) (plaintiff adequately alleged a claim of moneys had and received against a

municipality where plaintiff paid taxes under duress).

Here, the Complaint plausibly alleges that Troiano protested the payment of her fines to the TBTA. It alleges that she "repeatedly contacted" E-Z Pass customer service in an attempt to understand the basis for the fines demanded of her, and that she "has repeatedly disputed the outstanding, improper charges . . . ." (Compl't ¶¶ 87, 89.) At the pleading stage, the allegations are sufficient to allege that Troiano protested the fines prior to their payment. Video Aid Corp., 85 N.Y.2d at 667.

Troiano has not identified any recovery that she would be entitled to on her unjust enrichment claim that would not be recoverable under her section 1983 claim. Typically, the payment of a fee or tax is recovered when the law requiring its payment has been invalidated. See, e.g., Video Aid Corp., 85 N.Y.2d at 666. Plaintiffs urge that an unjust enrichment claim could permit recovery for "a broad array of inequitable conduct" and not just constitutional violations. According to the Complaint, Troiano made a payment of $2,355.50 toward fines and tolls, including $1,305 in fines, about two and a half weeks after the New York Department of Motor Vehicles threatened to suspend her vehicle registration for unpaid fines and tolls, and she alleges that she paid only "under a threat of continued harm to her credit score." (Compl't ¶¶ 90, 94, 98.) If, as Troiano asserts, she paid wrongfully-demanded fines under protest and under the threat of the loss of property interests, it is narrowly possible that the retention of her payments by the TBTA could be "against equity and good conscience . . . ." Paramount, 30 N.Y.2d at 421. The Court will not dismiss Troiano's unjust enrichment claim as duplicative of her surviving section 1983 claim.

To the extent that the TBTA urges the unjust enrichment claim should be dismissed based on the voluntary payment doctrine, the motion will be denied. As noted, the

voluntary payment doctrine is an affirmative defense, and a motion to dismiss is often "too early in th[e] case" to determine whether it applies.  Spagnola, 574 F.3d at 73.

The unjust enrichment claim will be dismissed, with the exception of Troiano's claim against the TBTA.

## X.      The Remainder of Defendants' Motions Is Denied.

The Port Authority moves for the dismissal of the Complaint's request for punitive damages and its allegations made on behalf of a putative class.  To the extent that its arguments are incorporated by the TBTA as to Troiano's claims, the motion will be denied as premature.

"A motion to dismiss is addressed to a 'claim' – not to a form of damages.  There is 'no independent cause of action for punitive damages under New York law.'"  Amusement Indus., Inc. v. Stern, 693 F. Supp. 2d 301, 318 n.5 (S.D.N.Y. 2010) (Kaplan, J.) (quoting Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc., 871 F. Supp. 709, 731-32 (S.D.N.Y. 1995)).  "Because punitive damages are a form of damages, not an independent cause of action, a motion to dismiss a prayer for relief in the form of punitive damages is 'procedurally premature.'"  Hunter v. Palisades Acquisition XVI, LLC, 2017 WL 5513636, at *9 (S.D.N.Y. Nov. 16, 2017) (Ramos, J.).

Similarly, "motions to strike class allegations are generally viewed with disfavor and infrequently granted because they require a reviewing court to preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification."  Med. Soc'y of New York v. UnitedHealth Grp. Inc., 2018 WL 1773142, at *2 (S.D.N.Y. Apr. 12, 2018) (Oetken, J.) (internal citations and quotation

marks omitted). The Port Authority has urged that allegations of commonality, typicality and adequacy are conclusory. Whether a plaintiff can satisfy the requirements of Rule 23 are more properly decided on a class certification motion. See id. ("Whether questions common to the class predominate over individualized issues is precisely the sort of determination that the Court would make at the class certification stage.").

The motion to dismiss the class allegations and the prayer for punitive damages will be denied.

CONCLUSION.

For the reasons explained, plaintiff Deloris Troiano has plausibly alleged that the TBTA violated the Eight Amendment prohibition against excessive fines. She also has plausibly alleged a claim of unjust enrichment against the TBTA.

The defendants' motions to dismiss are otherwise GRANTED. All claims of plaintiffs Farina, Gardner, Ritchie and Rojas are dismissed. All claims against the MTA, the Port Authority, the Thruway Authority and Conduent are also dismissed.

The Clerk is directed to terminate the motions. (Docket # 85, 89, 92, 97, 118.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
August 21, 2019