UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MIRIAN ROJAS, BRIAN OWENS and
KORISZAN REESE,

                            Plaintiffs,                    18-cv-1433 (PKC)

            -against-                                        OPINION
                                                            AND ORDER

TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY and THE PORT AUTHORITY OF
NEW YORK AND NEW JERSEY,

                            Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

            Defendants Triborough Bridge and Tunnel Authority ("TBTA") and the Port

Authority of New York and New Jersey (the "Port Authority") are public authorities that oversee

bridge and tunnel crossings in and around New York City.  Those crossings sometimes become

traffic bottlenecks, and the defendants aspire to manage them efficiently while also collecting

vehicle tolls.  Toll collection presents an ongoing challenge, and in 2019, the TBTA alone

recorded more than twelve million tolling violations.

            Beginning in 2017, the two agencies began to implement a "cashless tolling"

process for the collection of tolls.  When a vehicle traverses a tolled crossing, a license plate

reader records a toll, and sends a toll bill by mail to the address on file with the license plate

holder's home-state Department of Motor Vehicles ("DMV").  Vehicle owners also have the

option of registering an E-ZPass account, in which case, an antenna communicates with a

transponder tag affixed to the registrant's vehicle and the amount of the toll is withdrawn from

the E-ZPass account.  Some crossings, such as the George Washington Bridge, have not yet fully

transitioned to tolls by mail, and continue to offer cash-only toll lanes.

Over periods of months or years, vehicles owned by the three plaintiffs in this

case made multiple toll crossings without paying the mandatory tolls.  Defendants sent multiple

toll bills and violation notices to plaintiffs' addresses on file with the Department of Motor

Vehicles ("DMV"), to no avail.  Plaintiffs' outstanding tolls accumulated, as did the violation

fees arising from their non-payment.  The TBTA initially demanded $43,650 in fines from

Richard Owens, $4,000 in fines from Mirian Rojas, and $1,000 from Koriszan Reese, while the

Port Authority demanded $1,200 from Rojas and $1,700 from Reese.  Ultimately, each plaintiff

paid significantly reduced fines, and, in some instances, were given discounts on the payments of

their outstanding tolls.

Plaintiffs assert that their fines were grossly disproportional to their underlying

violations, and, through 42 U.S.C. § 1983, assert that defendants violated the prohibition against

excessive fines contained in the Eighth Amendment to the U.S. Constitution.  Plaintiffs also

bring a claim of unjust enrichment against the TBTA.

Discovery in now closed, and defendants move for summary judgment in their

favor pursuant to Rule 56, Fed. R. Civ. P.  To the extent that defendants urge that plaintiffs do

not have Article III standing, their motions will be denied.  On the issue of whether the fees are

punitive and fall within Eighth Amendment scrutiny, plaintiffs have pointed to evidence that

would permit a reasonable trier of fact to conclude that the TBTA's fees are punitive in nature,

but they have failed to do so as to the Port Authority's fees, and the Port Authority's motion will

be granted.  Finally, the Court concludes that no reasonable trier of fact could conclude that any

of the fines paid by plaintiffs were grossly disproportional to the gravity of their underlying

violations, and defendants' summary judgment motions will be granted.  See United States v. Bajakajian, 524 U.S. 321, 329 (1998).

Defendants' summary judgment motions will therefore be granted as to plaintiffs' Eighth Amendment claims.  Summary judgment also will be granted to the TBTA as to plaintiffs' unjust enrichment claim.  Accordingly, plaintiffs' claims will be dismissed and judgment will be entered for the defendants.

BACKGROUND.

The Port Authority operates interstate tunnels and bridges between New York City and the State of New Jersey, including the George Washington Bridge, the Holland Tunnel and the Lincoln Tunnel.  (PA 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6.)  The TBTA operates major New York City crossings that include the Queens Midtown Tunnel, the Robert F. Kennedy Bridge and the Verrazano-Narrows Bridge.  See 21. N.Y.C.R.R. § 1021.3(b).  New York law provides that every public authority that operates a bridge or tunnel facility is "authorized and empowered to impose monetary liability on the owner of a vehicle" for failure to comply with toll-collection regulations.  N.Y. Pub. Auth. § 2985(1).  In certain circumstances, refusing or evading payment at a Port Authority crossing can be a misdemeanor, potentially subject to fines and imprisonment.  (PA 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.)

Defendants' tolled crossings accept payment through E-ZPass, an electronic toll-collection system whereby a user registers an account and receives a designated transponder for the vehicle.  (PA 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.)  An antenna reads the transponder as the vehicle enters the toll lane and charges the toll to the vehicle's funded E-ZPass account.  (PA 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.)  When a vehicle with an E-ZPass transponder passes through a cashless toll lane, the system processes the toll through the vehicle's valid E-ZPass account associated with

the transponder.  (PA 56.1 ¶ 14; Pl. 56.1 Resp. ¶ 14.)  If the E-ZPass account has a negative

balance, a notice of violation is sent to the vehicle's registered owner, requesting payment of the

unpaid toll and a $50 administrative fee for each unpaid toll transaction.  (PA 56.1 ¶ 15; Pl. 56.1

Resp. ¶ 15.)

   In addition to allowing drivers to pay tolls by E-ZPass, defendants began to

implement a system for cashless toll collection in February 2017, known as "Tolls by Mail."

(PA 56.1 ¶ 13; Pl. 56.1 Resp. ¶ 13.)  If the vehicle does not have a valid E-ZPass transponder, the

vehicle's registered owner receives a toll bill for all new crossings, plus any late fees associated

with a previously unpaid bill.  (PA 56.1 ¶ 16; Pl. 56.1 Resp. ¶ 16.)  If toll bills remain unpaid, the

late fees become violations, and additional fees are assessed.  (PA 56.1 ¶ 16; Pl. 56.1 Resp. ¶ 16.)

   It is undisputed that the three plaintiffs in this case made numerous toll crossings

without making timely payment, eventually accumulating thousands of dollars in fines.

Plaintiffs Rojas and Reese paid fines to both the Port Authority and TBTA, while plaintiff

Owens paid fines only to the TBTA and was never fined by the Port Authority.

   Between 2016 and 2018, plaintiff Rojas's vehicle traveled over the George

Washington Bridge approximately thirty-two times.  (PA 56.1 ¶ 17; Pl. 56.1 Resp. ¶ 17.)  Her

vehicle did not have a valid E-ZPass transponder and the vehicle's driver did not pay tolls in

cash at the time of crossing.  (PA 56.1 ¶ 17; Pl. 56.1 Resp. ¶ 17.)  At the time Rojas's vehicle

crossed, the George Washington Bridge had not yet transitioned to fully cashless tolling, and

drivers without an E-ZPass had the option of paying tolls in a cash-only lane.  (PA 56.1 ¶ 11; Pl.

56.1 Resp. ¶ 11.)  The Port Authority mailed notices of violation to a home address for Rojas in

College Point, Queens, which was the address on file with the DMV.  (PA 56.1 ¶¶ 18-19; Pl.

56.1 Resp. ¶¶ 18-19.)  Certain of the notices did not arrive, and the parties dispute the exact

timeline of when Rojas's husband updated their mailing address from one in College Point, Queens to a new address in Maspeth, Queens.  (PA 56.1 ¶¶ 18-19; Pl. 56.1 Resp. ¶¶ 18-19.) Rojas testified that she first began to receive Notices of Violation at her Maspeth address in 2018.  (Pl. 56.1 Resp. ¶ 22.)  Rojas's thirty-two violation totaled $480 in unpaid tolls and $1,600 in violation fees.  (PA 56.1 ¶ 20; Pl. 56.1 Resp. ¶ 20.)  On or about June 18, 2019, Rojas paid $360 in tolls and $1,200 in violation fees to clear her Port Authority violations.  (PA 56.1 ¶ 26; Pl. 56.1 Resp. ¶ 26.)

Rojas also incurred violations in connection with TBTA crossings.  The TBTA assessed Rojas $4,000 in violation fees in connection with forty-one toll violations, with the underlying tolls totaling $381.50.  (TBTA 56.1 ¶ 5; Pl. Resp. ¶ 5.)  The violations were assessed because Tolls-By-Mail bills were not paid, and, in one instance, an invalid E-ZPass tag was used with Rojas's vehicle.  (TBTA 56.1 ¶ 6; Pl. Resp. ¶ 6.)  In September 2019, the TBTA accepted a payment of $720 to resolve Rojas's outstanding violation fees.  (TBTA 56.1 ¶ 8; Pl. Resp. ¶ 8.)

Between 2017 and 2020, plaintiff Reese's vehicle crossed the George Washington Bridge approximately forty times without a valid E-ZPass transponder or paying a cash toll, resulting in $1,700 in violation fees and $606 in tolls.  (PA 56.1 ¶¶ 27, 29; Pl. 56.1 Resp. ¶¶ 27, 29.)  Notices of Violation were mailed to Reese's home address, first to an address on Light House Court in the Bronx and then an address on Mermaid Lane in the Bronx.  (PA 56.1 ¶ 28; Pl. 56.1 Resp. ¶ 28.)  Reese did not update her address with the Department of Motor Vehicles or E-ZPass when she moved from Light House Court to Mermaid Lane.  (PA 56.1 ¶ 31; Pl. Resp. ¶ 31.)  On or about September 16, 2019, Reese paid $311.25 in tolls and $1,000 in violation fees to clear her Port Authority violations.  (PA 56.1 ¶ 33; Pl. Resp. ¶ 33.)

The TBTA assessed Reese with $1,000 in violation fees in connection with 10 toll violations, with underlying tolls totaling $85.  (TBTA 56.1 ¶ 9; Pl. Resp. ¶ 9.)  Reese was assessed a violation because her vehicle had an invalid E-ZPass tag, which was associated with the account of a non-party individual who Reese has described as her best friend.  (TBTA 56.1 ¶ 10; Pl. Resp. ¶ 10.)  In September 2019, the TBTA accepted a payment of $500 to resolve Reese's outstanding violation fees.  (TBTA 56.1 ¶ 12; Pl. Resp. ¶ 12.)

Plaintiff Owens was assessed a total of $43,650 in fees arising out of 440 toll violations at TBTA crossings, all arising from his failure to make payment on Tolls-By-Mail bills.  (TBTA 56.1 ¶¶ 1-2; Pl. Resp. ¶¶ 1-2.)  It is undisputed that the TBTA sent notices of violation and Tolls by Mail to both Owens's home address and a UPS mailbox registered to him. (Bressler Dec. Exs. 16-18.)  Excluding one January 2020 violation, which post-dates Owens's payment of TBTA fines, his violation fees totaled $43,550 and the underlying tolls totaled $3,810.  (TBTA 56.1 ¶ 1; Pl. Resp. ¶ 1.)  In September 2019, the TBTA accepted a payment of $8,170 from Owens to resolve the 439 outstanding violation fees.  (TBTA 56.1 ¶ 4; Pl. Resp. ¶ 4.)

Defendants raise three principal arguments in moving for summary judgment. First, they assert that defendants do not have Article III standing because their injuries were self-inflicted and therefore are not "fairly traceable" to the Port Authority or the TBTA.  Second, they assert that the violation fees were not punitive in nature, and therefore are not "fines" subject to Eighth Amendment scrutiny.  Third, they assert that the fines are not excessive as a matter of law because they are not grossly disproportional to the gravity of plaintiffs' underlying violations.

SUMMARY JUDGMENT STANDARD.

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).  On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quotation marks omitted).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009).  In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).  A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).

DISCUSSION

> I.     Defendants Have Not Come Forward with Evidence Demonstrating that
>        Plaintiffs Lack Article III Standing.

The Port Authority and the TBTA urge that summary judgment should be granted

in their favor because no reasonable trier of fact could conclude that any plaintiff's injury is

fairly traceable to the actions of the Port Authority or the TBTA.  According to defendants, any

purportedly excessive fines are attributable to plaintiffs' failure to monitor their accounts or

mailings, or to keep current contact information on file with transportation agencies.  Thus,

defendants urge, plaintiffs' actions ruptured any "causal chain" between the defendants and their

claimed injuries, and deprives plaintiffs of Article III standing.

For a dispute to be properly resolved through the federal judicial process, a

plaintiff must have constitutional standing under Article III of the Constitution.  See Lujan v.

Defense of Wildlife, 504 U.S. 555, 560 (1992).  To demonstrate Article III standing, "[t]he

plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged

conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).  "The party invoking federal jurisdiction bears

the burden of establishing these elements."  Lujan, 504 U.S. at 561.  "Since they are not mere

pleading requirements but rather an indispensable part of the plaintiff's case, each element must

be supported in the same way as any other matter on which the plaintiff bears the burden of

proof, i.e., with the manner and degree of evidence required at the successive stages of the

litigation."  Id.

Defendants urge that any injury suffered by plaintiffs was self-inflicted and

therefore does not satisfy the "fairly traceable" requirement.  "The traceability requirement for

Article III standing means that the plaintiff must 'demonstrate a causal nexus between the

defendant's conduct and the injury.'"  Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013)

(quoting Heldman v. Sobol, 962 F.2d 148, 156 (2d Cir. 1992)).  In assessing traceability,

"[courts] are concerned with something less than the concept of proximate cause," and a harm

that flows indirectly from a defendant's action is sufficient to satisfy the "fairly traceable"

requirement.  Id. at 92 (quotation marks omitted; emphasis in original).

    "To be sure, a plaintiff may not establish injury for standing purposes based on a

'self-inflicted' injury.  An injury is self-inflicted so as to defeat the causation necessary to

establish standing, however, 'only if . . . the injury is so completely due to the plaintiff's own

fault as to break the causal chain.'"  Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.,

710 F.3d 71, 85 (2d Cir. 2013) (quoting St. Pierre v. Dyer, 208 F.3d 394, 403 (2d Cir. 2000)).

For example, a plaintiff's injury was held not fairly traceable to the acts of the defendant where

the plaintiff was eligible to be fully reimbursed for a fee but failed to seek reimbursement.

Bandler v. Town of Woodstock, 832 Fed. App'x 733, 734-35 (2d Cir. 2020) (summary order).

Generally, however, "'[s]o long as the defendants have engaged in conduct that may have

contributed to causing the injury, it would be better to recognize standing.'"  NRDC, 710 F.3d at

85 (quoting St. Pierre, 208 F.3d at 402).

    In urging that plaintiffs' injuries were self-inflicted, the defendants point to

evidence that, they argue, reflects plaintiffs' inattention to tolling bills, mailings and credit card

statements.  Concerning Owens, defendants note that he testified at his deposition that he

permitted his young, school-aged children to check the mail and that he did not monitor his E-

ZPass account or credit card statements to confirm that he was being charged for toll crossings.

(Owens Tr. 43, 45, 110.)  In apparent sarcasm, Owens also stated in his deposition that the

family dog may have eaten his mail or that his children "could have walked off with it."  (Owens

Tr. 222.)  As to Rojas, defendants assert that her vehicle was not added to an E-ZPass account during the relevant period, and that bills and notices were mailed to her previous, out-of-date address, which she had failed to update with the Department of Motor Vehicles.  As to Reese, defendants note that she acknowledged in her deposition that her vehicle crossed with an invalid E-ZPass tag belonging to a friend and that she failed to update her address with the DMV: "Every time I move, I never update it.  So I wasn't aware that that was something that people do."  (Reese Tr. 47.)

Evidence going toward plaintiffs' lax approach to their mailings, billing statements and contact information does not, as a matter of law, "break the causal chain" of plaintiffs' claims.  The prohibition against excessive fines "'limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense.'"  von Hofe v. United States, 492 F.3d 175, 178 (2d Cir. 2007) (quoting Austin v. United States, 509 U.S. 602, 609-10 (1993)).  Plaintiffs' claims are directed to the proportionality of punitive fines in relation to the underlying violations.  The adequacy of notice and the due process afforded plaintiffs is not at issue.[1]  It is undisputed TBTA and Port Authority were responsible for administering the crossing, collecting tolls, and setting violation fees, and that plaintiffs paid violation fees.  For the purposes of an Article III standing analysis, plaintiffs' purported injuries are therefore "fairly traceable" to defendants.  See NRDC, 710 F.3d at 85.

Defendants' motion for summary judgment as to plaintiffs' Article III standing will therefore be denied.

---

[1] The Court previously dismissed certain plaintiffs' claims that notice did not satisfy the Constitution's guarantee of due process.  Farina v. Metro. Transportation Auth., 409 F. Supp. 3d 173, 206-12 (S.D.N.Y. 2019).

II.     Defendants' Summary Judgment Motions on the Issue of Whether their Fees Are Punitive in Nature Will Be Denied as to the TBTA but Granted <u>as to the Port Authority.</u>

A.  <u>Legal Standard.</u>

In order for a fine to be subject to Eighth Amendment scrutiny, it must be punitive in nature.  <u>United States v. Viloski</u>, 814 F.3d 104, 109 (2d Cir. 2016).  Defendants urge that they impose violation fees for solely remedial purposes and that those fees therefore should not be subject to Eighth Amendment scrutiny.  As will be explained, the TBTA's own summary judgment submissions suggest that the fees are intended to have a punitive effect.  As to the Port Authority, plaintiffs have pointed to no evidence indicating that its violation fees have a punitive purpose or effect.  The TBTA's summary judgment motion will therefore be denied and the Port Authority's will be granted.

The Eighth Amendment states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  The protections of the Excessive Fines Clause are incorporated under the Fourteenth Amendment and applicable to the states.  <u>Timbs v. Indiana</u>, 139 S. Ct. 682, 686-87 (2019).

Courts apply a two-step inquiry to determine whether a financial penalty is excessive under the Eighth Amendment.  <u>Viloski</u>, 814 F.3d at 108-09.  First, courts consider whether the fine is punitive in nature and therefore falls within the Eighth Amendment's purview.  <u>Id.</u> at 109.  The Excessive Fines Clause applies where a fine "may be characterized, at least in part, as 'punitive,'" meaning that one of the goals is "to punish" the individual.  <u>Id.</u>  This protection applies to both criminal and civil proceedings.  <u>United States v. Sabhnani</u>, 599 F.3d 215, 263 n. 19 (2d Cir. 2010).  If the fine is punitive, the Court proceeds to consider whether the fine is unconstitutionally excessive.  <u>Viloski</u>, 814 F.3d at 109.

In evaluating the purpose of a fine, deterrence "has traditionally been viewed as a goal of punishment," in contrast to payments that "serve the remedial purpose of compensating the Government for a loss." Bajakajian, 524 U.S. at 329.  "[A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." Austin, 509 U.S. at 610 (quotation marks omitted); see also Timbs, 139 S. Ct. at 689 (fines may serve "the penal goals of retribution and deterrence . . . .") (quotation marks omitted); Viloski, 814 F.3d at 109 (distinguishing "punitive" fines from "purely 'remedial' forfeitures . . . ."); von Hofe, 492 F.3d at 182 (a penalty falls within the Excessive Fines clause if its goal is to "deter and punish" the payer); cf. United States v. An Antique Platter of Gold, 184 F.3d 131, 139 (2d Cir. 1999) (a forfeiture is punitive if it is "imposed at the culmination of a criminal proceeding that required a conviction of the underlying felony and could not have been imposed upon an innocent party").

If the fine is "remedial," and is intended only to compensate the government for lost revenue, it "fall[s] outside the scope of the Excessive Fines Clause."  Id.  Similarly, a fine that is "coercive," such as a fine for civil contempt, has been held not to be a penalty when it attempts to secure compliance with a court order.  United States v. Mongelli, 2 F.3d 29, 30 (2d Cir. 1993) (per curiam).[2]

---

[2] The civil contempt penalty at issue in Mongelli was directed toward the contemptors' ongoing refusal to testify before a grand jury, and was intended to secure compliance with an existing order.  2 F.3d at 30.  The purpose of deterrence, by contrast, is to discourage future acts of wrongdoing.  See, e.g., Hudson v. United States, 522 U.S. 93, 105 (1997).

B.  The TBTA's Summary Judgment Motion Directed to the Purportedly
     Non-Punitive Nature of the Violation Fees Will Be Denied.

The TBTA asserts that the summary judgment record demonstrates that its

violation fees are intended to make the TBTA whole for lost tolls and associated costs, and are

not punitive in nature.  Because a reasonable trier of fact could conclude that the fees are

punitive, the TBTA's motion will be denied.

To support its argument that violation fees are non-punitive, the TBTA points to

its statutory authority for such fees.  The statute authorizes public authorities to "impose

monetary liability" on vehicle owners who fail to comply with toll-collection regulations, and

provides that "[t]he owner of a vehicle shall be liable for a civil penalty" if the vehicle was used

with permission and violated toll-collection regulation.  N.Y. Pub. Auth. § 2985(1), (2).  The

statute also sets graduated caps on the amounts that may be charged as "a monetary penalty,"

depending on the number of violations the individual has incurred.  Id. § 2985(5).  The TBTA's

implementing regulations provide that the owner of any vehicle that traverses a TBTA-

administered bridge or tunnel without paying a toll "shall be liable to the [TBTA] for an

administrative fee, known as the toll violation fee."  21 N.Y.C.R.R. § 1021.3(b).

The TBTA notes that its implementing regulations permit violators to contest the

assessment of tolls and fees, and that each of the three plaintiffs ultimately paid fees that were

substantially reduced from the amounts originally demanded.  Id. § 1021.3(d).  Without pointing

to evidence in the record, the TBTA urges its toll violation fees were adopted to secure

compliance and not function as a penalty.  (TBTA Mem. at 11, citing Bd. of Health Pub. Review

Comm'n v. NYC Bd. of Health, No. 100847/2013 (N.Y. Sup. Ct. N.Y. Cnty. Sept. 4, 2014).)

The statute and regulation cited by the TBTA does not demonstrate that toll

violation fees have a purely remedial purpose or effect.  The TBTA's implementing regulations

do not speak to the fees' purpose, and the New York statute expressly refers to the fees as a "civil penalty" and "monetary penalty."  The fact that a second violation within eighteen months is met with a "monetary penalty" not to exceed $100 or five times the evaded toll, whichever is greater, and a third violation a "penalty" not exceeding $150 or ten times the evaded toll, suggests a deterrent rather than remedial intent.  N.Y. Pub. Auth. § 2985(5).  The TBTA has not explained how a violator's ability to contest a fee goes toward a remedial function and judicial decisions cited by the TBTA involved agencies and fee regimes with no apparent relationship to the defendants in this case.

The TBTA also points to certain documents from the Metropolitan Transit Administration ("MTA") and the TBTA that, it urges, demonstrate that the fees were intended to be revenue-neutral and to make up for the losses resulting from unpaid tolls.  But the evidence submitted by the TBTA contains contradictory statements about the purposes for adopting the fees.  An October 2016 document prepared for an MTA board meeting discussed "toll violation enforcement regulations" and the suspension of vehicle registrations "for habitual or persistent violators."  (Bressler Dec. Ex. 43 at 1752-53.)  It stated that increasing the violation fee to $100 "will increase toll revenue . . . by deterring toll evasion."  (Bressler Dec. Ex. 43 at 1753.)  A recital provision in a draft resolution of the MTA Board stated that increasing the violation fee to $100 at certain crossings "is expected to increase toll revenue by deterring toll evasion at the Authority's cashless Open Road Tolling facilities."  (Bressler Dec. Ex. 43 at 1754.)  Plaintiffs also point to the deposition testimony of the TBTA's Rule 30(b)(6) witness, Anne Marie Bressler, who testified that the TBTA's violation fee was intended "to disincentivize the customer from violating in this case to keep an [E-ZPass] account funded."  (Morales Dec. Ex. 21 at 273.)  This is evidence that the fees were adopted in part with a goal of deterring violations

– a punitive goal that places the fees under the scrutiny of the Excessive Fines Clause.  See, e.g., Bajakajian, 524 U.S. at 329.  Some evidence cited by the TBTA does include agency documents indicating that any violation fee "is intended to be revenue-neutral" and "to offset the financial burdens arising from toll violations . . . ."  (Bressler Dec. Ex. 39 at 9112-13; Ex. 41 at 1162; see also Ex. 48 at 4058 (summarizing discussion about revenue from violation fees offsetting losses from toll evasion); Ex. 46 at 1969.)

      A reasonable trier of fact on this record could conclude that toll violation fees were adopted for the punitive goal of deterrence.  The TBTA's motion directed toward the purportedly non-punitive nature of the fees will be denied.

      C.  The Port Authority's Summary Judgment Motion Directed to the Purportedly Non-Punitive Nature of Its Fees Will Be Granted.

      In asserting that its tolling violation fee was intended to be remedial and revenue neutral, the Port Authority principally relies on a declaration submitted by its Rule 30(b)(6) witness, Charles Fausti, who has the job title of Program Director for Toll Systems & Revenue Management at the Port Authority.  (Docket # 207-4.)  Fausti states that the $50 fee assessed for each unpaid toll is a lower amount than the $58.08 in costs to the Port Authority.  (Fausti Dec. ¶ 14.)  He separates the costs into twelve categories:

- $14.61 (violation notices, license plate image review and associated Department of Motor Vehicle "DMV" costs);
- $2.49 (E-ZPass Customer Service Center change orders for violations);
- $16.33 (E-ZPass Customer Service Center base contract invoices related to violations);
- $3.41 (collections agency fees);
- $1.94 (outside law firm collection costs);
- $0.78 (lane maintenance costs to calculate violations rates);
- $2.28 (Port Authority staff DMV suspension program labor costs);
- $0.04 (Port Authority customer service staff);
- $0.12 (Port Authority finance staff);

- $0.08 (Port Authority audit and revenue accounting);
- $15.24 (Port Authority toll write-offs);
- $0.76 (Port Authority DMV support costs);
- **TOTAL: $58.08 per each unpaid toll transaction**

(Fausti Dec. ¶ 14.)  In his deposition, Fausti stated that he met with his own staff and with consultants and reviewed invoices to determine the Port Authority's costs per tolling violation. (Fausti Dep. 84-85.)

In opposition, plaintiffs point to certain infirmities in Fausti's calculation and methods.  Fausti testified at his deposition that he was not involved in a 2009 decision that increased the violations fee from $25 to $50 and was not personally aware of any internal Port Authority analysis about the fee increase.  (PA 56.1 Resp. ¶ 97; Fausti Dep. at 86-87.)  The Port Authority does not dispute plaintiffs' assertion that prior to Fausti's analysis, the Port Authority had not determined the costs of collecting an outstanding toll violation.  (Pl. 56.1 ¶ 108; PA 56.1 Resp. ¶ 108.)  Plaintiffs urge that Fausti's $58.08 figure is "substantially inflated" by costs that are not related to processing and collecting violations, including a $5.383 million expense that the Port Authority took approximately six years ago for toll violation write-offs.  (Pl. 56.1 ¶¶ 109-10.)

But plaintiffs do not point to evidence that would permit a reasonable trier of fact to conclude that the Port Authority's violation fees have a deterrent purpose or effect, or that the fees play any other punitive role.  By way of contrast, in their opposition to the TBTA's motion, plaintiffs identified statements from the MTA and TBTA that described a deterrent purpose for violation fees.  For the Port Authority's fees, assuming that Fausti's method of calculation was imprecise, such a defect is not evidence that would permit a reasonable finder of fact to conclude

that the Port Authority's $50 violation fee has a deterrent purpose, even in part.[3]  As the non-movants, plaintiffs have failed to meet their "limited burden of production" to come forward with "specific facts showing that there is a genuine issue for trial."  Powell, 364 F.3d at 84 (quotation marks omitted).

Because plaintiffs have not directed the Court to evidence that would permit a reasonable trier of fact to conclude that the Port Authority's violation fees are punitive in nature, they have not pointed to evidence that the fees fall within the Eighth Amendment's scrutiny. The Port Authority's summary judgment motion will be granted.[4]

    D.  Defendants' Argument about Plaintiffs' Ability to Mitigate their Fees Is
       Misplaced.

Similar to their Article III standing argument, both defendants urge that their violation fees fall outside of Eighth Amendment scrutiny because plaintiffs had an opportunity to mitigate their fees.  The TBTA and Port Authority point to the previously-discussed evidence that plaintiffs did not diligently check their mailings, update their addresses with state vehicle agencies, or use valid E-ZPass tags.  The Port Authority also notes that plaintiffs could have avoided the violations if they used the cash lane at the George Washington Bridge.

Defendants do not explain how the possibility of mitigating a fine speaks to whether that fine is subject to Eight Amendment scrutiny.  As the First Department persuasively observed: "Under that rationale, no penalty could ever be subject to the Excessive Fines Clause because any potential violator could always avoid a fine by not committing the charged conduct

---

[3] The Port Authority's power to issue violation fees does not appear to arise from section 2985 of the New York Public Authorities Laws, which described violation fees as a "penalty" and allowed for escalating caps.  The Port Authority appears to have separate statutory authorization to collect tolls and enforce toll obligations, and the refusal or evasion of toll payments is classified as a misdemeanor.  N.Y. Unconsolidated Laws §§ 6501, 6512, 6802, 6809, 6816.  The parties have not pointed to a particular provision that speaks to the Port Authority's assessment of civil tolling violation fees.

[4] For the reasons that will be discussed, the Court separately concludes that even if the Port Authority's fees have a punitive character, they would not be grossly disproportional to the underlying violations.

in the first place."  Prince v. City of New York, 108 A.D.3d 114, 121 n.4 (1st Dep't 2013).

Plaintiffs' purported inattention to mailings, updating their addresses or monitoring their E-ZPass

status does not go toward whether the fees were punitive in nature and therefore subject to

Eighth Amendment scrutiny.

        To the extent that the defendants move for summary judgment based on plaintiffs'

ability to mitigate their fees, the motion will be denied.

        III.    The Court Concludes as a Matter of Law that the Fines Paid by Plaintiffs
              Were Not Grossly Disproportional to the Gravity of their Violations, and
              That They Therefore Did Not Violate the Excessive Fines Clause.

        A.  Legal Standard.

        If a fine is punitive in nature, a court then considers whether it is

unconstitutionally excessive.  Viloski, 814 F.3d at 109.  "The touchstone of the constitutional

inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the

forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."

Bajakajian, 524 U.S. at 334.

        A fine "violates the Excessive Fines Clause if it is grossly disproportional to the

gravity of a defendant's offense."  Id.  "[J]udgments about the appropriate punishment for an

offense belong in the first instance to the legislature," and "any judicial determination regarding

the gravity of a particular criminal offense will be inherently imprecise."  Id. at 336.  A court

"must compare the amount of the forfeiture to the gravity of the defendant's offense.  If the

amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is

unconstitutional."  Id. at 336-37.

        Applying Bajakajian, the Second Circuit has adopted a four-factor test that guides

the proportionality analysis.  Viloski, 814 F.3d at 110.  Courts should weigh:

> (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct.

Id. (quoting United States v. George, 779 F.3d 113, 122 (2d Cir. 2015)).  These factors are not exhaustive and should not be treated as a "rigid test" of a fine's proportionality.  Id. at 110-11. For example, courts should not consider a penalized party's personal characteristics – such as age, health or present finances – but they may consider whether the fine would deprive the party of his or her livelihood.  Id. at 115-16.

### B.  The TBTA's Summary Judgment Motion Will Be Granted as to Owens's Eight Amendment Claim

#### 1.  The TBTA's Fines of $18.61 per Violation Were Not Grossly Disproportional to the Underlying Violations.

Owens was initially assessed $43,550 in violation fees in connection with 439 toll violations between February 2017 and June 2019, primarily incurred when he crossed the Queens Midtown Tunnel.[5]  (TBTA 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1; Pl. 56.1 ¶ 53; TBTA 56.1 Resp. ¶ 53.)  His unpaid tolls totaled $3,810.  (Id.)  In September 2019, Owens paid $8,170 to resolve all outstanding violation fees.  (TBTA 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4.)  Accordingly, Owens paid a total of $8,170 in fines, in connection with $3,810 in unpaid tolls.  Each fine averaged approximately $18.61, and the average amount of each unpaid toll was approximately $8.68. The fines paid by Owens reflects a multiplier of approximately 2.14 against each unpaid toll.

---

[5] After his payment of his then-outstanding fines, Owens incurred one additional fee in connection with a January 2020 crossing, but the current status of that fee, which was incurred after the commencement of this litigation, is not explained and is not at issue in the case.  (TBTA 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1; TBTA 56.1 Resp. ¶ 58.)

The Court applies the four factors set out by the Second Circuit to Owens's fines and ultimately concludes that no reasonable fact finder could conclude that Owens's fines were grossly disproportional to the gravity of his underlying violations.

Factor 1: The essence of the violation and its relationship to other prohibited activity. Over approximately 28 months, Owens accumulated 439 violations for unpaid tolls.[6] Owens was a longtime E-ZPass account holder, and testified in his deposition that TBTA antennas did not read his E-ZPass signal after he acquired a new Tesla, the technologies of which, he asserts, interfered with the E-ZPass signal. (Pl. 56.1 ¶ 54.) Over the 28-month period, Owens was billed for the crossings through Tolls by Mail, and notices of violation were also mailed to him. (Bressler Dec. Exs. 9, 10, 16-18.)

The underlying violation is fairly straightforward. Owens traversed TBTA-managed toll crossings, particularly the Queens Midtown Tunnel, and failed to pay the tolls later demanded in mailings. Drawing every reasonable inference in favor of Owens as the non-movant, the Court accepts his explanation that he was unaware that TBTA facilities were not reading his E-ZPass, and that, as a busy restauranteur, he was not closely monitoring his E-ZPass account or the mailings addressed to him. (Pl. 56.1 ¶¶ 51, 53-54, 57.) There is no suggestion that Owens intended to evade toll payments or defraud the TBTA. The summary judgment record reflects that the essence of Owens's violation was a failure to pay tolls caused by mere inattention to toll procedures, official mailings and the status of his E-ZPass account.

Factor 2: Whether Owens fits into the class of persons for whom the violation fees were principally designed. There is no dispute that as the owner of a vehicle that traversed a

---

[6] Apparently in error, plaintiffs occasionally state that Owens accrued 493 violations. (Opp. Mem. at 19; Pl. 56.1 ¶ 58.) It appears that plaintiffs transposed the 3 and the 9, as they do not otherwise dispute that 439 violations are at issue. (TBTA 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1.)

crossing without paying the required tolls, Owens falls into the class of persons for whom the violation fees were designed.

Factor 3: The maximum fine that could have been imposed.  TBTA regulation imposes a fine of $100 upon the owner of any vehicle that "violates toll collection regulations" when crossing the Queens Midtown Tunnel.  21 N.Y.C.R.R. § 1021.3(b).  Here, Owens paid a fine of $18.61 for each violation.

In opposition, plaintiffs assert that Owens and the other plaintiffs did, in fact, pay the maximum fine that could be imposed by the TBTA.  A "Violations Fee Waiver Matrix" (the "Fee Matrix") used by the TBTA gives internal guidance on the reduction of violations fees based on factors that include the vehicle owner's prior requests for fee dismissals, history of registration suspension by the DMV, whether tolls have been paid in full, whether the vehicle has an E-ZPass account, and whether a collections agency has become involved in the toll collection.  (Bressler Dec. ¶ 11; Docket # 186-6.)  For example, under the Fee Matrix, if a collections agency is seeking to collect unpaid tolls and no prior violations have been dismissed, the TBTA will "[a]ssess 20% on fees provided tolls are paid . . . ."  (Docket # 186-6.)  If it is the violator's second request for dismissal, the TBTA will assess 30% on the fees.  (Id.)

Plaintiffs characterize the Fee Matrix as "a secretive negotiation process" that was "utterly unfair" to violators.  (Opp. Mem. at 25.)  But the Fee Matrix appears to set broad internal guidance for the resolution of disputed fees.  There is no assertion that the Fee Matrix was binding within the TBTA, and, indeed, plaintiffs' payments varied from the document's guidance: Owens's payment of $8,170 was approximately 18.76% of the $43,550 initially demanded.  The TBTA exercised its discretion to fine Owens in an amount well below the

maximum $100-per-violation fee set out in its regulations, and there is no evidence to indicate that the Fee Matrix served some nefarious or coercive purpose.

Owens also urges that he paid the maximum fine that could have been imposed because, in calculating the total fines to be paid, the TBTA allocated the full $100 fine to certain violations while dismissing other fines in their entirety, as opposed to reducing each proportionally.  (Bressler Dec. ¶ 21; Docket # 186-7.)  The TBTA's calculations are reflected in a document that the TBTA describes as "a worksheet that was used to resolve Mr. Owens's violation fees."  (Bressler Dec. ¶ 21.)  The undated worksheet states that Owens had one registration suspension.  (Docket # 186-7 at 9440.)  A chart includes calculations for Owens's total fines if reduced to either 30% or 20% of the initial demands.  (Id.)  The pages that follow consist of a lengthy spreadsheet with columns headed "Amount Due," "Amount Paid" and "Amount Dismissed."  (Id. at 9441-56.)  The worksheet reflects that, as to certain fines, Owens paid full amounts of $50 and $100.  (Id. at 9441, 9443, 9447-48, 9454, 9455.)  For one fine, he paid $20 out of $100, and $80 of the fine was dismissed.  (Id. at 9448.)  For another, he paid $50 out of $100, and $50 of the fine was dismissed.  (Id. at 9454.)  For the significant majority of Owens's fines, however, the full $100 fine was dismissed, without any payment by Owens.  (Id. at 9441-56.)

The worksheet reflects that the TBTA calculated an across-the-board reduction of Owens's total fines, and accounted for the reduction by charging full fines of $50 and $100 to certain violations and dismissing other violations in their entirety.  The TBTA effected a proportional reduction of Owens's fines in their entirety, no different than if it had attributed a

- 22 -

payment of $18.61 to each fine and dismissed the remainder.  The worksheet is evidence that the TBTA reduced Owens's fines to an amount well below the $100 maximum.[7]

        <u>Factor 4: The nature of harm caused by Owens's conduct.</u>  The TBTA emphasizes that it relies on toll revenue to pay its expenses and bondholders, and to support the MTA's transportation network.  It also states that the TBTA implemented cashless tolling for public policy reasons, including traffic reduction, improved safety and environmental benefits.  Owens's failure to pay crossing tolls required the TBTA to expended resources to collect the unpaid tolls.  More broadly, in the context of discussing parking tickets and related penalties, Judge Engelmayer has observed that even "small-scale disregard" that "may not entail a great degree of moral culpability" causes financial harm to public authorities.  <u>Tsinberg v. City of New York</u>, 2021 WL 1146942, at *8 (S.D.N.Y. Mar. 25, 2021).  The TBTA asserts that it experienced 9,763,348 toll violations in 2020 and 12,353,893 violations in 2019.  (Bressler Dec. ¶ 9 & Ex. 3.)  "Without the ability to enforce timely compliance by scofflaws who might otherwise be disinclined to pay up, [public authorities] would likely suffer substantial financial harms."  <u>Tsinberg</u>, 2021 WL 1146942, at *8.  Here, the volume and duration of Owens's non-compliance similarly harmed the TBTA.

        <u>Conclusion.</u>  Applying the <u>Bajakajian</u> factors, the Court concludes that no reasonable fact finder could conclude that Owens's average fine of  $18.61 per violation was "grossly disproportional" to the underlying violation, given the duration and volume of his violations and that the amount of each unpaid toll averages approximately $8.68 per crossing.

---

[7] Plaintiffs note that in deciding the motion to dismiss, the Court concluded that one plaintiff's payment of thirteen fines of $100 each and one fine of $5 plausibly alleged payment of the maximum possible fine in thirteen instances.  <u>Farina</u>, 409 F. Supp. 3d at 202.  At the Rule 12(b)(6) stage, the Court's considers whether the non-conclusory factual allegations plausibly allege a claim for relief.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 680 (2009).  At the summary judgment stage, however, the non-movant must "come forward with specific facts showing that there is a genuine issue for trial."  <u>Powell</u>, 364 F.3d at 84.  The TBTA's internal worksheet expressly reflects a proportional reduction of Owens's total fines, not the imposition of maximum fines authorized by law.

See Bajakajian, 524 U.S. at 336-37.  Indeed, the fines of $18.61 are relatively modest given the volume and duration of Owens's violations.  Owens's inattention to official mailings and the status of his E-ZPass account persisted for more than two years, during which time he made 439 toll crossings.  This resulted in harm to the TBTA, both in the revenue lost through unpaid tolls and the effort and expense to enforce the agency's tolling procedures against him.

The TBTA's summary judgment motion will be granted as to Owens's Excessive Fines claim.

### 2. Owens's Assertions Concerning the Impoundment of His Car Does Not Defeat the TBTA's Motion.

Owens also asserts that "tow and storage fees" associated with the impoundment of his car violated the Excessive Fines Clause.  Owens states that he first learned of his tolling violations when law enforcement impounded his car as he exited the Queens-Midtown Tunnel on September 13, 2019.  (Pl. 56.1 ¶ 56.)  He states that he took immediate action when he learned of the violations, including retrieving his vehicle from an impound lot.  (Pl. 56.1 ¶ 59.)  In response to the TBTA's interrogatories, Owens stated that he "paid tow and storage fees of $1,339.16 to recover his car from the impound lot."  (Morales Dec. Ex. 2 ¶ 8.)

Owens points to no evidence that the "tow and storage fees" operated as a fine. His interrogatory responses indicate that the DMV, and not the TBTA, was responsible for the expenses associated with the car's impoundment.  (Id. ¶ 11 ("In late September or early October 2019, Plaintiff went to the NY DMV . . . to re-register his car, receive new plates, and recover his vehicle from the impound lot. Plaintiff had various communications with the NY DMV during that time."); id. ¶ 2 (referencing "various oral communications with the NY DMV and impound lot to recover Plaintiffs' vehicle from impound, re-register the vehicle, and confirm payment of impound lot fees.").

Drawing every reasonable inference in favor of Owens as the non-movant, he has not pointed to evidence that would permit a reasonable trier of fact to conclude that the impound fees violated the Excessive Fines Clause, or even that they are attributable to the TBTA.

### C. Defendants' Summary Judgment Motions Will Be Granted as to Rojas's Eighth Amendment Claim.

#### 1. The TBTA's Fines of $17.56 per Violation Were Not Grossly Disproportional to the Underlying Violations.

The TBTA initially assessed $4,000 in violation fees against Rojas, in connection with 41 toll violations between February 2017 and January 2018. (TBTA 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5.) Her unpaid tolls totaled $381.50. (Id.) In September 2019, Rojas paid $720 to resolve all outstanding violation fees. (TBTA 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.) Accordingly, Rojas paid $720 in fines, in connection with $381.50 in unpaid tolls. Each fine had an average amount of approximately $17.56, and the average amount of each unpaid toll was approximately $9.30. The fines that Rojas paid to the TBTA reflects a multiplier of approximately 1.89 against each unpaid toll.

Factor 1: The essence of the violation and its relationship to other prohibited activity. The essence of Rojas's violation is similar to Owens's, although it varies in certain details. It is undisputed that the fines were assessed because Rojas did not pay Tolls by Mail bills, and, in one instance, because an invalid E-ZPass tag was used by her vehicle. (TBTA 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6.) The TBTA mailed notices of violation to an address for Rojas that it obtained through the DMV. (Bressler Dec. Ex. 22 at 827.) In responding to requests to admit, Rojas confirmed that she did not file an updated address with the DMV until April 2018, and that she had moved from an address in College Point, Queens to Maspeth, Queens in or about August 2015. (Morales Dec. Ex. 9, Responses 2, 12.) Rojas testified in her deposition that her husband

had used her car without permission and that she had not received Tolls by Mail bills.  (Rojas Dep. 41, 43-54, 89, 118-19.)

Drawing every reasonable inference in favor of Rojas as the non-movant, the essence of her violation was a failure to make timely payments for toll crossings due to her inattention.  In Rojas's case, she failed to update her address with the DMV after she moved in 2015.  There is no suggestion that Rojas willfully evaded tolling procedures or otherwise intended to defraud the TBTA.  Accepting Rojas's description of events, the tolls arose when her husband used her car without permission, and she did not receive notice of violation because she failed to timely update her home address.

Factor 2: Whether Rojas fits into the class of persons for whom the violation fees were principally designed.  There is no dispute that as the owner of a vehicle that traversed a crossing without paying the required tolls, Rojas falls into the class of persons for whom the violation fees were designed.

Factor 3: The maximum fine that could have been imposed.  Rojas was assessed tolls for crossings at the Robert F. Kennedy Bridge, the Verrazano Narrows Bridge, the Queens Midtown Tunnel and the Throgs Neck Bridge.  (Bressler Dec. Ex. 24.)  TBTA regulation imposes a fine of $100 upon the owner of any vehicle that "violates toll collection regulations" at these crossings.  21 N.Y.C.R.R. § 1021.3(b).  Here, Owens paid a fine of approximately $17.56 for each violation.

As to the role of the TBTA's Fee Matrix, the Court's previous discussion of Owens also applies to Rojas.

Factor 4: The nature of harm caused by Rojas's conduct.  For the purposes of weighing the Bajakajian factors, the nature of harm caused by Rojas was identical to the harm

caused by Owens: her non-payment of tolls deprived the TBTA of needed revenues, and it required the TBTA to expend resources to collect the unpaid tolls.

      <u>Conclusion.</u>  Applying the <u>Bajakajian</u> factors, the Court concludes that Rojas's fines were excessive under the Eighth Amendment.  Rojas did not receive Tolls by Mail bills because she waited nearly three years to update her home address with the DMV.  After initially demanding $100 per violation, Rojas's fee-per-violation was ultimately reduced to $17.56.  No reasonable jury could find that Rojas's average fine of $17.56 was "grossly disproportional" to the gravity of her underlying violation.  <u>See Bajakajian</u>, 524 U.S. at 336-37.

      The TBTA's summary judgment motion will be granted as to Rojas's Excessive Fines claim.

          2.   The Port Authority's Fines of $37.50 per Violation Were Not <u>Grossly Disproportional to Rojas's Underlying Violations.</u>

      The Port Authority initially assessed $1,600 in violation fees against Rojas, in connection with 32 incidents in which her vehicle crossed the George Washington Bridge without paying tolls.  (PA 56.1 ¶¶ 17, 20; Pl. 56.1 Resp. ¶¶ 17, 20.)  Her unpaid tolls totaled $480.  (PA 56.1 ¶ 20.)  On or about June 18, 2019, Rojas paid $1,200 to resolve all outstanding Port Authority fees, and paid $360 to resolve her outstanding tolls.  (PA 56.1 ¶ 26; Pl. 56.1 Resp. ¶ 26.)  Thus, Rojas paid to the Port Authority 75% of what was initially demanded of her, for both her tolling charges and her violation fees.  Each fine had an average amount of $37.50 and the average amount of each toll paid was $11.25.  The fines that Rojas paid to the Port Authority reflects a multiplier of 3.33 against the tolls amount that she actually paid.

      <u>Factor 1: The essence of the violation and its relationship to other prohibited activity.</u>  The essence of Rojas's violation of the Port Authority's toll procedures is identical to her violation of the TBTA's toll procedures.  Additionally, the Port Authority notes that the

Terms and Conditions of the agreement governing E-ZPass use requires users to file updated address information following a move.  (Kromm Dec. Ex. 14 at Item 13.)  It also notes that sections 505(5) and 509(8) of the New York Vehicle and Traffic Law require driver's license holders to advise the DMV in writing of any address change.  As with the TBTA, Rojas's failure to pay tolls owed to the Port Authority was a product of inattention, and there is no suggestion here that Rojas willfully refused to pay tolls or attempted to evade payment obligations.

Factor 2: Whether Rojas fits into the class of persons for whom the violation fees were principally designed.  Again, there is no dispute that as the owner of a vehicle that traversed a crossing without paying the required tolls, Reese falls into the class of persons for whom the violation fees were designed.

Factor 3: The maximum fine that could have been imposed.  The Port Authority assessed tolling violations for crossings at the George Washington Bridge.  The Port Authority imposes a fine of $50 for the non-payment of a toll.  Here, Rojas resolved her outstanding fines with a payment in the average amount of $37.50 per fine.  It is also relevant that the Port Authority agreed to resolve her outstanding tolls with a payment of $11.25 per toll, instead of the $15 tolls required at the crossings.

Factor 4: The nature of the harm caused by Rojas's conduct.  For the purposes of weighing the Bajakajian factors, the nature of harm caused by Rojas was identical to the harm that she caused to the TBTA: her non-payment of tolls deprived the Port Authority of needed revenues, and it required the Port Authority to expend resources to collect the unpaid tolls.

Conclusion. For the reasons already explained concerning the TBTA, the Court concludes that no reasonable jury could conclude that Rojas's fines are excessive under the Eighth Amendment.  Her fines of $37.50 were higher than the $17.56 average that she paid to the

TBTA, but a fine in this amount is reasonably within the discretion of the Port Authority, and is not "grossly disproportional" to the gravity of the underlying violation of failing to timely pay $15 tolls.

The Port Authority's summary judgment motion will be granted as to Rojas's Excessive Fines claim.

              **3.**   **Defendants' Summary Judgment Motions Will Be Granted as to <u>Reese's Eighth Amendment Claim.</u>**

                     **1.**   **The TBTA's Fines of $50 per Violation Were Not Grossly <u>Disproportional to Reese's Underlying Violations.</u>**

The TBTA initially assessed $1,000 in violation fees against Reese, in connection with 10 toll violations between August 2018 and November 2018.  (TBTA 56.1 ¶ 9; Pl. 56.1 Resp. ¶ 9.)  Her unpaid tolls totaled $85.  (<u>Id.</u>)  In September 2019, Reese paid $500 to resolve all outstanding violation fees.  (TBTA 56.1 ¶ 12; Pl. 56.1 Resp. ¶ 12.).  Accordingly, Reese paid $500 in fines in connection with $85 in unpaid tolls.  Each fine had an average amount of $50 and the average amount of each unpaid toll was $8.50.  The fines that Reese paid to the TBTA reflects a multiplier of approximately 5.88 against each unpaid toll.

<u>Factor 1: The essence of the violation and its relationship to other prohibited activity.</u>  The essence of Reese's violation is somewhat different than those of Rojas and Owens. A vehicle belonging to Reese traversed TBTA crossings while affixed with an E-ZPass tag that was registered to an individual who she has described as her best friend.  (TBTA 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.)  The notices of violation sent from the TBTA to Reese stated that an invalid E-ZPass tag was used in a vehicle registered to her, and that the tag had a negative balance, was suspended, revoked, reported lost or stolen, or was an "Unregistered on-the-go Tag."  (Bressler

Dec. Ex. 33.)  Reese testified at her deposition that her friend sometimes borrowed her car in order to take children on play dates to places like Dave and Buster's.  (Reese Dep. 51-52.)

Reese also testified at her deposition that she had not updated her address after she had moved, and had not noticed that she had stopped receiving Tolls-by-Mail mailings following her move.  (Reese Dep. 47-49 ("I definitely know that I did not update any address with the DMV.  I did not know.  Every time I move I never update it.  So I wasn't aware that that was something that people do.").)

There is no suggestion that Reese or her friend intended to defraud or deceive the TBTA when Reese's friend used his own E-ZPass tag on Reese's vehicle.  There is also no suggestion that Reese was intending to evade or avoid correspondence when she failed to update her address.  Drawing every reasonable inference in favor of Reese as the non-movant, the essence of her violation stemmed from inattention or a misunderstanding of both E-ZPass rules and the status of her current address on file with the DMV.

Factor 2: Whether Reese fits into the class of persons for whom the violation fees were principally designed.  There is no dispute that as the owner of a vehicle that traversed a crossing without paying the required tolls, Reese falls into the class of persons for whom the violation fees were designed.

Factor 3: The maximum fine that could have been imposed.  The TBTA assessed tolling violations for crossings at the Bronx Whitestone Bridge and the Robert F. Kennedy Bridge.  (Bressler Dec. Ex. 33.)  TBTA regulation imposes a fine of $100 upon the owner of any vehicle that "violates toll collection regulations" at these crossings.  21 N.Y.C.R.R. § 1021.3(b).  Here, Reese paid a fine of $50 for each violation.  As to the role of the TBTA's Fee Matrix, the Court's previous discussion of Owens also applies to Reese.

Factor 4: The nature of harm caused by Reese's conduct.  For the purposes of weighing the Bajakajian factors, the harm in Reese's case arose when a vehicle registered to her traversed the TBTA's tolled crossings using an E-ZPass tag that belonged to a third party.  The notices of violation state that the tag had either a negative balance or that its status was suspended, revoked or unregistered.  Again, there is no suggestion of any intent to defraud or malfeasance on the part of Reese or her friend, but her vehicle's use of a third party's E-ZPass tag raised a potential risk that the E-ZPass tag could have been used fraudulently or without permission.  Reese's failure to update her address complicated the TBTA's task of collecting the unpaid tolls and resolving the violations.

Conclusion.  Applying the Bajakajian factors, the Court comfortably that no reasonable jury could conclude that Reese's fines are excessive under the Eighth Amendment. Her fines were assessed because a vehicle registered in her name traversed crossings using a third party's E-ZPass tag, and the TBTA's efforts to collect unpaid tolls and communicate the notices of violation were complicated because Reese failed to update her address after she moved.  The fines were reduced to $50 per violation after the TBTA initially demanded payments of $100 per violation.  Given the essence of the violation and the nature of the harm, no reasonable fact finder could find that Reese's fines in the average amount of $50 were "grossly disproportional" to the gravity of her underlying violations.  See Bajakajian, 524 U.S. at 336-37.

The TBTA's summary judgment motion will be granted as to Reese's Excessive Fines claim.

- 31 -

> 2. The Port Authority's Fines of $25 per Violation Were Not Grossly Disproportional to Reese's Underlying Violations.

The Port Authority initially assessed $1,700 in violation fees against Reese, in connection with 40 toll violations between 2017 and 2020.  (PA 56.1 ¶ 27, 29; Pl. 56.1 Resp. ¶¶ 27, 29.)  Her unpaid tolls totaled $606.  (PA 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29.)  In September 2019, Reese paid $1,000 to resolve all outstanding violation fees and $311.25 to resolve her unpaid tolls.  (PA 56.1 ¶ 33; Pl. 56.1 Resp. ¶ 33.)  Each fine had an average amount of $25 and the average amount she paid for each toll was approximately $7.78.  The fines that Reese paid to the Port Authority reflects a multiplier of approximately 3.21 against paid tolls averaging $7.78.

Factor 1: The essence of the violation and its relationship to other prohibited activity.  The Court discussed the essence of Reese's violations in connection with the fines that she paid to the TBTA.  Again, there is no suggestion that Reese or her friend intended to defraud or deceive the Port Authority when Reese's friend used his own E-ZPass tag on Reese's vehicle, or that Reese willfully intended to evade correspondence from the Port Authority.

Factor 2: Whether Reese fits into the class of persons for whom the violation fees were principally designed.  Again, there is no dispute that as the owner of a vehicle that traversed a crossing without paying the required tolls, Reese falls into the class of persons for whom the violation fees were designed.

Factor 3: The maximum fine that could have been imposed.  Reese paid fines in the average amount of $25, against the maximum permitted fine of $50 set by the Port Authority.

Factor 4: The nature of harm caused by Reese's conduct.  The harm caused by Reese's vehicle crossings at the George Washington Bridge are identical to the harms caused when her vehicle traversed crossing overseen by the TBTA.

Conclusion.  Applying the <u>Bajakajian</u> factors, the Court concludes that no reasonable fact finder could conclude that Reese's fines are excessive under the Eighth Amendment.  It is notable that the Port Authority not only reduced her fines from a maximum of $50 per incident to $25 per incident, but also reduced its demand for the payment of tolls from $606 to $311.25.  Given the essence of the violation and the nature of the harm, no reasonable finder of fact could conclude that Reese's fines of $25 were "grossly disproportional" to her underlying violations.  <u>See Bajakajian</u>, 524 U.S. at 336-37.

The Port Authority's summary judgment motion will be granted as to Reese's Excessive Fines claim.

IV.   <u>Plaintiffs' Unjust Enrichment Claim against the TBTA Will Be Dismissed.</u>

Plaintiffs assert a claim of unjust enrichment against the TBTA but not against the Port Authority.  The TBTA moves for summary judgment in its favor.  The motion will be granted.

"The elements of a cause of action to recover for unjust enrichment are '(1) the defendant was enriched, (2) at the plaintiff's expense, and (3) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.'"  <u>GFRE, Inc. v. U.S. Bank, N.A.</u>, 130 A.D.3d 569, 570 (2d Dep't 2015) (quoting <u>Mobarak v. Mowad</u>, 117 A.D.3d 998, 1001 (2d Dep't 2014).  "'The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.'"  <u>Id.</u> (quoting <u>Paramount Film Distrib. Corp. v. State of New York</u>, 30 N.Y.2d 415, 421 (1972)).

For the reasons discussed, the Court concludes that the fines paid by plaintiffs to the TBTA were not grossly disproportional, and therefore did not violate the Excessive Fines

clause of the Eighth Amendment.  Indeed, the fines were well below the maximum amounts set

by statute and regulation and fall within the discretion afforded to the TBTA and Port Authority.

Plaintiffs urge that their unjust enrichment claim should nevertheless proceed because plaintiffs

paid the fines under economic duress and in the face of potentially paying significantly higher

fines.  This argument is without merit.  As discussed, the fines paid were reasonable in light of

the underlying tolls and the harms caused by plaintiffs' non-payment.  Plaintiffs have not

articulated how as a matter of law defendants' retention of the fines would be against equity and

good conscience.

   The TBTA's summary judgment motion will be granted as to plaintiffs' unjust

enrichment claim.

CONCLUSION.

   Defendants' summary judgment motions are GRANTED as to plaintiffs' claims

under the Excessive Fines Clause of the Eighth Amendment.  The TBTA's summary judgment

motion is GRANTED as to plaintiffs' unjust enrichment claim.

   The Clerk is respectfully directed to terminate the motions (Docket # 187, 191),

enter judgment for the defendants, and close the case.

   SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
   March 10, 2022